UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                    )
JOHN XEREAS,                        )
                                    )
        Plaintiff,                  )
                                    )
        v.                          )   Civil Action No. 12-456 (RWR)
                                    )
MARJORIE HEISS, et al.,             )
                                    )
        Defendants.                 )
_____)
```

### MEMORANDUM OPINION AND ORDER

Plaintiff John Xereas brings this action against Marjorie Heiss, Geoffrey Dawson, Riot Act D.C., LLC ("the LLC"), and Squiid, Inc., alleging claims of trademark infringement, unfair competition, conversion, breach of contract, breach of the implied duty of good faith and fair dealing, fraudulent inducement, conspiracy, tortious interference, unjust enrichment, a violation of the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), and defamation. The defendants moved to dismiss eight of Xereas's counts in the amended complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state claims for relief. The claims of breach of the implied duty of good faith and fair dealing against Dawson and Heiss, unjust enrichment against the LLC and cyber-squatting against Dawson, Heiss and the LLC are adequately pled, and the motion to dismiss will be denied as to those claims but granted as to the remaining challenged claims.

-2-

## BACKGROUND

In 2005 and 2009, Xereas registered a group of domain names using the Riot Act comedy name, including "riotactcomedy.com." Am. Compl. ¶¶ 14, 23.  He conducted his entertainment business for years using those names.  Id. ¶¶ 18-19, 23.  In May 2010, Xereas, Dawson and Heiss agreed to launch a new comedy club in Washington, D.C. called the Riot Act Comedy Club.  Id. ¶ 30. Xereas, Dawson and Heiss executed an Operating Agreement and, in November 2010, an Amended Operating Agreement to establish the LLC.  Id. ¶¶ 32-35, Ex. 13, Am. and Restated Operating Agreement of Riot Act DC, LLC ("Am. Operating Agreement").  After forming the LLC, Dawson, Heiss and Xereas created a Business Plan.  Id. ¶¶ 36-38, Ex. 14, Business Plan for Start Up Business for Riot Act Comedy Theater ("Business Plan").  Starting in December 2010, Xereas served as the club's general manager and worked in a variety of roles in preparing for the club's opening and thereafter.  Id. ¶¶ 38, 44, 48.  In January 2011, the LLC hired Squiid to create a website for Xereas's domain name "riotactcomedy.com."  Id. ¶ 40.  In November 2011, Xereas completed paying his $100,000 capital contribution to the LLC. Id. ¶ 45, 54.  Dawson and Heiss agreed to compensate Xereas at an annual salary of $42,000 starting in December 2011.  Id. ¶ 56. In January 2012, Dawson and Heiss removed Xereas from his management role and, without Xereas's knowledge or approval, instructed Squiid to revise the domain name registration

-3-

information for "riotactcomedy.com" to transfer ownership of the
domain names to the LLC.  Id. ¶¶ 58, 60.

    In March 2012, Xereas filed his complaint, and later, he
filed an eleven-count amended complaint which includes claims of
unlawful conversion and an ACPA violation against all defendants,
id., Counts IV, X; unjust enrichment claims against Dawson, Heiss
and the LLC, id., Count IX; and breach of contract, breach of the
duty of good faith and fair dealing, fraudulent inducement,
conspiracy to defraud, tortious interference, and defamation
claims against Dawson and Heiss, id., Counts V-VIII, XI.[1]
Dawson, Heiss and the LLC moved to dismiss under Rule 12(b)(6)
for failure to state a cause of action the unlawful conversion,
breach of contract, fraudulent inducement, conspiracy to defraud,
tortious interference, unjust enrichment, ACPA, and defamation
claims.  Squiid moved to dismiss under Rule 12(b)(6) for failure
to state a cause of action the unlawful conversion and ACPA
claims against Squiid.

DISCUSSION

    In considering a motion to dismiss under Rule 12(b)(6) for
failure to state a claim, a court accepts well-pleaded factual
allegations in the complaint as true and interprets them in the
light most favorable to the plaintiff.  Howard Univ. v. Watkins,
857 F. Supp. 2d 67, 71 (D.D.C. 2012) (citing Warren v. District

---

[1] The amended complaint also includes common law and Lanham
Act claims of trademark infringement and unfair competition
against Dawson, Heiss and the LLC.  Am. Compl., Counts I-III.

-4-

of Columbia, 353 F.3d 36, 39 (D.C. Cir. 2004)).  The motion to dismiss may be granted where facts alleged in the complaint "do not raise a right to relief above the speculative level, or fail to state a claim to relief that is plausible on its face." Henok v. Chase Home Finance, Civil Action No. 12-335 (RWR), 2013 WL 525696, at *4 (D.D.C. Feb. 13, 2013) (internal quotation marks omitted).

I.  CONVERSION

Xereas's amended complaint alleges that the defendants unlawfully converted the "RIOT ACT" and "hireacomic.com" domain names.[2]  To state a claim for conversion under D.C. law, the plaintiff must allege "'(1) an unlawful exercise, (2) of ownership, dominion, or control, (3) over the personal property of another, (4) in denial or repudiation of that person's rights thereto.'" Johnson v. McCool, 808 F. Supp. 2d 304, 308 (D.D.C. 2011) (quoting Gov't of Rwanda v. Rwanda Working Grp., 227 F. Supp. 2d 45, 62 (D.D.C. 2002)); see also Baltimore v. District of Columbia, 10 A.3d 1141, 1155 (D.C. 2011).

---

[2] Domain names are unique combinations of alphanumeric characters which allow users to connect to particular internet sites.  See Thomas v. Network Solutions, Inc., 176 F.3d 500, 502-04 (D.C. Cir. 1999) (explaining the purpose and function of domain names on the internet); Vizer v. VIZERNEWS.COM, 869 F. Supp. 2d 75, 77 (D.D.C. 2012) (stating that "the internet domain name system . . . links user-friendly names . . . to unique numeric addresses that identify servers connected to the internet").

-5-

Although D.C. courts have not addressed whether internet domain names are intangible or tangible property,[3] domain names are generally considered intangible property.  See Kremen v. Cohen, 337 F.3d 1024, 1030 (9th Cir. 2002) (identifying an interest in a domain name as an intangible property right); Famology.com Inc. v. Perot Sys. Corp., 158 F. Supp. 2d 589, 591 (E.D. Pa. 2001) (same); but see In re Paige, 413 B.R. 882, 917-18 (Bankr. D. Utah 2009) (stating that a domain name is a type of tangible property), aff'd on other grounds, 685 F.3d 1160 (10th Cir. 2012).[4]  Whether D.C. courts would apply the tort of

---

[3] Courts in this jurisdiction have recognized that intangible property includes frequent flyer miles, Ficken v. AMR Corp., 578 F. Supp. 2d 134, 143 (D.D.C. 2008), proprietary data such as personnel records, 3D Global Solutions, Inc. v. MVM, Inc., 552 F. Supp. 2d 1, 10 (D.D.C. 2008), and an individual's patent rights, Kaempe v. Myers, 367 F.3d 958, 963-64 (D.C. Cir. 2004).

[4] Paige relied on Margae, Inc. v. Clear Link Technologies, LLC, 620 F. Supp. 2d 1284 (D. Utah 2009), which recognized that the Utah Supreme Court classified software as tangible personal property for tax purposes because it "'is information recorded in a physical form which has a physical existence, takes up space on the tape, disc, or hard drive, makes physical things happen, and can be perceived by the senses.'"  Id. at 1288 (quoting South Cent. Utah Tel. Assoc., Inc. v. Auditing Div. of the Utah State Tax Comm'n, 951 P.2d 218, 223-24 (Utah 1997)).  The Margae court concluded that a web page has all of those attributes.  Id.  The Paige court used this analysis and found that domain names had a "physical presence on a computer drive" and that they qualify as "a type of tangible property that is capable of conversion."  See Paige, 413 B.R. at 918.  By contrast, the D.C. Circuit has held that computer software is intangible property because the software itself is valuable only because of the intangible information stored in it.  District of Columbia v. Universal Computer Assocs., Inc., 465 F.2d 615, 617-19 (D.C. Cir. 1972).  Here, the value of a domain name arises from the electronic information which matches a user's query to the website

-6-

conversion to intangible property is unsettled.

> While other courts have concluded that the law of
> conversion in other jurisdictions may protect
> electronic data or information, . . . it remains an
> open question whether District of Columbia law would
> protect intangible property of this kind, <u>see</u> <u>Kaempe v.</u>
> <u>Myers</u>, 367 F.3d 958, 963 (D.C. Cir. 2004)(observing
> that the District of Columbia courts have provided
> limited guidance on the protections to be afforded to
> intangible property); <u>Equity Grp., Ltd. v. PaineWebber</u>
> <u>Inc.</u>, 48 F.3d 1285, 1286 (D.C. Cir. 1995)(per curiam)
> (same).  Meanwhile, Maryland, to which the District of
> Columbia courts often look for guidance in the absence
> of other precedent, . . . does not extend the tort of
> conversion to cover intangible property rights beyond
> those that "are merged or incorporated into a
> transferable document[.]"

<u>Council on American-Islamic Relations Action Network, Inc. v.</u>

<u>Gaubatz</u>, 793 F. Supp. 2d 311, 339-40 (D.D.C. 2011) (internal

citations omitted).  Maryland law continues to follow directly

Section 242 of the Restatement (Second) of Torts (1965) which

limits application of the tort of conversion of intangible

property rights to those that have been "'merged or incorporated

into a transferable document'" and Maryland courts have not

extended the tort of conversion to "'situations in which the

relevant document itself has not been transferred.'"  <u>Brass Metal</u>

<u>Products, Inc. v. E-J Enters., Inc.</u>, 984 A.2d 361, 378 (Md. Ct.

Spec. App. 2009) (quoting <u>Allied Inv. Corp. v. Jasen</u>, 731 A.2d

957, 965 (1999)) (finding that Maryland law does not recognize

the tort of conversion to protect the plaintiff's intellectual

property rights in designs or shapes of aluminum railings); <u>see</u>

<u>also</u> <u>Joe Hand Promotions, Inc. v. Md. Food & Entm't, LLC</u>, No.

---

associated with the domain name.  <u>See</u> <u>Thomas</u>, 176 F.3d at 503.

-7-

CCB-11-3272, 2012 WL 5879127, at *4 (D. Md. Nov. 19, 2012)
(granting motion to dismiss for failure to state a claim under
Maryland law of conversion of a television broadcast signal
because the complaint contains no factual allegation that
tangible documents incorporating the plaintiff's intangible
property interests were transferred).

Here, the plaintiff alleges that "[a]t the direction of
Defendants Dawson and Heiss, . . . Defendant Squiid unlawfully
converted the RIOT ACT Domain Names and hireacomic.com domain
name by revising the Domain Name Registration information to
effectuate the . . . transfer of ownership of the [domain names]
from Plaintiff to the LLC[.]"  Am. Compl., Count IV, ¶ 89.
Xereas relies upon Kremen v. Cohen, 337 F.3d 1024 (9th Cir.
2002), which held that a domain name is within the class of
property protected by the tort of conversion.  Id. at 1030-35.
Kremen reasoned that under California law, a domain name is
property capable of being converted because a domain name is a
"well-defined interest" similar to "a share of corporate stock or
a plot of land," domain name registrants have a "legitimate claim
to exclusivity" similar to deeds with plots of land, and domain
names are "valued, bought and sold, often for millions of
dollars."  Id. at 1030.  The Kremen court explained that
California had rejected the Restatement's requirement that
intangible property could be protected only where the intangible
rights are "merged in a document[.]"  Id. at 1031-1033
(discussing Restatement (Second) of Torts § 242 (1965)).

-8-

D.C. courts have not directly addressed this issue, but also have not extended the tort of conversion to intangible property such as domain names, and Maryland courts hold to the Restatement rule limiting the tort of conversion of intangible property to where the property is merged into a document. <u>Gaubatz</u>, 793 F. Supp. 2d at 339-40.  Xereas has not asserted any basis for his cause of action beyond relying on <u>Kremen</u> which interpreted California law and rejected the Restatement's strict rule that Maryland applies.  <u>Kremen</u>, 337 F.3d at 1031-1033.  Xereas does not allege that his property interests were merged in any tangible documents which were transferred to the defendants.  In sum, the plaintiff has failed to show that his claim against the defendants for conversion states a cognizable cause of action.

II.  BREACH OF CONTRACT

To state a claim for breach of contract under D.C. law, the plaintiff must plead facts to state four elements: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." <u>Tsintolas Realty Co. v. Mendez</u>, 984 A.2d 181, 187 (D.C. 2009).  Also, "'all contracts contain an implied duty of good faith and fair dealing[,]'" which means that "'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" <u>Murray v. Wells Fargo Home Mortg.</u>, 953 A.2d 308, 321 (D.C. 2008) (quoting <u>Allworth v. Howard Univ.</u>, 890 A.2d 194, 201 (D.C. 2006)).  "Liability lies for breach of the duty [of

good faith and fair dealing] if a party (1) evades the spirit of the contract, (2) willfully renders imperfect performance, or (3) interferes with performance by the other party." <u>C & E Servs., Inc. v. Ashland Inc.</u>, 601 F. Supp. 2d 262, 276 (D.D.C. 2009) (citing <u>Allworth</u>, 890 A.2d at 201).  A claim for "breach of the duty of good faith and fair dealing must necessarily arise out of the performance or enforcement of the contract, not out of the contract negotiations." <u>Id.</u> at 275 (citing <u>Ellipso, Inc. v. Mann</u>, 541 F. Supp. 2d 365, 373-74 (D.D.C. 2006)).  D.C. law is unsettled about whether a breach of the implied duty of good faith and fair dealing claim may be brought as an independent cause of action without a breach of an express contractual duty claim.  <u>C & E Servs.</u>, 601 F. Supp. 2d at 274-75.  However, "breach of the implied covenant is not an independent cause of action when the allegations are identical to other claims for relief under [an] established cause of action." <u>Washington Metro. Area Transit Auth. v. Quik Serve Foods, Inc.</u>, Civil Action Nos. 04-838, 04-687 (RCL), 2006 WL 1147933, at *5 (D.D.C. Apr. 28, 2006) (citing <u>Jacobson v. Oliver</u>, 201 F. Supp. 2d 93, 98 n.2 (D.D.C. 2002)).

Xereas's breach of contract claim alleges that Dawson and Heiss "breached their duty of good faith and fair dealing by fraudulently inducing [Xereas] to enter into a business relationship with them . . . and then terminating Plaintiff Xereas's participation, involvement, and ownership in the Venture shortly after the club's opening." Am. Compl., Count V, ¶ 94.

-10-

Dawson and Heiss move to dismiss the breach of contract claim arguing in part that Xereas's allegations do not specify the express contractual duty owed or how the defendants allegedly breached the contract.  Defs. Heiss', Dawson's and the LLC's Mem. of Law in Supp. of Mot. to Dismiss ("Defs.' Mem.") at 7.  Xereas argues that there are two relevant contracts -- the Amended Operating Agreement and the Business Plan -- and that these contracts recognize his position as general manager.  Pl.'s Resp. to Defs.' Mot. to Dismiss at 3, 5.  Xereas also argues that Heiss and Dawson entered the contract in bad faith and abruptly terminated employees who assisted Xereas.  Id. at 4-5.

Xereas's amended complaint does not identify any express contractual duty which Dawson and Heiss allegedly have breached. The Amended Operating Agreement vests the broad authority to engage and employ persons in the Managing Members and states that "[a]ny vote, consent, approval, determination or other action required or permitted to be taken by the Managing Members must be approved by a majority . . . of the Managing Members."  Am. Compl., Ex. 13, Am. Operating Agreement, Art. VI, ¶ 6.1(e). Xereas's amended complaint confirms that "any management decisions should be controlled and dictated by a two-thirds vote of the Class A Members."  Id. ¶ 35.  Xereas's allegations that Heiss and Dawson terminated employees and removed Xereas as general manager do not state a claim for breach of the Amended Operating Agreement because Dawson and Heiss were empowered to do so as the majority of Managing Members.

-11-

Xereas also states that the Business Plan "specifically recognized and detailed Plaintiff Xereas' longstanding rights in, and use of, the RIOT ACT Trademarks[.]"  Am. Compl. ¶ 37. Whether the Business Plan is in fact a contract is an open question.  "[A] valid contract requires 'both (1) agreement as to all material terms; and (2) intention of the parties to be bound.'"  Duk Hea Oh v. Nat'l Capital Revitalization Corp., 7 A.3d 997, 1013 (D.C. 2010) (quoting Jack Baker, Inc. v. Office Space Dev. Corp., 664 A.2d 1236, 1238 (D.C. 1995)).  It is unnecessary to resolve this issue because even if the Business Plan is a contract, Xereas has not identified any statement within the Business Plan which created a contractual duty regarding his trademarks which Heiss and Dawson violated.  Thus, Xereas's claim of breach of an express contractual duty fails because Xereas has identified no provision of either purported contract that created any contractual duty that Heiss and Dawson are alleged to have violated.

The defendants also move to dismiss Xereas's implied duty of good faith and fair dealing claim.  The first portion of Xereas's implied duty claim alleges that the defendants caused Xereas "to enter into a business relationship with them" and "to sign the Operating Agreement[.]"  Am. Compl., Count V, ¶ 94.  This allegation regarding "pre-contract negotiations" cannot state an implied duty claim under D.C. Law.  See Ellipso, 541 F. Supp. 2d at 373-74.

-12-

Xereas also alleges that Dawson and Heiss caused Xereas "to contribute $100,000, and to contribute his time and industry expertise, contacts, and business plans . . . [and] the right to use [Xereas's] RIOT ACT Trademarks and Domain Names, to the Venture." Am. Compl., Count V, ¶ 94. The defendants argue that the allegations supporting this claim are identical to the allegations underlying the Xereas's fraudulent inducement claim in Count VI of the amended complaint. Defs.' Mem. at 10. While the relevant factual allegations for the fraudulent inducement claim are Heiss and Dawson's actions *before* the parties entered into the contract, the factual allegations for an implied duty claim must have occurred *after* a contract was executed. Here, Xereas has alleged that after Xereas, Heiss and Dawson entered into a contract, Heiss and Dawson induced him to contribute the $100,000 and continue his efforts in furtherance of the LLC by giving Xereas "repeated verbal assurances . . . regarding their continued interest in the Venture and, in particular, in working together with Plaintiff Xereas to ensure the club's success[.]" Am. Compl. ¶ 53. These assurances allegedly were given to Xereas before he paid his remaining $50,000 contribution and Xereas continued to work for the club from that time through December 2011. Id. In addition, Xereas alleges that Heiss and Dawson "terminat[ed] Plaintiff Xereas' participation, involvement and ownership in the Venture shortly after the club's opening." Id., Count V, ¶ 94.

-13-

These allegations of actions by Dawson and Heiss after the contract went into force support Xereas's claim that Dawson and Heiss "evade[d] the spirit of the contract" or "interfere[d] with [Xereas's] performance" of the contract by causing Xereas to contribute further financial contribution and his professional services despite an intention to terminate Xereas and deprive him of the club's future earnings.  The plaintiff's allegations, if true, would show that Dawson and Heiss violated the standard that "'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  Murray, 953 A.2d at 321 (quoting Allworth, 890 A.2d at 201).  Xereas's amended complaint states a claim for breach of contract under an implied duty of good faith and fair dealing theory against Dawson and Heiss.

III. FRAUDULENT INDUCEMENT, CONSPIRACY TO DEFRAUD

Under District of Columbia law, "[f]raudulent inducement requires proof of: 1) a false [representation]; 2) made in reference to a material fact; 3) with knowledge of its falsity; 4) with the intent to deceive; and 5) action taken in reliance upon the misrepresentation."  McWilliams Ballard, Inc. v. Level 2 Dev't, 697 F. Supp. 2d 101, 108 (D.D.C. 2010) (citing In re Estate of McKenney, 953 A.2d 336, 342 (D.C. 2008)).  Under D.C. law, the elements of fraud and fraudulent inducement are the same, In re U.S. Office Prod. Co. Sec. Litig., 251 F. Supp. 2d 77, 100 (D.D.C. 2003), and a claim of fraudulent inducement must plead with particularity the circumstances constituting fraud

-14-

under Federal Rule of Civil Procedure 9(b), <u>Buy Back District of Columbia, LLC v. Home Depot USA, Inc.</u>, Civil Action No. 04-1429 (PLF), 2004 WL 4012265, at *1 (D.D.C. Dec. 14, 2004).  This rule requires the claimant to plead specifically "'the time, place and content of the false [representations], the fact misrepresented and what was retained or given up as a consequence of the fraud.'" <u>Kowal v. MCI Communic'ns Corp.</u>, 16 F.3d 1271, 1278 (D.C. Cir. 1994) (quoting <u>United States ex rel. Joseph v. Cannon</u>, 642 F.2d 1373, 1385 (D.C. Cir. 1981)).  To establish a prima facie case of civil conspiracy, a plaintiff must prove: "(1) an agreement between two or more persons; (2) to participate in an unlawful act; and (3) injury caused by an unlawful overt act performed by one of [the] parties to the agreement, and in furtherance of the common scheme." <u>Hill v. Medlantic Health Care Grp.</u>, 933 A.2d 314, 334 (D.C. 2007) (citing <u>Paul v. Howard Univ.</u>, 754 A.2d 297, 310 (D.C. 2000)).  However, "[c]ivil conspiracy 'is not an independent tort but only a means for establishing vicarious liability for an underlying tort.'"  <u>Id.</u> (citing <u>Paul</u>, 754 A.2d at 310 n.27).

In this case, Xereas claims that Dawson and Heiss fraudulently induced him to

> enter into a business relationship with them, to sign
> the Operating Agreement, to contribute $100,000, and to
> contribute his time and industry expertise, contacts,
> and business plans, and to allow use of the RIOT ACT
> Trademarks and Domain Names by the Venture, all while
> intending to terminate without cause Plaintiff Xereas'
> participation, involvement, and ownership shortly after
> the club's opening.

Am. Compl., Count VI, ¶ 97.  Xereas states that the fraudulent inducement claim relies on the "representations made that resulted in the Operating Agreement."  Pl.'s Resp. to Defs.' Mot. to Dismiss at 6.  In particular, Xereas cites paragraphs 33, 34, and 36 of the amended complaint as identifying the representations which resulted in the Operating Agreement.  Id. However, these paragraphs only describe the formation of the operating agreements and do not include any specific representations by Dawson or Heiss which support the plaintiff's fraudulent inducement claim.  See Am. Compl. ¶¶ 33, 34, 36. Xereas may be referring to his assertion that he "permitted use of his trademarks by the Venture relying upon his ownership interest and role as General Manager to insure quality control and proper use of his RIOT ACT Trademarks and RIOT ACT domain names."  Id. ¶ 31.  However, this statement does not satisfy the requirement that the plaintiff plead with particularity the "time, place and content of the false [representations]" by an alleged tortfeasor.  See Kowal, 16 F.3d at 1278.  Because Xereas's amended complaint does not identify any particular misrepresentation by Dawson and Heiss which induced Xereas to sign the contract, Xereas has failed to state a claim for either conspiracy to defraud or its underlying tort of fraudulent inducement.

IV.  TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS
     RELATIONSHIPS[5]

     Under D.C. law, a claim for tortious interference with
prospective business relationships requires: "'(1) the existence
of a valid business relationship or expectancy, (2) knowledge of
the relationship or expectancy on the part of the interferer, (3)
intentional interference inducing or causing a breach or
termination of the relationship or expectancy, and (4) resultant
damage.'"  Jankovic v. Int'l Crisis Grp., 593 F.3d 22, 29 (D.C.
Cir. 2010) (quoting Bennett Enterprises v. Domino's Pizza, Inc.,
45 F.3d 493, 499 (D.C. Cir. 1995)).  "Valid business expectancies
may include lost future contracts and lost opportunities to
obtain customers."  Command Consulting Grp., LLC v. Neuraliq,
Inc., 623 F. Supp. 2d 49, 52 (D.D.C. 2009).  However, any
business expectancy must be "'commercially reasonable to
anticipate.'"  Id. (quoting Browning v. Clinton, 292 F.3d 235,
242 (D.C. Cir. 2002)).  "A valid business expectancy requires a
probability of future contractual or economic relationship and
not a mere possibility."  Robertson v. Cartinhour, 867 F. Supp.
2d 37, 60 (D.D.C. 2012) (internal quotation marks omitted); see
also Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.,
791 F. Supp. 2d 33, 56 (D.D.C. 2011) (stating that the plaintiff

---

[5] The amended complaint captions this claim as "Tortious
Interference with Contractual Relations[.]"  Am. Compl., Count
VIII.  However, Xereas conceded that the amended complaint's
caption was inaccurate and argued that the allegations in the
amended complaint support the claim of tortious interference with
prospective business relationships.  Pl.'s Resp. to Defs.' Mot to
Dismiss at 8.

must show a "reasonable likelihood" of receiving a contract and "mere speculative contractual expectations or hope are insufficient" to state a claim for tortious interference with prospective business relationships (internal quotation marks omitted)).  A claim of tortuous interference with prospective business relations cannot survive where the plaintiff does not allege any specific future business relations or expectancies and only provides general references to potential opportunities.  See e.g., Command Consulting Grp., LLC, 623 F. Supp. 2d at 52-53; Sheppard v. Dickstein, Shapiro, Morin & Oshinsky, 59 F. Supp. 2d 27, 34 (D.D.C. 1999); Kwang Dong Pharm. Co. v. Han, 205 F. Supp. 2d 489, 496-97 (D. Md. 2002) (dismissing a tortuous interference claim under D.C. law because the plaintiff "has not pointed to any specific contractual relations that [the defendant] allegedly interfered with").

Here, Xereas has not alleged an identified prospective business relationship which is commercially reasonable to anticipate.  Xereas generally alleges that Dawson and Heiss interfered with his "long standing business relationships with numerous persons in the comedy field[.]"  Pl.'s Resp. to Defs.' Mot. to Dismiss at 8; see Am. Compl. ¶¶ 12, 71-73.  Xereas further alleges that Dawson and Heiss's actions interfered with "his ability to maintain contact and relationships, and continue doing business" with Xereas's contacts in the entertainment industry, specifically "current and prospective customers and industry players[.]"  Am. Compl., Count VIII, ¶¶ 104-05.

Xereas's claim focuses on his past positions and relationships; Xereas's failure to identify any specific future employment prospect undermines his claim.  The amended complaint has not stated a cause of action for tortious interference with prospective business relations against Dawson and Heiss.

V.   UNJUST ENRICHMENT

"Unjust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." Peart v. District of Columbia Hous. Auth., 972 A.2d 810, 813 (D.C. 2009) (quoting News World Communic'ns, Inc. v. Thompsen, 878 A.2d 1218, 1222 (D.C. 2005)).  "For defendants to be liable for unjust enrichment, their actions must be 'unjust,' that is to say, they must have committed some 'wrongful act.'" Griffith v. Barnes, 560 F. Supp. 2d 29, 34 (D.D.C. 2008) (citing Thompsen, 878 A.2d at 1225). "'[T]here can be no claim for unjust enrichment when an express contract exists between the parties.'" Albrecht v. Comm. on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys., 357 F.3d 62, 69 (D.C. Cir. 2004) (quoting Schiff v. AARP, 697 A.2d 1193, 1194 (D.C. 1997)).  The court must evaluate unjust enrichment claims on a "case-by-case basis, considering the particular circumstances giving rise to the claim." Peart, 972 A.2d at 814.

Xereas concedes that he has not stated an unjust enrichment claim against Heiss and Dawson because the existence of an express contract between the managing members of the LLC

precludes such a claim.  Pl.'s Resp. to Defs.' Mot. to Dismiss at 8.  Xereas instead argues that his unjust enrichment claim can survive as to the LLC, because there is no express contract between Xereas and the LLC.  Id.

As an initial matter, the Amended Operating Agreement does not expressly state whether the LLC is a party to the agreement. The provision of the D.C. Code in force in 2010[6] that governed the creation of limited liability companies, Chapter 10 of Title 29, did not specify whether an LLC is a party to its own operating agreement, and D.C. courts have not addressed this precise issue.  Other courts addressing this issue have focused on the text of the relevant state statute governing the creation of limited liability companies.  See Elf Atochem North America, Inc. v. Jaffari, 727 A.2d 286, 293 (Del. 1999) (holding that a limited liability corporation was bound by its operating agreement, even though the agreement was signed only by the LLC's members and not by the corporation itself because Delaware Code tit. 6 § 18-101(7) states that "[a] limited liability company is bound by its limited liability company agreement whether or not the limited liability company executes the limited liability company agreement"); Trover v. 419 OCR, Inc., 397 Ill. App. 3d 403, 408-09 (2010) (holding that two LLCs were not parties to

---

[6] The amended complaint states that Xereas, Heiss and Dawson executed the original Operating Agreement in May 2010 and the Amended Operating Agreement at issue here in November 2010.  Am. Compl. ¶¶ 33-34.  The section of the D.C. Code governing the creation of LLCs at that time was repealed and replaced in July 2011.

their own operating agreements where no member signed the agreement on behalf of the LLC because the Illinois Limited Liability Company Act stated that "[a] limited liability company is a legal entity distinct from its members" and it was clear from the Operating Agreement that the members understood how to legally bind the LLC but did not do so).

The D.C. statute applicable at the time stated that "[t]he members of a limited liability company may enter into an operating agreement to regulate or establish the affairs of the limited liability company[.]" D.C. Code § 29-1018(a) (2001). This language did not reflect that a limited liability company itself was a party to its operating agreement. The Amended Operating Agreement here does not list the LLC on the signatories page, and it does not include the LLC in the first paragraph as one of the parties entering into the agreement. The "Formation and Name" section of the Amended Operating Agreement distinguishes between the parties and the LLC in stating that "[t]he parties to this Agreement agree to and do hereby form a limited liability company under the name Riot Act DC, LLC." Am. Compl., Ex. 13, Am. Operating Agreement, Art. II, ¶ 2.1. The Amended Operating Agreement also provides that managing members have the power to legally bind the LLC. Id., Ex. 13, Am. Operating Agreement, Art. VI, ¶ 6.1(b)(ii-iii). As happened in Trover, the parties here could legally bind the LLC to an agreement, but did not do so. Under these circumstances, the Amended Operating Agreement did not create a contract between the

LLC and Xereas.  Xereas's claim for unjust enrichment survives the first challenge.

Heiss, Dawson, and the LLC also argue that Xereas's unjust enrichment claim against the LLC cannot survive because litigants may not assert an unjust enrichment claim "'where there is an express contract that *governs the parties' conduct*.'"  Defs.' Reply at 14 (quoting <u>Plesha v. Ferguson</u>, 725 F. Supp. 2d 106, 112 (D.D.C. 2010)).  The defendants state that the Amended Operating Agreement governs the rights and responsibilities of the parties and Xereas's unjust enrichment claim against the LLC is foreclosed.  <u>Id.</u>  However, <u>Plesha</u> stands for the proposition that a claim for unjust enrichment is inappropriate where the parties entered a contract with one another.  <u>Plesha</u> cited only cases which follow this distinction, and it reinforced the principle by quoting the D.C. Court of Appeals: "'One who has entered into a valid contract cannot be heard to complain that the contract is unjust, or that it unjustly enriches the party *with whom he or she has reached agreement*.'"  <u>Plesha</u>, 725 F. Supp. 2d at 112 (quoting <u>Jordan Keys & Jessamy, LLP v. St. Paul Fire and Marine Ins. Co.</u>, 870 A.2d 58, 64 (D.C. 2005)) (emphasis added).  Since the LLC is not a party to the Amended Operating Agreement, the defendants' reliance on <u>Plesha</u> is misplaced.  The D.C. Court of Appeals has recognized that the unjust enrichment doctrine could apply despite the presence of a contract with another party "where A, who claims that B has been unjustly enriched at A's expense, has a contract with C rather than with B.  It is not at

-22-

all clear to us that in such a situation, the existence of a
contract with C should automatically bar A's claim of unjust
enrichment against B." <u>Jordan Keys & Jessamy</u>, 870 A.2d at 64.

Xereas's unjust enrichment claim must reflect that "under
the circumstances, the defendant's retention of the benefit is
unjust." <u>Peart</u>, 972 A.2d at 813.  Here, Xereas alleges that his
substantial efforts for the LLC in working on the website,
developing the company's marketing, advertising and social media
strategies, fostering relations with managers, agents, comics,
and other contacts, booking talent for shows, and various other
aspects was provided "for no compensation . . . in anticipation
of future earnings from club operations." Am. Compl. ¶ 44.  By
November 2011, Xereas had paid his $100,000 contribution in full.
<u>Id.</u> ¶¶ 45, 54.  Under the Amended Operating Agreement, Xereas was
entitled to "a reasonable, market-based salary as compensation
for the performance of his . . . management responsibilities.
Any consideration to be paid as salaries by the [LLC] to the
Managing Members shall be determined by the Managing Members in
their reasonable discretion." <u>Id.</u>, Ex. 13, Am. Operating
Agreement, Art. VI, ¶ 6.4.  Xereas alleges that in December 2011,
Dawson and Heiss agreed to pay Xereas an annual salary of $42,000
and Xereas has received only "a little over $8,000 for 2 years of
work and dedication." <u>Id.</u> ¶ 56.  Any complaint about Xereas's
compensation after Xereas secured the annual salary agreement in
December 2011 cannot be the basis of Xereas's unjust enrichment
claim.  On the other hand, the complaint's allegations of

Xereas's uncompensated efforts for the LLC from December 2010 to December 2011, when viewed in the light most favorable to Xereas, plead sufficient facts to state a cause of action for unjust enrichment against the LLC.

VI.  CYBER-SQUATTING UNDER THE ACPA

The ACPA makes liable to the owner of a mark any person who "has a bad faith intent to profit from that mark . . . and . . . registers, traffics in, or uses a domain name that . . . is identical or confusingly similar to that mark . . . [if it] is famous [or distinctive] at the time of registration of the domain name[.]"  15 U.S.C. § 1125(d)(1)(A).  The statute "prohibits the bad faith registration of trademarks as domain names."  Vizer v. VIZERNEWS.COM, 869 F. Supp. 2d 75, 76 (D.D.C. 2012).  "To succeed on an ACPA claim, Plaintiff must demonstrate that: (1) its trademark is a distinctive or famous mark entitled to protection; (2) Defendants' domain name is identical or confusingly similar to the Plaintiff's mark; and (3) Defendants 'register[], traffic[] in, or use[]' a domain name with the bad faith intent to profit from it."  Hanley-Wood LLC v. Hanley Wood LLC, 783 F. Supp. 2d 147, 152 (D.D.C. 2011) (quoting 15 U.S.C. § 1125(d)(1)(A)).  Under the first element, the mark must be either distinctive or famous "at the time of registration of the domain name."  15 U.S.C. § 1125(d)(1)(A)(ii)(I)-(II).  "In determining whether a person has acted with bad faith, the Court may consider such factors as . . . whether the person has previously used the name to offer goods or services for sale, and

-24-

whether the person intended to divert consumers from the
infringed owner's website either for commercial gain or to
tarnish or disparage the mark by creating a likelihood of
confusion as to the source or sponsorship of the site." <u>Hanley-</u>
<u>Wood</u>, 783 F. Supp. 2d at 152 (citing 15 U.S.C. § 1125(d)(1)(B)).[7]

---

[7] The statute provides a list of nine factors to consider in
determining whether a person has a bad faith intent to profit:
 (I) the trademark or other intellectual property rights
 of the person, if any, in the domain name;
 (II) the extent to which the domain name consists of
 the legal name of the person or a name that is
 otherwise commonly used to identify that person;
 (III) the person's prior use, if any, of the domain
 name in connection with the bona fide offering of any
 goods or services;
 (IV) the person's bona fide noncommercial or fair use
 of the mark in a site accessible under the domain name;
 (V) the person's intent to divert consumers from the
 mark owner's online location to a site accessible under
 the domain name that could harm the goodwill
 represented by the mark, either for commercial gain or
 with the intent to tarnish or disparage the mark, by
 creating a likelihood of confusion as to the source,
 sponsorship, affiliation, or endorsement of the site;
 (VI) the person's offer to transfer, sell, or otherwise
 assign the domain name to the mark owner or any third
 party for financial gain without having used, or having
 an intent to use, the domain name in the bona fide
 offering of any goods or services, or the person's
 prior conduct indicating a pattern of such conduct;
 (VII) the person's provision of material and misleading
 false contact information when applying for the
 registration of the domain name, the person's
 intentional failure to maintain accurate contact
 information, or the person's prior conduct indicating a
 pattern of such conduct;
 (VIII) the person's registration or acquisition of
 multiple domain names which the person knows are
 identical or confusingly similar to marks of others
 that are distinctive at the time of registration of
 such domain names, or dilutive of famous marks of
 others that are famous at the time of registration of
 such domain names, without regard to the goods or

-25-

The defendants move to dismiss the ACPA claim arguing that Xereas has not stated a claim for cyber-squatting.  They argue that the ACPA does not apply to the Riot Act domain names because it was Xereas who registered them and that occurred before the Riot Act trademarks became distinctive.[8]  Although Xereas admits that he registered the domain names originally, he argues that the defendants re-registered the domain names for "unlawful and deceptive purposes."  Pl.'s Resp. to Def. Squid's Mot. to Dismiss at 3; see Am. Compl. ¶ 60.

This dispute turns on whether the term "registers" and "registration" in the ACPA refer only to the initial registration of a domain name or also to the "re-registration" of a domain name.  The defendants rely on GoPets Ltd. v. Hise, 657 F.3d 1024 (9th Cir. 2011), which held that "re-registration of a currently registered domain name by a new registrant . . . is not a 'registration' within the meaning of § 1125(d)(1)."  Id. at 1026.[9]  Xereas seeks to distinguish his case from GoPets because

_____

services of the parties; and
(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.
15 U.S.C. § 1125(d)(1)(B)(i).
    [8] Although this argument is in Squiid's motion to dismiss, Heiss, Dawson and the LLC's motion to dismiss incorporated "all arguments set forth in Squiid's motion to dismiss that are applicable to them."  Defs.' Mem. at 2.
    [9] The GoPets court explained that:
[T]here are three primary actors in the domain name system.  First, companies called "registries" operate a database (or "registry") for all domain names within the scope of their authority . . . .  Second, companies called "registrars" register domain names with

in that case, there was a lawful transfer of ownership of the domain name to a new entity which later sought to register the name, whereas here, Xereas alleges that "the re-registration was done for unlawful and deceptive purposes."  Pl.'s Resp. to Def. Squid's Mot. to Dismiss at 3.

In GoPets, plaintiff GoPets Ltd. alleged that defendants Edward and Joseph Hise and their company Digital Overture violated the ACPA through re-registering the domain name gopets.com.  Edward Hise registered gopets.com in his own name in 1999 -- years before GoPets Ltd. was founded in 2004 -- and later transferred the registration of the domain name to Digital Overture in 2006.  GoPets, 657 F.3d at 1026-27.  The parties agreed that the domain name was not "identical or confusingly similar to" a distinctive trademark in 1999 when Edward Hise originally registered it, and that the domain name was distinctive in 2006 when the domain name was transferred to Digital Overture.  Id. at 1030.  The GoPets court noted that the ACPA did not define the term registration, id., but held that the term registration in the ACPA did not refer to "re-registrations" because that interpretation does not comport with traditional

_____

registries on behalf of those who own the names. Registrars maintain an ownership record for each domain name they have registered with a registry.  Action by a registrar is needed to transfer ownership of a domain name from one registrant to another.  Third, individuals and companies called "registrants" own the domain names.  Registrants interact with the registrars, who in turn interact with the registries.

GoPets, 657 F.3d at 1030 (quoting Office Depot Inc. v. Zuccarini, 596 F.3d 696, 699 (9th Cir. 2010)).

property law principles which grant a property owner the right to sell all of his rights in property to another.  Id. at 1031-32. In particular, GoPets stated that the original registrant Edward Hise would have had all rights to the domain name if he had kept the domain name in his own personal name and that there was "no basis in [the] ACPA to conclude that a right that belongs to an initial registrant of a currently registered domain name is lost when that name is transferred to another owner."  Id. at 1031. GoPets explained that the ACPA should not be interpreted to deny Edward Hise the ability to validly transfer the rights in the domain name to a third party after the GoPets mark became distinctive because Hise's property rights in the domain name would be inalienable.[10]

Presumably, the GoPets court viewed the potential inalienability[11] of Hise's property rights in the domain name as the potential ACPA liability to which Hise or his company might have been subject if re-registration were covered under the ACPA.

_____

[10] Courts have come to opposite conclusions when considering whether the terms "register" and "registration" in the ACPA refer only to the initial registration.  Compare Ricks v. BMEzine.com, LLC, 727 F. Supp. 2d 936, 954 (D. Nev. 2010) ("The statute [§ 1125(d)(1)(A)] does not refer to an original registration or the registration that creates the domain name. . . .  The Act provides no exception for re-registrations by the same owner. Any registration thus may bring the registrant within the statute's purview."), with Vizer, 869 F. Supp. 2d at 81-82 (citing the GoPets decision for the proposition that re-registration of a domain name is not a "registration" under 15 U.S.C. § 1125(d)(1)), and AIRFX.com v. AirFX LLC, No. CV 11-1064 FJM, 2012 WL 3638721, at *3-4 (D. Ariz. Aug. 24, 2012) (same).
[11] An inalienable property interest is one that is "not transferable or assignable[.]"  Black's Law Dictionary (9th ed. 2009).

But, the statute does not take away the initial registrant's rights to sell or transfer all of the rights he or she owns in a distinctive or famous domain name to any other party.  The statute simply requires that a domain name registrant not register the domain name with a bad faith intent to profit.  The ACPA's focus is on the transferee's bad faith intent to profit from re-registering a domain name, not on restricting the ability of a domain name owner to sell or transfer his property interest in the domain name to anyone he would prefer.  GoPets is not persuasive as it failed to address how Digital Overture's good faith would free Hise from worry about liability or alienability of his domain name.[12]  By interpreting the term registration as applying to re-registrations, the scope of coverage extends to each registrant of a domain name rather than only the first registrant.  This interpretation furthers the statute's purpose of eliminating cyber-squatting.  The congressional conference report on the ACPA stated that the ACPA applies "only to cases where the plaintiff can demonstrate that the defendant registered, trafficked in, or used the offending domain name with bad-faith intent to profit from the goodwill of a mark belonging to someone else."  H.R. Conf. Rep. No. 106-464 at *109 (1999), 1999 WL 1095089.  The Senate report said "the abusive conduct that is made actionable is appropriately limited just to bad-faith registrations and uses of others' marks by persons who

---

[12] Interestingly, GoPets did discuss the good faith factor in discussing domain name grabs that Hise engaged in after GoPets Ltd. was up and running.

-29-

seek to profit unfairly from the goodwill associated therewith."
S. Rep. No. 106-140 at *8 (1999), 1999 WL 594571.  These
statements of congressional intent apply with equal force to the
initial registration and later re-registrations.  See Ricks, 727
F. Supp. 2d at 954 ("If a domain name was registered in good
faith originally, but thereafter re-registered in bad faith, the
cybersquatter would escape liability, a result not supportable by
the statutory scheme.").  In addition, the ACPA provides no
reason why any party who registers a distinctive or famous domain
name with bad faith intent to profit after the original
registration should escape the statute's enforcement.  The terms
"register" and "registration" in § 1125(d)(1)(A) should be read
to refer to the initial registration and later re-registrations
of the domain name.

In this case, many of the domain names at issue were
registered by Xereas in 2005.  Am. Compl. ¶ 14.  Xereas alleges
that the defendants re-registered the domain names by revising
the registration information for the Riot Act domain names in
2012 when the Riot Act trademarks were distinctive.  Id. ¶¶ 60,
111.  Xereas also alleges that the defendants had bad faith
intent to profit from the use of the Riot Act domain names which
were identical or confusingly similar to the Riot Act trademarks.
Id. ¶¶ 110, 112.  In particular, Xereas alleges that continued
use of the Riot Act domain names and trademarks by Dawson, Heiss
and the LLC has caused "confusion, mistake, and deception on the
part of consumers" and mislead the public and individuals in the

-30-

entertainment industry "into believing that the LLC's business and activities are authorized by, attributable to, sponsored by, or associated with[] Plaintiff." Id. ¶¶ 71, 72.  Here, the factual allegations in the amended complaint state a claim for cyber-squatting under the ACPA against Dawson, Heiss and the LLC.

However, the cyber-squatting claim will be dismissed against Squiid.  Squiid argued that the ACPA does not apply to Squiid because it did not register, traffic in, or use the Riot Act domain names, and that the amended complaint does not allege any facts supporting a reasonable inference of Squiid's bad faith intent to profit.  Def. Squiid's Mot. to Dismiss at 7-10.  Xereas did not respond to these arguments relating only to Squiid, and the arguments will be deemed conceded.  See Stephenson v. Cox, 223 F. Supp. 2d 119, 121 (D.D.C. 2002) ("[W]hen a plaintiff files a response to a motion to dismiss but fails to address certain arguments made by the defendant, the court may treat those arguments as conceded[.]").

VII. DEFAMATION

To state a claim for defamation under D.C. law, the plaintiff must show four elements: "'(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special

harm.'"  <u>Solers, Inc. v. Doe</u>, 977 A.2d 941, 948 (D.C. 2009)
(quoting <u>Oparaugo v. Watts</u>, 884 A.2d 63, 76 (D.C. 2005)).
"District of Columbia courts have held that a defamation claim
survives a Rule 12(b)(6) motion to dismiss only if 'the contested
statements are both verifiable and reasonably capable of
defamatory meaning.'"  <u>Franklin v. Pepco Holdings, Inc.</u>, 875 F.
Supp. 2d 66, 74 (D.D.C. 2012) (quoting <u>Weyrich v. New Republic,
Inc.</u>, 235 F.3d 617, 620 (D.C. Cir. 2001)).  "A publication is
defamatory 'if it tends to injure plaintiff in his trade,
profession or community standing, or lower him in the estimation
of the community.'"  <u>Rosen v. American Israel Pub. Affairs Comm.,
Inc.</u>, 41 A.3d 1250, 1256 (D.C. 2012) (quoting <u>McBride v. Merrell
Dow and Pharm., Inc.</u>, 540 F. Supp. 1252, 1254 (D.D.C. 1982)).
"[A]n allegedly defamatory remark must be more than unpleasant or
offensive; the language must make the plaintiff appear odious,
infamous, or ridiculous."  <u>Id.</u> (citing <u>Howard Univ. v. Best</u>, 484
A.2d 958, 989 (D.C. 1984)) (internal quotation marks omitted).

> As a general rule, . . . a statement of fact may be the
> basis for a defamation claim, [but] a statement of pure
> opinion cannot.  Nonetheless, . . . statements of
> opinion can be actionable if they imply a provably
> false fact, or rely upon stated facts that are provably
> false.  Thus, a statement of opinion is actionable if
> -- but only if -- it has an explicit or implicit
> factual foundation and is therefore objectively
> verifiable.  On the other hand, if it is plain that a
> speaker is expressing a subjective view, an
> interpretation, a theory, conjecture, or surmise,
> rather than claiming to be in possession of objectively
> verifiable facts, the statement is not actionable.

<u>Rosen</u>, 41 A.3d 1250, 1256 (D.C. 2012) (internal quotation marks
omitted).

-32-

In this case, Xereas alleges that Heiss and Dawson made oral and written statements to "members of the entertainment industry and the general public" representing that Xereas's employment was terminated because of his "incompetence, dishonest business practices, deceptive sales practices, and other like false and defamatory claims."  Am. Compl. ¶ 63, <u>see also</u> <u>id.</u>, Count XI, ¶ 114.  Xereas further alleges that Dawson and Heiss acted with "reckless disregard for the truth or falsity" and that the statements "irreparably harmed Xereas[.]"  <u>Id.</u>, Count XI, ¶¶ 117-19.

Dawson and Heiss move to dismiss the defamation claim arguing that Xereas does not sufficiently allege facts to state that the statements are actionable under D.C. law.  Dawson and Heiss argue that the statements are "generalized critical statements" which "cannot form the basis of a defamation claim unless the statements reference specific incidents that can be found to be provably false."  Defs.' Reply at 15.  Defendants rely on the <u>Rosen</u> case arguing that the alleged statements are not actionable because they are statements of opinion which do not have "'an explicit or implicit factual foundation[.]'" Defs.' Mot to Dismiss at 17 (quoting <u>Rosen</u>, 41 A.3d at 1256).  In response, Xereas states, without citation to any authority, that accusing a business person of dishonesty is not a statement of opinion, but rather is a statement of fact.  Pl.'s Resp. to Defs.' Mot. to Dismiss at 10.

-33-

In <u>Rosen</u>, the American Israel Public Affairs Committee terminated Rosen's employment and later published a statement that Rosen's behavior "did not comport with the standards that AIPAC expects of its employees[.]"  <u>Id.</u> at 1256 (internal quotation marks omitted).  The D.C. Court of Appeals found that this statement was not provably false because the reference to "standards" was too general to form the basis of the defamation action.  <u>Id.</u> at 1258-60.  <u>Rosen</u> cited with approval another case that affirmed summary judgment for a defendant employer on a defamation claim where the employer stated that it had fired an employee for actions that were "'prejudicial to the company'" and that the employees had "engaged in 'disloyal and disruptive activity'" and "'conduct unacceptable by any business standard.'" <u>Id.</u> at 1258 (quoting <u>McClure v. American Family Mut. Ins. Co.</u>, 223 F.3d 845, 853 (8th Cir. 2000)).  The <u>Rosen</u> court reasoned that although certain events could have formed the basis for the statements in <u>McClure</u>, "no one learned of particular incidents from the words used" and the statements "exuded merely a subjective evaluation -- essentially a statement of opinion without an explicit or implicit factual foundation."  <u>Id.</u> at 1259 (internal quotation marks omitted).  Similarly, Xereas's amended complaint alleges only statements of opinion which do not affirmatively provide a factual foundation.  In particular, the characterization of his "incompetence" is a statement of opinion not unlike a characterization of disloyalty.  The alleged statements that Xereas engaged in "dishonest business practices"

and "deceptive sales practices" are also not sufficiently verifiable or provably false and are similar to the statement that one engaged in "conduct unacceptable by any business standard." See McClure, 223 F.3d at 853. Shor Int'l Corp. v. Eisinger Enterprises, Inc., No. 90 Civ. 2353 (RJW), 2000 WL 1793389, at *3 (S.D.N.Y. Dec. 5, 2000), too, found a statement that a plaintiff engaged in dishonest business and sales practices to be "a statement of opinion" which "is not a verifiable statement of fact."

Nor does Xereas allege that the publication of the statements caused him special harm. Special harm, also known as "special damages," are limited to "actual pecuniary loss, which must be specially pleaded and proved." Fed. Aviation Admin. v. Cooper, 132 S. Ct. 1441, 1451 (2012). Here, Xereas alleges only that the statements have "harmed Plaintiff, his personal and professional reputation and his future business prospects." Am. Compl., Count XI, ¶ 119. Simply asserting the risk of future harm is insufficient. Xereas must allege some specific harm and the actual pecuniary loss arising from that harm. Franklin, 875 F. Supp. 2d at 75. Xereas does not do so here.

Because Xereas does not allege that the statements were actionable as a matter of law or that the publication of the statements caused the plaintiff special harm, Xereas does not state a claim against Heiss and Dawson for defamation.

-35-

## CONCLUSION AND ORDER

Xereas's amended complaint pleads sufficient facts to state a claim for relief for the breach of the duty of good faith and fair dealing against Dawson and Heiss, unjust enrichment against the LLC and cyber-squatting against Dawson, Heiss and the LLC. However, Xereas does not plead facts to state his conversion, breach of contract, fraudulent inducement, conspiracy to defraud, tortious interference or defamation claims. Accordingly, it is hereby

ORDERED that defendants' motions [15, 16] to dismiss be, and hereby are, GRANTED IN PART and DENIED IN PART. The amended complaint's conversion, breach of contract, fraudulent inducement, conspiracy to defraud, tortious interference and defamation claims in Counts IV through VIII and XI, the cyber-squatting claim against Squiid in Count X and the unjust enrichment claim against Heiss and Dawson are DISMISSED. However, the motion to dismiss the breach of the implied duty of good faith and fair dealing claim in Count V, the unjust enrichment claim against the LLC in Count IX, and the cyber-squatting claim against Heiss, Dawson and the LLC in Count X of the amended complaint is denied.

SIGNED this 27th day of March, 2013.

_____/s/_____
RICHARD W. ROBERTS
United States District Judge