IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JOHN N. XEREAS, individually, on behalf of himself, and derivatively, as a Member and Shareholder in Penn Social, LLC, on behalf of Penn Social, LLC f/k/a Riot Act DC, LLC** | ) ) ) ) ) | |
| | ) | **Civil Action No. 1:12-cv-00456-RCL** |
| **Plaintiff,** | ) | |
| v. | ) | |
| | ) | |
| **MARJORIE A. HEISS, GEOFFREY O.S. DAWSON, and PENN SOCIAL, LLC f/k/a Riot Act DC, LLC,** | ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## SECOND AMENDED COMPLAINT

In his Amended Complaint in this action, Plaintiff John N. Xereas, individually ("Plaintiff" or "Plaintiff Xereas") and derivatively on behalf of Penn Social, LLC f/k/a Riot Act DC, LLC ("Derivative Plaintiff"), by and through his undersigned attorneys, alleges as follows, based upon actual knowledge with respect to his own acts and upon information and belief with respect to all other matters.

## NATURE OF THE CASE

1.     This is a civil action to remedy the actions taken by the Defendants to deprive Plaintiff and  the Derivative Plaintiff of what was lawfully theirs.  Specifically, the individual Defendants stole the Plaintiffs' intellectual property and the other fruits of his efforts and engaged in acts of deception and misappropriation, all with the intention to illegally usurp what had been intended to be a cooperative business relationship.  Simply put, Plaintiff, a well-known and well-respected manager and owner of comedy venues

and the creator of the Riot Act and similar trademarks, entered into a business venture with the individual Defendants to open and operate a comedy theater under the Riot Act name.  But Defendants Dawson and Heiss had other designs.  From the very beginning, unbeknownst to Plaintiff, Defendant Dawson began to treat the comedy club as his personal piggybank, supporting and subsidizing his other business ventures as well as his son's business and otherwise misappropriating the funds and commingling assets of the Derivative Plaintiff.  Defendant Heiss, a D.C. barred attorney, was complicit in the scheme and assisted in the cover-up.

2.     Defendants' legal violations are numerous and include,  inter alia, federal infringement of an unregistered trademark and False Designation of Origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1051, et seq.; federal unfair competition under Section 43(a) of the Lanham Act 15 U.S.C. § 1125(a); common law trademark infringement and unfair competition; trover and conversion under D.C. common Law, breach of contract and of the covenant of good faith and fair dealing under D.C. common law and § 29–804.09 of the D.C. Code; breach of contract, fraudulent inducement under D.C. common law; conspiracy to defraud under D.C. common law; fraudulent representation or, in the alternative negligent misrepresentation under D.C. common law; constructive fraud under D.C. common law, Unauthorized interception of electronic communications under Subsection (1)(a) of the Electronic Communications Privacy Act 18 U.S.C. § 2511; Unauthorized disclosure of electronic communications under subsection (1)(c) of the Electronic Communications Privacy Act 18 U.S.C. § 2511; Unlawful access to stored communications under Subsection (a) of the Stored Communications Act 18 U.S.C. § 2701; Misappropriation of trade secrets under D.C.

Uniform Trade Secrets Act - D.C. Code §§ 36-401 to 36-410; intentional interference with business relations, opportunities, expectancy and prospective economic advantage; unjust enrichment under D.C. common law; Cybersquatting under Section 43(d) of the Lanham Act, 15 U.S.C. S § 1125(d); Intentional infliction of emotional distress under D.C. Common Law; breach of the fiduciary duties of loyalty and care under § 29–804.09 of the DC Code and DC Common Law, or in the alternative, under D.C. Code § 29-1043 (2011); Action for Accounting under D.C. common law; Action for Quantum Meruit under D.C. common law; Violation of § 29–804.10 of the D.C. Code, or in the alternative, D.C. Code § 29-1022 (2011); Violation of RICO, 18 U.S.C. § 1962; and Conspiracy to Commit certain named Counts pled herein.

## JURISDICTION AND VENUE

3.      Jurisdiction is predicated upon 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338(a)-(b), and jurisdiction supplemental thereto.

4.      Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over the claims in this Complaint that arise under the common law of the District of Columbia because the claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

5.      Defendants are each subject to this Court's personal jurisdiction because they reside in and/or operate and transact business in the District of Columbia, can be found in this District, and have committed the acts complained of herein in this District.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and § 1400(a) because Plaintiff is located in this District; Plaintiff's claims arise in this District

because a substantial part of the events giving rise to the claims occurred in this District; and Defendants are doing and have done business within this District.

## THE PARTIES

7.    Plaintiff John N. Xereas is a resident of the District of Columbia with a residential address at 3903 Davis Place, #101, Washington, D.C. 20007.

8.    Plaintiff Xereas is a principal, member, and 26.67% shareholder of Defendant (and Derivative Plaintiff) Penn Social, LLC.

9.    Defendant (and Derivative Plaintiff) Penn Social, LLC ("LLC"), is a limited liability company organized under the laws of the District of Columbia with an address at 801 E Street, N.W., Washington, D.C. 20004.  The LLC formerly conducted the majority of its business under the name Riot Act DC, LLC, and, although Penn Social, LLC, has filed the documents to change the name of the LLC from Riot Act DC, LLC, it still conducts business today under the name Riot Act DC, LLC.  The Riot Act name still appears on various government licenses and certificates, which are displayed throughout the establishment.

10.    Defendant Marjorie A. Heiss is a resident of the District of Columbia with a residence at 1359 28th Street, N.W., Washington, D.C. 20007.  She is an attorney and was at the time of the actions described herein a member of the District of Columbia Bar.

11.    Defendant Heiss is a principal and member and was a 26.67% shareholder of Defendant (and Derivative Plaintiff) Penn Social, LLC, at the time Plaintiff filed his original Complaint in this case.  She was a member-manager of Penn Social, LLC, since the formation of the LLC and 25.67% of her shares were subsequently purchased by Defendant Geoffrey O.S. Dawson on or about August 2012.  Defendant Heiss is currently

4

a 1% shareholder of Defendant (and Derivative Plaintiff) Penn Social, LLC.

12.     Defendant Dawson is a resident of the District of Columbia with an address at 4905 Potomac Avenue, N.W., Washington, D.C. 20007.

13.     Defendant Dawson is a principal, member, and 52.34% shareholder of Defendant (and Derivative Plaintiff) Penn Social, LLC.  He has been a member-manager of Penn Social, LLC since the formation of the LLC.

### STATEMENT OF FACTS

14.     For at least the past 17 years, Plaintiff Xereas has managed comedy clubs and otherwise been involved in the comedy business in and around the Washington Metropolitan Area.  His full-time occupation and principal source of income was his employment in comedy clubs, booking comedy acts, and ownership of comedy clubs.

15.     In the late 1990s, Plaintiff Xereas conceived of the name "RIOT ACT" as a trademark for use in connection with his business as a comedy event organizer and talent scout.  He planned to use the name for his future comedy club, as the name of a record label devoted to comedy acts, and as the name of a potential television show about comedy clubs.

16.     In March 2005, Plaintiff Xereas obtained a trademark search to determine the availability of the RIOT ACT trademark for use in connection with comedy-related services.  Upon learning that the mark was available Plaintiff Xereas, on April 16, 2005, registered the following domain names through Network Solutions: "riotactcomedy.com," "riotactentertainment.com,"  "riotactcomedytheater.com," and  "riotactrecords.com."   He also registered the domain name "hireacomic.net."  Those five domain names were registered to Plaintiff Xereas, as sole owner, through April 16, 2015.  Two additional

domain names, "riotactentertainment.com" and "riotactrecords.com," were registered to Plaintiff, as sole owner, on June 25, 2005, and remained his through June 25, 2015. Plaintiff purchased many domain names related to the RIOT ACT business, but the seven domain names cited specifically herein (collectively, the "RIOT ACT Domain Names") are the subject of this Second Amended Complaint.

17.     Following registration of the RIOT ACT Domain Names, Plaintiff Xereas established business and personal e-mail accounts at "riotactcomedy.com."  In particular, Plaintiff Xereas commenced doing business at the e-mail address "johnx@riotactcomedy.com."  He also created the e-mail address "tedx@riotactcomedy.com" for his brother Ted Xereas, an event planner for RIOT ACT, and "maria@riotactcomedy.com" for his mother Maria Xereas, an assistant for RIOT ACT.  The e-mail addresses johnx@riotactcomedy.com and tedx@riotactcomedy.com have been in consistent use by Plaintiff and his brother for both business and personal use since 2005.  The e-mail address for Maria Xereas was established in 2007.

18.     In September 2005, Plaintiff Xereas launched his business as a comedy and entertainment booking agent, event planner, and producer under the name and mark RIOT ACT ENTERTAINMENT and at the domain name "riotactcomedy.com."  Plaintiff Xereas first registered "RIOT ACT Entertainment LLC" as a business entity in the District of Columbia on September 6, 2005. Plaintiff utilized the "riotactcomedy.com" website, *inter alia*, to announce shows for GW Lisner Auditorium on October 1, 2005, with comedians Jeff Ross and Dan Nuturman; October 25, 2005, with comedians Judy Gold and Wendy Liebman; and November 15, 2005, with comedian Bob Saget.  RIOT ACT ENTERTAINMENT also booked comics and entertainment for universities,

corporations, and local and national private functions, as well as launched and operated a companion website at "hireacomic.net" to assist people in locating qualified, diverse comedy entertainment for any function.

19.    In addition to launching the RIOT ACT ENTERTAINMENT business, Plaintiff Xereas also launched a record label under the name and mark RIOT ACT RECORDS.  Joel Hass, comedy director at XM radio, was retained in Fall 2005 by RIOT ACT RECORDS as its producer for all comedy albums.  The first talent signed to RIOT ACT RECORDS was comedian and musician Doug Powell.

20.    From 2005 through 2012, Plaintiff Xereas continued to do business under various RIOT ACT trademarks and trade names, including, *inter alia,* "RIOT ACT," "RIOT ACT ENTERTAINMENT," "RIOT ACT RECORDS," "RIOT ACT COMEDY," and "RIOT ACT TV" (collectively, the "RIOT ACT Trademarks"), and the RIOT ACT Domain Names.

21.    In the years following the 2005 launch of RIOT ACT and RIOT ACT ENTERTAINMENT, Plaintiff Xereas organized and produced more than 100 comedy shows in the DC area, across the country and internationally, including shows at GW Lisner Auditorium, The Lincoln Theater, 9:30 Club, and DAR Constitution Hall.

22.    In February 2007, Plaintiff Xereas opened and operated a comedy club under the name and trademark RIOT ACT COMEDY CLUB located at 1610 14th Street, N.W., Washington, D.C., below the former location of HR-57, the renowned jazz club (hereafter, "Riot Act Club #1").  Riot Act Club #1 received considerable and positive media and public attention during its tenure, including being identified as one of the "Best Bets" by *The Washington Post*, selected three times as "Pick of the Week" by the

7

*Washington City Paper*, and covered in articles in *The Washington Post*, *The Washington Times*, *Metro Weekly*, and other local press.

23.     Riot Act Club #1 ceased to operate in or around November 2007 due to issues related to the size and capacity of the venue.  Following closure of the Riot Act Club #1, and throughout 2008, 2009, and 2010, Plaintiff Xereas and his family devoted their time and resources to actively pursue his comedy booking and production business under the RIOT ACT Trademarks and Domain Names, as well as his ultimate goal of reopening a RIOT ACT comedy club at a larger and more significant venue.

24.     After Riot Act Club #1 closed, Plaintiff Xereas developed a detailed business plan and, together with restaurateur Constantine Stavropoulos, owner of The Diner and Tryst in Adams Morgan and Open City in Woodley Park, pursued space for a new club at 14th and T Streets in Northwest Washington, D.C.  The property was ultimately sold to another entity and therefore was no longer available for Plaintiff Xereas.  Plaintiff nonetheless continued to pursue his goal of opening a new comedy club.

25.     In July 2009, in anticipation of expanding his business and relaunching his efforts to open a RIOT ACT comedy club in the Washington, D.C. area, Plaintiff Xereas registered more than sixty (60) other RIOT ACT-formative domain names including, but not limited to, "riotactcomedytheaters.com," "riotactevents.com," "riotactconcerts.com," "riotactdownloads.com," "rioactfanclub.com," "riotactfundraiser.com," "riotactmerchandise.com," "riotactgear.com," "riotactcomedyclub.com," "riotactdvds.com," "riotactclothes.com," "riotactcomedyclubs.com," "riotactkids.com," "riotactshow.com," "riotactmusic.com," and "riotactcomics.com."  Each of those domain names were registered to Plaintiff Xereas as sole owner, for the period of July 19, 2009

through July 19, 2011.

26.     Since launching his businesses under the various RIOT ACT Trademarks and Domain Names in 2005, Plaintiff Xereas has devoted significant resources, both financial and personal, to establish the reputation of the RIOT ACT Trademarks, both within and outside the comedy community, as a source of high-quality entertainment services and civic responsibility.  Through his RIOT ACT businesses, Plaintiff Xereas has been actively involved in community and fundraising activities for various charitable causes, including, but not limited to, Hands on DC, The Posse Foundation, Surfrider Foundation, the YMCA, Boys & Girls Clubs of America, and Whitman-Walker Health. Over the years since its inception, RIOT ACT ENTERTAINMENT has donated numerous show tickets to private auctions that benefitted many worthy causes and charitable organizations in the larger D.C. metropolitan area.

27.     As a result of his longstanding efforts, and those of various family members and friends associated with his businesses, the RIOT ACT Trademarks have become well known and are favorably perceived in the community.

28.     Plaintiff Xereas has acquired valuable common law rights in the RIOT ACT Trademarks and Domain Names through longstanding use of them.

29.     Plaintiff Xereas filed a trademark application for RIOT ACT with the United States Patent and Trademark Office on or about January 13, 2012.  On or about September 25, 2012, Plaintiff Xereas became the sole registered owner of the RIOT ACT trademark with a first-use date of September 2005.

**DEFENDANTS DAWSON AND HEISS**

30.     In or about March 2010, and in connection with his efforts to expand his

business under the RIOT ACT Trademarks and establish a larger comedy venue in the Washington, D.C. area, Plaintiff Xereas was introduced to Defendant Dawson by a real estate agent. The agent was attempting to lease space at 505 9th Street, N.W., Washington, D.C. (which later became known as 801 E Street, N.W., Washington, DC) to Defendant Dawson for a restaurant.  However, an ordinary restaurant would not meet then-existing zoning restrictions for the space which required an arts/theater venue.  The space, officially known as Square 0406, Lot 0026, was designated by the D.C. Office of Planning to house a theater.

31.    Defendant Dawson, a successful bar and restaurant owner who owns approximately 23 establishments, had been interested in the subject lease space for over two years because of significant rent abatement, tax credits, and other incentives that the space offered due to the specialized zoning restriction ("Preferred Use Zoning") and prime location.    The establishments Dawson had experience running did not meet the zoning criteria, and he did not have a business plan that would meet the Preferred Use Zoning requirements or possess the knowledge of how to run an arts/theater venue. Defendant Xereas had that requisite business plan and knowledge to run an arts/theater venue, but lacked the capital that would be required to lease a 13,000-square-foot commercial space.  Accordingly, the real estate agent introduced Plaintiff to Defendant Dawson.

32.    During their initial meetings, Plaintiff Xereas informed Defendant Dawson of his experience in the comedy field, his longstanding family business under the RIOT ACT Trademarks, and of his interest in launching a new comedy club under the RIOT ACT Trademark.   Defendant Dawson informed Plaintiff Xereas of his longstanding

expertise in the restaurant business and of the multiple local restaurants he owns (or owned), designed, and operates as a partner in D.C.-based Bedrock Management Company.  Defendant Dawson expressed an interest in participating in the comedy club business venture proposed to him by Plaintiff and agreed to contribute to it financially, to operate a restaurant/bar within the comedy theater, and to solicit other investors to the venture.

33.     Initially, Plaintiff and Defendant Dawson intended to be equal partners.

34.     Shortly after Plaintiff and Defendant Dawson verbally agreed to be equal partners, Defendant Dawson introduced Plaintiff to Defendant Heiss as another potential investor and business partner in the proposed comedy club and dinner theater venture (the "Venture").  Defendant Heiss is a corporate and tax attorney and longstanding in-house counsel for Mr. Dawson's Bedrock Management Company,

35.     Following various meetings, Plaintiff and Defendants Dawson and Heiss decided to go into business together to launch a new comedy club at 801 E. Street, N.W. (the "Venue"), under the name and trademark RIOT ACT COMEDY CLUB, pursuant to a trademark license from Plaintiff Xereas.  They also decided to utilize much of the content of the business plan that Plaintiff prepared and used during his 2008 to 2009 efforts to lease another location for his club.

36.     Plaintiff Xereas permitted use of his Trademarks by the Venture, relying upon his ownership interest and role as General Manager to ensure quality control and proper use of his RIOT ACT Trademarks and RIOT ACT Domain Names.  From the inception of their plans to go into business together, Plaintiff made clear, and Defendants Dawson and Heiss were aware, that the RIOT ACT Trademarks and Domain Names were

owned, and were to be continually owned, solely and exclusively by Plaintiff.  Indeed, Plaintiff advised Defendant Dawson and Defendant Heiss that he would not enter into a business relationship with them, or anyone else, unless Plaintiff remained the sole owner of the RIOT ACT Trademark and Domain Names.

37.     The question of who would have ownership of the RIOT ACT Trademark and RIOT ACT Domain names was a material fact to Xereas as he considered whether to enter into a business relationship with Heiss and Dawson.

38.     Defendants convinced Plaintiff to contribute funds, labor, time, expertise, and his extensive list of entertainment and personal contacts to the benefit of the LLC, while later failing to pay Plaintiff adequate compensation for such contributions.

39.     Heiss and Dawson falsely promised Plaintiff that they would not challenge Plaintiff Xereas's ownership of the RIOT ACT Trademark and Domain Names and that Plaintiff would remain the sole owner of the RIOT ACT Trademark and Domain Names. Defendants Heiss and Dawson made such statements with knowledge of their falsity. Plaintiff reasonably relied on Defendants' statements in deciding to enter into a business relationship with them and contribute $100,000 in capital towards the LLC.  Accordingly, Defendant Dawson, Defendant Heiss, and Plaintiff entered into a verbal agreement on or about March 2010 in Defendant Dawson's office, located at 4830 V Street, N.W. in Washington D.C., wherein the parties agreed that Plaintiff would continue to be the sole owner of the RIOT ACT Trademark and Domain Names.

40.     In April or May 2010, Plaintiff Xereas and Defendants Dawson and Heiss agreed to memorialize their planned business relationship and to establish a corporate entity to pursue their plans to open a new RIOT ACT COMEDY THEATER at 801 E.

Street, N.W., Washington, D.C. (hereafter, "Riot Act Club #2").  The parties agreed verbally that Plaintiff Xereas would contribute his ability, expertise, talent, and experience in comedy club management, comedy booking services, and comedy production services, to the Venture; Dawson would contribute his ability, expertise, talent, and experience as a restaurant designer, owner, and operator, and in finding investors and assisting, when needed, in the Venture's management; and Heiss would contribute her expertise as a corporate and tax attorney to the Venture.

41.    Defendant Heiss's legal representation of the LLC created many conflicts of interest, all of which Heiss should have disclosed to Plaintiff.  Among Heiss's conflicts of interest are her representation of Defendant Dawson and/or Defendant Dawson's other businesses, her representation of the LLC while also being a member of the LLC, and her adulterous sexual relationship with Dawson.  At no time, however, did Defendant Heiss advise Plaintiff to seek independent counsel due to conflicts of interest.

42.    Upon information and belief, Defendant Heiss acted as an attorney and legal counsel for the LLC from its inception.

43.    Upon information and belief, Defendant Heiss had other business dealings with Dawson prior to the formation of the LLC, and continued to have separate business relationships with Dawson after the formation of the LLC.

44.    During that period, Defendant Heiss, a licensed D.C. attorney, prepared the necessary documents to pursue the parties' Venture, including an Operating Agreement and the Articles of Organization for a DC limited liability corporation, identified as Riot Act DC, LLC.  Heiss registered the LLC with the District of Columbia on May 6, 2010. The Operating Agreement drafted by Heiss contained no conflict of interest provision and

13

no independent counsel provision, both of which are customary clauses in company Operating Agreements.

45.     Defendants Heiss and Dawson never disclosed the conflicts of interest that arose from Defendant Heiss's legal representation of the LLC to Plaintiff or to the other Members of the LLC, nor did Plaintiff or any Members of the LLC sign any conflict of interest waivers.

46.     Also on May 6, 2010, Plaintiff Xereas, without benefit of independent legal counsel, and Defendants Dawson and Heiss executed the Operating Agreement. Among other things, the Operating Agreement provided for each of the three Managing Members (Xereas, Dawson, and Heiss) to contribute the sum of $100,000 to the Venture as an initial capital contribution.  The Notice of Exempt Offering of Securities filed on behalf of the LLC with the U.S. Securities and Exchange Commission and signed by Heiss on January 6, 2011, asserts and estimates that $100,000 would be paid to each of Plaintiff, Heiss, and Dawson out of the investment funds contributed by Class B Members in consideration for "compensation for services devoted to starting up and establishing the business."  Plaintiff never received this payment.  If Heiss and Dawson received this payment, it was never discussed or voted on by the Managing Members.

47.     Because of Plaintiff's involvement in the business, Defendants gained the expertise necessary to operate a performing arts venue, as required under the Preferred Use Zoning.  Accordingly, the Defendants were able to become tenants in a 13,000 square foot Preferred Use Zoning commercial space and derived financial benefits from this classification.

48.     On November 1, 2010, the parties entered into an Amended and Restated

Operating Agreement of Riot Act DC, LLC ("Amended Operating Agreement"), which retained a number of fundamental terms from the original agreement, including the identity of the Managing Members.  A copy of one of the final mark-ups of that Amended Operated Agreement is attached as Exhibit 1.

49.     Both the Operating Agreement and the Amended Operating Agreement contained no legal provisions regarding any transfer of ownership of the RIOT ACT Trademark and RIOT ACT Domain Names nor did Defendant Heiss draft any separate transfer or licensing documents regarding same.

50.     Both the Operating Agreement and the Amended Operating Agreement established two tiers of ownership in Riot Act DC, LLC.  According to the agreements, Class A members, comprised solely of the three Managing Members (*i.e.*, Plaintiff Xereas and Defendants Dawson and Heiss), were to be exclusively responsible for the operation of the business of Riot Act DC, LLC.  The Agreement also provided for Class B members to hold an ownership interest in the LLC, but have no management role in its operation. Both the original and Amended Operating Agreement provided that any management decisions should be controlled and dictated by a two-thirds vote of the Class A Members.

51.     Following the formation of the LLC, Plaintiff Xereas, together with Defendants Dawson and Heiss, finalized the "Business Plan for Start Up Business Riot Act Comedy Theater" ("RIOT ACT Business Plan").  The purpose of the RIOT ACT Business Plan was to lay out the responsibility and expectations of the three Managing Members, as well as to solicit investment in the business by third parties (namely, Class B members).  The RIOT ACT Business Plan was used as a principal selling tool to solicit Class B Members and, ultimately, the LLC raised approximately $2.3 million dollars from

Class B investors.  A true and correct copy of the RIOT ACT Business Plan is attached as Exhibit 2.  The portions of the RIOT ACT Business Plan pertaining to the comedy club (as contrasted with the restaurant) were copied from Plaintiff Xereas's earlier (2008-2009) business plans.

52.    The RIOT ACT Business Plan as prepared by Plaintiff Xereas and Defendants Dawson and Heiss, reflected Plaintiff's understanding of the terms of his contractual relationship with Dawson, and Heiss.  In particular, the RIOT ACT Business Plan recognized and detailed Plaintiff Xereas's longstanding rights in, and use of, the RIOT ACT Trademarks in connection with comedy services.  Significantly, the RIOT ACT Business Plan provided for Plaintiff Xereas's contribution to the business of his expertise and experience in the comedy club field, but did *not* provide for the assignment or any ownership transfer of the RIOT ACT Trademarks and Domain Names from Plaintiff Xereas to the LLC or anyone else.

53.    The RIOT ACT Business Plan expressly recognized and stated that "the appeal and success of the Riot Act Comedy Theater would lie first and foremost in the ability, expertise, talent, and vast experience of John Xereas."  The RIOT ACT Business Plan specified that Plaintiff Xereas would act as Riot Act Club #2's General Manager, be responsible for entertainment bookings, and contribute his customer list of approximately 12,000 e-mail addresses and contact details to the Venture. The RIOT ACT Business Plan further specified that the LLC's website would be launched at Plaintiff's longstanding "riotactcomedy.com" domain name; Riot Act Club #2 would sell a range of collateral merchandise featuring the various RIOT ACT Trademarks; Riot Act Club #2 would sell CDs and DVDs produced by Plaintiff's business RIOT ACT RECORDS; and  Riot Act

Club #2 would benefit from revenue earned through Plaintiff Xereas's longstanding "hireacomic.com" website.  All parties expected that third parties would view and rely upon the representations in the RIOT ACT Business Plan when determining whether or not to invest in the LLC.

54.     On or about December 30, 2010,  the LLC signed a lease for space for Riot Act Club #2 at 505 9th Street, N.W., Washington, D.C. (later known as 801 E. Street, N.W., Washington, D.C.).  The Lease for the property specifically stated that the premises could only be used for a comedy club, a venture that would not have been possible for the Defendants to undertake without Plaintiff.

55.     Over the course of the next several months, Defendant Dawson took the lead in the planning, supervision, reconstruction, and buildout of the future club space. Defendant Dawson hired Geoff McNabola to act as general contractor for the buildout and was solely responsible for the finances related to that buildout.  Despite multiple requests, Plaintiff Xereas was never provided access to the financial documents related to the buildout and still has not been provided with these documents as of the date of the filing of this Second Amended Complaint.

56.     In or around January 2011, the LLC hired Squiid, Inc. ("Squiid"), a website design company, to create a new and improved website for Riot Act Club #2 at Plaintiff Xereas's longstanding domain "riotactcomedy.com."   In connection with that project, Plaintiff Xereas provided all registration, password, and other information associated with his "riotactcomedy.com" domain name and other RIOT ACT Domain Names to Squiid for use in developing the club website.  Squiid was offered full access to RIOT ACT Domain Names and websites, and to Plaintiff Xereas's e-mail account at

17

johnx@riotactcomedy.com, solely in connection with its web development activities. Defendants and Squiid were expressly informed by Plaintiff that ownership of the RIOT ACT Domain Names should be retained by Plaintiff and that no changes to domain name ownership records should be made.

57.     With the input and approval of Plaintiff Xereas, Defendants also developed a new RIOT ACT CLUB logo for use on the club website and in connection with the operations and promotion of Riot Act Club #2.

58.     In the time period leading up to the formal opening of Riot Act Club #2 in August 2011, Plaintiff Xereas and Defendant Dawson repeatedly discussed their mutual understanding that ownership of the RIOT ACT Trademarks and RIOT ACT Domain Names would remain exclusively with Plaintiff Xereas.   It was Plaintiff Xereas's understanding, confirmed in multiple conversations with Defendant Dawson, that Plaintiff should pursue federal registration for the RIOT ACT Trademarks in his name, that Plaintiff would continue to retain full ownership of the RIOT ACT Trademarks and RIOT ACT Domain Names, and that, once it became profitable, Riot Act Club #2 would pay Plaintiff a trademark licensing fee for its use of the RIOT ACT Tradename, marks, and associated Domain Names.

59.     On or about late May 2011, Plaintiff and Defendant Dawson were walking on D Street in Northwest Washington, D.C. The two spoke about their prior agreement and their mutual understanding that Plaintiff was to continue being the sole owner of the RIOT ACT Trademark and RIOT ACT Domain Names.   The question of who would have ownership of the RIOT ACT Trademark and RIOT ACT Domain names was a material fact to Xereas as he considered whether to continue his business relationship with Heiss

and Dawson. Defendant Dawson confirmed the agreement to Xereas at this time, and thereby falsely promised Plaintiff that he would not pursue or dispute ownership of Plaintiff's RIOT ACT Trademark and RIOT ACT Domain Names. Dawson made such statements with knowledge of their falsity.  Plaintiff reasonably relied on Defendants' statements in deciding to continue his business relationship with Defendants and contribute $100,000 in capital towards the LLC.  Dawson further stated that Plaintiff should talk to his attorney to take the proper steps to register the RIOT ACT Trademark in Plaintiff's name and that the LLC would pay to license the name from Plaintiff when the LLC was making money and could afford the licensing fee.

60.     On or about May 29, 2011, Plaintiff sent Defendant Dawson an e-mail expressing concerns about Defendant Heiss and requesting that the parties memorialize in writing the agreement and understanding regarding Plaintiff's sole ownership of the RIOT ACT Trademark.  Plaintiff requested that the verbal agreement regarding the RIOT ACT Trademark be memorialized in writing on several occasions thereafter, but Defendant Heiss, the LLC's counsel, never drafted a contract.

61.     In September 2011, in accordance with his financial obligations under the Amended Operating Agreement, Plaintiff Xereas contributed the first of two $50,000 investment payments to the LLC.

62.     On August 9, 2011, Defendant Heiss registered the trade name RIOT ACT COMEDY THEATER with the District of Columbia.

63.     Riot Act Club #2 opened to the public on August 11, 2011.

64.     On or about August 24, 2011, Plaintiff, at the urging of Defendant Dawson, authorized Plaintiff's independent legal counsel Jay Rosenthal to order

trademark searches through Thompson Compumark in anticipation of registering the RIOT ACT Trademark in Plaintiff's name pursuant to the agreement entered into by the parties.

65.     On or about August 29, 2011, in advance of taking action to federally register the RIOT ACT Trademarks, Plaintiff Xereas arranged for a follow-up trademark availability search to be conducted to confirm the continued availability for use and registration of the RIOT ACT Trademarks for comedy services in the U.S.  The search results confirmed Plaintiff Xereas's exclusive ownership of the various Riot Act Domain Names.  Defendant Dawson encouraged Plaintiff to register the RIOT ACT trademark in his name, as was previously agreed to, as Defendant Dawson was concerned about other parties using the trademark.

66.     Consistent with the parties' understanding, Plaintiff Xereas filed U.S. Trademark Application No. 76710275 for the mark RIOT ACT covering "comedy production in bars, restaurants, and other theatrical venues" on January 13, 2012, claiming a date of first use of September 2005 (the "Application").  The Application was approved and, on September 25, 2012, Plaintiff received confirmation from the United States Patent and Trademark Office that he is the sole registered owner of the RIOT ACT trademark with a first use date of September 2005.

67.     In the months following the December 2010 signing of the lease for Riot Act Club #2, Plaintiff Xereas devoted his full time, resources, contacts, and considerable talents towards the establishment of a new state-of-the-art comedy club. His activities during this time period included working closely with employees of Squiid to build a new "riotactcomedy.com" website, including consulting on the site's design, layout,

20

functionalities, and content; establishing a presence for the club in social media, including a Facebook page and Twitter account, and commencing electronic communications via those accounts; reaching out to talent managers, agents, comics, and other contacts in the comedy and entertainment industry to notify them of the new Venture; booking talent for future shows; establishing club policies and procedures; developing club marketing and advertising plans; developing a weekly club schedule of events and activities; co-developing with Squiid a new ticket reservations system; hiring and managing employees; making hotel and ground transportation arrangements for talent; responding to all e-mails directed to the "info@riotactcomedy.com" e-mail address; and many other aspects of club operations.  Plaintiff Xereas provided these services to the LLC in his role as a co-owner of the LLC and General Manager of Riot Act Club #2, and in anticipation of future earnings from club operations.

68.     Following the club's formal opening, and in his role as Owner/Operator, Plaintiff Xereas assumed responsibility for most operational aspects of the business including, but not limited to, the various responsibilities detailed above.  Plaintiff Xereas also took on responsibility for club staffing, acted as club host and, when needed, as bartender, waiter, sound supervisor, lighting supervisor, public relations manager, and more.  Consistent with his reputation in the industry, Plaintiff worked tirelessly to ensure the commercial and financial success of Riot Act Club #2 and, correspondingly, the LLC.

69.     On or about January 3, 2013, the LLC changed its name from Riot Act DC, LLC, to Penn Social, LLC.

### DEFENDANTS' WRONGFUL ACTS

70.     Defendant   Dawson   made   fraudulent,   intentional,   and   reckless

misrepresentations to Plaintiff to fraudulently induce Plaintiff to go into business with Defendants, thereby enabling Defendant Dawson to be an owner of a company that meets the Preferred Use Zoning restrictions of the 13,000-square-foot space he had been eyeing for two years.

71. As part of Defendants' plan, Dawson conspired with Defendant Heiss, someone to whom he was very close both professionally and personally, and brought Heiss on as a co-owner and attorney for the LLC, thus ensuring that Dawson and Heiss would have the majority of the votes over Plaintiff and could effectuate a freeze out of Plaintiff at a later date. Defendants' plotted to use Xereas's reputation, intellectual property, industry contacts, and business plan to acquire investment money for a new business, become a tenant in a specially zoned theater/arts venue – for dramatically reduced rent – and ultimately illegally force Xereas out of the endeavor. By leasing property with a special zoning restriction, Defendants were able to save approximately $43 per square foot, or approximately $559,000 per year, as compared to other similarly situated commercial properties without such zoning restrictions.

72. To sabotage Plaintiff and bolster their future argument for his removal, Defendants intentionally took actions to negatively affect Plaintiff's ability to manage the LLC and intentionally failed to take actions that would assist the LLC.

73. Once Defendants implemented their plan and effectuated the improper freeze out of Plaintiff, Defendants retained legal counsel to attempt to challenge Plaintiff's ownership of the RIOT ACT Trademarks and Domain Names. After Defendants attempts to steal Plaintiff's intellectual property failed, Defendants rebranded the LLC as Penn Social, LLC, a bar that no longer meets the Preferred Use Zoning

requirement.   Then, in or about July 2012, in completion of Dawson and Heiss's fraudulent scheme, Dawson then purchased all but one percent (1%) of Heiss's shares of the LLC so that he had a majority ownership interest (52.4%); this ensured his future control of the LLC in a commercial location where it could not have operated but for Plaintiff's involvement and Defendant's nefarious plan.   On information and belief, Dawson acquired Heiss's interests at a grossly undervalued price.

74.    As a result of Defendant Heiss's participation, Defendant Dawson and Defendant Heiss ensured that they would always be the voting majority and, as such, they conspired and made decisions to force Plaintiff out of the business once they were operating the Venue and had secured Plaintiff's contribution, industry contacts, social media accounts and learned from Plaintiff how to run a comedy club.  Defendants took complete control of the finances from the outset.  They excluded Plaintiff from managers' meetings, which were often held at one of Dawson's other businesses.

75.    Defendants actions violate Section 10.4 (paragraph 157) of the Second Amended Operating Agreement signed by the parties, willfully render imperfect performance, and interfere with Plaintiff's performance under the Operating Agreement.

76.    The Offering Memorandum that was used to secure investment funds for the LLC highlights Defendant Dawson's success in creating unique bars and restaurants and states that food and beverage sales would be an important revenue generator in addition to the comedy theater.   Despite this representation and Dawson's other legal duties, Defendant Dawson intentionally held back his resources and limited his involvement in an effort to undermine and sabotage Plaintiff.

77.    The Offering Memorandum also states that the LLC intends to extensively

cross market with Defendant Dawson's other 14 bars in the area and that the LLC would use its extensive media contacts for the benefit of the LLC. .  Despite this representation and Dawson's other legal duties, Defendant Dawson intentionally held back his resources and limited his involvement in an effort to undermine and sabotage Plaintiff. Notwithstanding the asserted importance of cross promotion, Defendant Dawson never put any fliers or cross-promoted the LLC in his other bars; after removing Plaintiff, he started extensive cross promotion, including bar crawls in participation with his other establishments.  Also, Dawson never used social media but started using it after Plaintiff was improperly removed.  Further, he never introduced Plaintiff to any of his media contacts or used those contacts to promote Riot Act Club #2, but started doing so after Plaintiff was improperly removed.  For example, Connie Poole handled public relations for Dawson and his other establishments and was also editor of a magazine that features venues similar to Riot Act Club #2.  Connie Poole was never introduced to Plaintiff or used to promote the Venue while Plaintiff was a Managing Member, but after he was removed Dawson started utilizing her services and industry contacts.  Finally, after Plaintiff was improperly removed, Defendant Dawson brought in all his promotional partnerships for the benefit of the LLC (*e.g.* District Entertainment, District Games, District Karaoke, District Trivia, MD Beer Pong, United Beltway Sports, United Social Sports, etc.), but held these back when Plaintiff was still managing the LLC.  These promo partners/leagues were brought in by Defendants in February 2012, just weeks after Plaintiff was improperly removed, to generate additional revenue.  One of these companies, US Sports actually announced on Twitter as early as November 2011 that it was "coming in February" and announced its new headquarters at the LLC's place of

business despite Plaintiff not being aware of any lease agreement, sublease agreement or any payment from US Sports to the LLC.

78.     Many ideas and concepts offered by Plaintiff were also "shelved" by Defendants while Plaintiff was a managing member, but as soon as Plaintiff was removed these ideas were implemented.  For example, Plaintiff wanted to use the theater screen to televise events such as the World Cup in the afternoons and on days when the club did not host comedy events and asked that they purchase a Direct TV/Sports package. Dawson refused, but as soon as Plaintiff was removed, Defendants purchased the package and advertised "College Hoops" in March 2012. In addition, Defendants limited the Venue's beer selections to just a few beers, but, after Plaintiff was improperly removed, the LLC expanded its offering to approximately 30 beers.  While Plaintiff was involved in the LLC, there were only five menu options (chosen by a general manager hired by Defendants without Plaintiff's knowledge or input), which resulted in abysmal food sales. However, after Plaintiff was improperly removed, a consultant was brought in by Defendants and the menu was revamped.  Similarly, while Plaintiff was handling day-to-day operations, there was little decor and little furniture at the venue.  After he was improperly removed, Defendants bought furniture, hung up paintings, and decorated the walls.

79.     In or about May 2011, prior to Riot Act Club #2 even opening its doors, Defendants hired Matthew Morinello as General Manager.  Morinello had no experience running a comedy club and often admitted, "I have no idea what I'm doing."  Defendants hired Morinello without consulting with Plaintiff, despite this being Plaintiff's initial job title.  Plaintiff insisted that another general manager was not needed and funds were

allegedly sparse at the time.  Plaintiff received multiple complaints about Morinello's behavior from staff and customers, including a letter from a White House aide.  With apparent authority from Defendants, and over Plaintiff's objections, Morinello made several business decisions that were detrimental to the LLC, including menu and drink selections that were inappropriate for a comedy venue.  He also stopped Internet sales of event tickets that prevented potential customers from purchasing last minute tickets and which had the effect of forcing potential customers to come to the venue to buy tickets at the doors but sometimes finding out that the event was sold out.  Such actions had the effect of decreasing the value of the business and the RIOT ACT Trademarks and were not consistent with standard industry practice.

80.    On August 11, 2011, the LLC's opening night, Dawn Henderson, the LLC's social media manager, had a conversation with an intoxicated Nathaniel Adams, who identified himself as a friend of Matthew Morinello.  Adams told Henderson that Plaintiff would not be around for long and that Morinello was there to replace him. Approximately one month later, the Defendants hired Adams as the LLC's Assistant General Manager, again without consulting Plaintiff.

81.    Plaintiff advised Defendant Dawson of the serious harm that Morinello was doing to the LLC, but Dawson resisted and refused to take corrective action.  After repeated complaints from Plaintiff, Dawson acceded to the removal of Morinello and Adams.  After Morinello and Adams were removed and Plaintiff was able to exert more control over the day-to-day operations of the LLC, losses subsided. In the month following Morinello and Adam's termination, the LLC makes a sizeable profit for the first time.

82.     Defendants insisted that the General Manager and Assistant General Manager, along with their other hires, be paid fairly large salaries ($50K-$65K) while Plaintiff – the "key man" and face of the LLC – received only a nominal sum, despite Plaintiff working many 20-hour days and often sleeping at the comedy club.  Another manager, who was hired from one of Defendant Dawson's other clubs, was paid an annual salary of $65,000, although he was very rarely at the Venue.  Plaintiff repeatedly told Defendants that these individuals were not needed and the expense of their inflated salaries was unjustified and wasteful.  Additional employees were given employment contracts without Plaintiff's knowledge and despite Plaintiff being told there was no money to pay him.  When Plaintiff asked Defendants about employment contracts, he was told that the business did not give out employment contracts.

83.     On information and belief, Defendants employed individuals who were also investors in and Members of the LLC as a way to provide a return on those persons' investments, but at a time when the LLC did not have adequate funds and as a way to deny funds to Plaintiff.

84.     Defendants Dawson and Heiss hired their friends and family who had no experience in comedy, including, for example, Dawson's son Zack.  On information and belief, Zack Dawson received a paycheck from the LLC during time periods for which he was not working at the place of business and was in different states.

85.     On information and belief, Defendants hiring of such employees were conducted as part of a scheme to have the LLC fund Dawson's other businesses, to otherwise deprive the LLC and Plaintiff of funds, and to otherwise benefit Defendants.

86.     In September 2011, as a result of interactions between the parties and

comments from club employees, Plaintiff began to suspect that Defendants Dawson and Heiss were trying to push him out of the business.

87.     On or about October 2, 2011, Defendants Dawson and Heiss presented Plaintiff with a draft Second Amended Operating Agreement.  The Second Amended Operating Agreement, a copy of which is attached as Exhibit 2, sought to significantly reduce Plaintiff's ownership percentage in the LLC, downgrade his investment status from a Class A Managing Member to a Class B investor with no management responsibilities or rights, remove his voting rights, and allow for his termination as General Manager without compensation either for his work to date or for his ownership contribution.  Defendant Heiss sent Plaintiff an e-mail, to which Defendant Dawson was copied, wherein she threatened Plaintiff and attempted to coerce him to sign the Second Amended Operating Agreement, telling Plaintiff that he would be terminated if he did not sign the Operating Agreement.  Defendant Dawson and Defendant Heiss also texted Plaintiff with messages telling him to sign the agreement or he would be fired the next day.    Notwithstanding, Plaintiff refused to sign the Second Amended Operating Agreement and, less than two months after the Venue opened its doors, was forced to retain an employment attorney to assert his legal rights and to seek compensation.

88.     Following the confrontation with Defendants Dawson and Heiss over the Second Amended Operating Agreement, Plaintiff Xereas again addressed the issue of his exclusive ownership of the RIOT ACT Trademarks and RIOT ACT Domain Names with Dawson.  In an October 1, 2011 e-mail to Defendant Dawson, Plaintiff repeated the parties' earlier conversations regarding the need to revise the Amended Operating Agreement to specifically address Plaintiff's ongoing ownership of the RIOT ACT

28

Trademarks and clarify the terms of the license pursuant to which the LLC was permitted to continue to use the RIOT ACT Trademarks.

89.     Following repeated verbal assurances from both Defendants Dawson and Heiss regarding their continued interest in the Venture and, in particular, in working together with Plaintiff Xereas to ensure the club's success, Plaintiff continued throughout the months of October, November, and December 2011 to devote his full time and resources to the ongoing operations and success of the club.  In November 2011, Plaintiff Xereas paid his remaining $50,000 contribution into the LLC.

90.     In October 2011, Defendants hired a new General Manager, Peter Bayne, again without consulting with Plaintiff.  Bayne was Defendant Dawson's friend and General Manager of one of Dawson's other establishments.  Defendant Dawson admitted to Plaintiff that Bayne was not competent for the position.  Bayne had no experience in comedy, entertainment, or any ticket-driven business.  On several occasions, Mr. Bayne became intoxicated during work hours and "comped" large checks for big groups of his friends who would frequent the Venue, to the detriment of the Company's finances and reputation. Bayne was also but paid a full-time salary through the LLC despite rarely being at the Venue.  After Plaintiff was improperly removed, Bayne intercepted, read and impersonated Plaintiff when responding to e-mails addressed to Plaintiff.

91.     Throughout the Fall of 2011, Plaintiff Xereas's relationship with Defendants Dawson and Heiss continued to deteriorate, due in large part to Defendants Heiss and Dawson's poor management decisions, the pair's inappropriate behavior, and their desire to remove Plaintiff.

92.     Heiss made numerous decisions that negatively impacted the LLC,

29

financially and otherwise.  For example, Defendant Heiss fired the LLC's public relations company and hired Bulldog Public Relations at twice the cost, simply because she was upset that the first company did not include her name in a press release.  In addition, Defendant Heiss paid $10,000-$15,000 for a designer and posters, but neglected to put the LLC's phone number and social media information on the posters.  She also failed to sign a contract to pay Squiid a flat annual fee, despite a unanimous vote of the managing members, thereby resulting in the LLC having to pay Squiid more than double the flat fee; this action alone resulted in a loss to the LLC of at least $35,000.  She also made wasteful purchases, such as hiring a photographer to take photos that the LLC never used.

93.     Defendant Heiss had represented to the parties that she would handle employee-related grievances and issues, but she did not handle these responsibilities properly, responsibly, or legally.  She neglected to draft employee manuals, and no written procedures or training information were given to employees.  Additionally, she created no policies for the hiring, firing, or promotion of employees; no personnel files were kept; and no policies were established regarding e-mail accounts, privacy, or use of company computers.

94.     Defendant Heiss brought men with whom she was having adulterous affairs to the Venue and behaved with them in a sexually inappropriate manner. Defendant Heiss would also inappropriately touch and interact with staff and comics. She regularly asked individuals to feel her breasts to "prove they are real" and lifted her shirt to show employees and comics, including Paul Mooney, her breasts.  At one point, a comic's wife became upset and embarrassed by Defendant Heiss's inappropriate physical actions with her husband.  Heiss also had an extra-marital affair with a well-known

comedian.

95.     Defendant Heiss would often speak in an obscene manner, including calling Plaintiff's mother Maria an obscene and derogatory term and suggesting that Plaintiff's brother Ted perform an obscenity on their mother.  Defendant Heiss frequently discussed her aptitude at performing oral sex and how performing oral sex resulted in her always getting her way.  In one particularly vulgar instance, Defendant Heiss approached Eddie Griffin, a well-known comic and actor in the green room, and in the presence of the Assistant Deputy Mayor Sedrick Muhammed, told the comic that "I'll blow you if you do another show here."  Defendant Heiss had to be physically removed from the green room.

96.     As a result of Defendant Heiss's inappropriate and harmful acts, Defendant Heiss created an uncomfortable environment that affected morale, the LLC's reputation, and revenue.  Concerned about the behavior of Defendant Heiss, Plaintiff, on multiple occasions, spoke with and e-mailed Defendant Dawson, regarding the problems caused by Defendant Heiss and the adverse effects she was having on the business. Dawson refused to take any action against Heiss and, in January 2012, he named her Director of Operations.  This decision was not in the best interest of the LLC, but it was in Defendant Dawson's personal interest.  Defendant Heiss told Plaintiff that she had information she could use against Defendant Dawson, including their adulterous sexual relationship, as well as other business improprieties and inappropriate actions.  Defendant Heiss told Plaintiff that she had information on Defendant Dawson, that she "could bring him down whenever I want" and that Defendant Dawson felt "emasculated" by Defendant Heiss.  Defendant Heiss also stated that Defendant Dawson owed her money.

97.     Defendant Heiss's inappropriate behavior eventually led to a sexual harassment charge being filed against her as part of an EEOC claim.

98.     Assault charges were filed against Defendant Dawson by a former employee.

99.     In or about the Summer of 2010, Defendants agreed that Plaintiff would be compensated $72,000 per year for his role as General Manager, and this was provided for in the LLC's Business Plan.  Defendants later informed Plaintiff that he would begin receiving these guaranteed payments in January 2011.   Defendants later told Plaintiff that his guaranteed payments would be deferred until such time as the LLC was in a better financial position, at which time he would be paid for past unpaid time.

100.     On or about April 2011, Plaintiff advised Defendants that he could no longer defer his compensation and, as such, Plaintiff was paid $6,000 a month for the months of May through July 2011.  This $18,000 was never reported to the IRS by Defendants until Plaintiff challenged the issue with the IRS.  On or about August 2011, Plaintiff stopped receiving his compensation because there was little operating capital as all money raised was allegedly spent on the buildout.  The money raised from Class B members was intended to pay for the buildout as well as operating expenses, but Defendants mismanaged and misappropriated investment funds, leaving Plaintiff no operating capital to run the business to its maximum potential, thereby diminishing LLC revenue.

101.     Upon information and belief, Defendants caused company funds to be used for personal expenses and to subsidize Defendants' other business ventures.

102.     On or about November 2011, Plaintiff Xereas met with Defendants

Dawson and Heiss to request that the parties prepare and sign paperwork regarding Plaintiff Xereas's compensation as the General Manager of the LLC going forward and for him to receive compensation for his efforts over the prior two-year period. Although they refused to enter into any written agreement with Plaintiff, Dawson and Heiss agreed to compensate Plaintiff effective December 2011, at an annual compensation of $42,000 – an amount much lower than that previously agreed upon. This "salary" was significantly lower than existing salaries paid by Defendants Dawson and Heiss to other members of the club's management staff. To date, Plaintiff has received approximately $26,000 for two years of hard work and dedication.

103.    As time passed, Defendants Dawson and Heiss aggressively increased their machinations to force Plaintiff out of the business. The Defendants conspired to create a hostile work environment, refused to include Plaintiff in company decisions, refused to provide Plaintiff with any financial accounting or access to financial records, and placed undue stress on him and other employees loyal to him. Defendant Dawson instructed managers to be callous to staff and to set as many rules and regulations as possible so that Plaintiff and "his people" would leave. To further contribute to this hostile work environment, Defendants tolerated racist comments. A manager of the LLC, Vincent Coletti, sent a racist e-mail to staff stating "Happy MLK day my Afro Darkie" and regularly called African-American employees "Darkies," resulting in three EEOC complaints being filed. Despite Plaintiff expressing his concern about the e-mail and possible repercussions to the LLC, to Plaintiff's knowledge, Dawson and Heiss never reprimanded or disciplined Coletti. In addition, Defendant Heiss herself made racist comments.

104.    On or about January 17, 2012, without provocation or warning – and despite January being on pace to be the LLC's most successful month yet – Defendants Dawson and Heiss terminated the employment of Plaintiff Xereas's brother Ted and Plaintiff Xereas's friend Mike Farfel.  Ted had been a booker and event planner for the club who had been employed by Riot Act since 2005, while Mike Farfel assisted Plaintiff in the day-to-day operations of the club.  Both Ted Xereas and Mike Farfel were excellent and valuable employees and were eventually replaced with friends of the Defendants, who had no experience running a comedy theater.

105.    On that same date and during that same meeting, Defendants Dawson and Heiss also fired Maria Xereas, Plaintiff's mother, who had assisted Plaintiff Xereas in various aspects of club business without being compensated.

106.    In order to deny unemployment benefits to Ted Xereas, Defendants filed a false report to Unemployment Compensation claiming he was fired due to misconduct. After Ted Xereas filed an appeal, Defendants did not pursue their bogus claim.

107.    Although Ted Xereas had utilized the e-mail address "tedx@riotactcomedy.com" since 2005 for both commercial and personal business, on or about January 17, 2012, Defendants prevented Ted Xereas's access to his longstanding e-mail account.  Defendants also disabled Plaintiff's mother's e-mail on the same day. Plaintiff's mother had been working for the LLC from home without any compensation.

108.    Plaintiff promptly exchanged e-mails with Defendants Dawson and Heiss on January 17, 2012, and asserted his sole ownership of the Riot Act Trademark and e-mail accounts and demanded that Defendants Dawson and Heiss return the disabled e-mail accounts.

109.    Following the firings of Ted Xereas and Mike Farfel, Plaintiff continued to devote the "time and effort to the business as [wa]s reasonably necessary" per the Operating Agreement and continued to handle his usual job responsibilities as is documented in e-mails Plaintiff exchanged with Defendant Heiss.

110.    On January 20, 2012, Defendants Dawson and Heiss saw Plaintiff in the club and cornered him in his office.   The Defendants locked the door and called an impromptu managers' meeting, which Defendant Dawson recorded on his phone.   During the meeting, Defendants Dawson and Heiss voted to relieve Plaintiff of certain management duties.

111.    In an e-mail dated January 25, 2012, Defendant Heiss acknowledged that Plaintiff was at the club multiple times after the January 17, 2012 firings.   An e-mail exchange between Defendant Heiss and Plaintiff, dated January 22, 2012 and January 23, 2012, further demonstrates that Defendants were aware that Plaintiff continued to perform his work duties after the January 17, 2012 firings. Despite having had full knowledge that Plaintiff continued to diligently work and perform his duties for the LLC subsequent to the January 17, 2012 firings, Defendants, on January 26, 2012, a date known to Defendants as Plaintiff's birthday, Defendants Dawson and Heiss held a meeting, without notice, during which they purported, as the majority of the Managing Members, to authorize the removal of Plaintiff from any management role or authority for the operation of Riot Act Club #2 and/or the LLC.

112.    Defendants Dawson and Heiss often called meetings without a stated agenda, as required by the Operating Agreement, and on short notice.   One such instance occurred on January 26, 2012, when Defendant Heiss sent Plaintiff an e-mail requesting a

meeting within 24 hours; Plaintiff responded to this e-mail and asserted that these last-minute, agenda-less meetings are often held under duress and resulted in business being dictated to him.

113.    On or about January 28, 2012, Defendants disabled Plaintiff's use of his RIOT ACT e-mail account.

114.    After Defendants unlawfully seized control of Plaintiff's e-mail account, e-mails sent to his Riot Act e-mail address were intercepted by Defendants and never relayed to Plaintiff.  As such, Plaintiff was unable to conduct business and was deprived of income that he would have received for specific engagements had he received these e-mails.

115.    Defendants further removed Plaintiff as a Managing Member on March 22, 2012, at which time they outlined Plaintiff's alleged "unjustified actions." Defendants' false allegations included, *inter alia*, that Plaintiff refused to return to the club and refused to perform his business duties after the January 17, 2012 firings. Defendants made this claim despite having actual knowledge that Plaintiff did indeed return to the club after the January 17, 2012 firings and that he performed the job duties required of him.

116.    On or about that same date, Defendants Dawson and Heiss arranged for the locks and security system codes at Riot Act Club #2 to be changed to prevent Plaintiff's access to the club or business records.

117.    Plaintiff's removal as a Managing Member violated Section 6.3 of the Amended Operating Agreement, which lists only three triggering events that can lead to the removal of a Managing Member:  death, fraud/willful misconduct, or failure to devote

36

the time and effort to the business as is reasonably necessary.  Although none of these three triggering events had occurred, Defendants unlawfully removed Plaintiff as a Managing Member.

118.    Within a few days following Plaintiff's illegal removal as Managing Member and after his e-mail account was disabled, Plaintiff made inquiries regarding the RIOT ACT Domain Names and associated e-mail accounts.  It was at this time he discovered that, in or around January 2011, before the business opened, Defendants Dawson and Heiss, without Plaintiff's knowledge, authorization, or approval, authorized the wrongful revision of the Domain Name Registration information for "riotactcomedy.com" to unlawfully transfer ownership of the RIOT ACT Domain Names to the LLC.  As a result of the actions taken by Defendants, Plaintiff was denied access to his longstanding e-mail accounts, deprived of ownership of his various RIOT ACT Domain Names, and denied access to club booking records and to his customer and contact lists, all to his detriment.  Without Plaintiff's required authorization Defendants, by and through Squiid, illegally changed the registration and ownership of the domains, thereby giving Defendants complete control of the websites and e-mail accounts associated with the Plaintiff's domain names, all of which he has owned and used since 2005.

119.    The LLC had no policy regarding e-mail use and e-mail accounts, but Plaintiff and his family had a reasonable expectation of privacy in their longstanding accounts.  Additionally, all of the e-mail accounts were used for personal use and contained private and confidential information including, but not limited to, medical information and correspondence with legal counsel pertaining to the matters that give rise

to the filing of this action.

120.    After illegally seizing Plaintiff's e-mail account, an automated message was sent to anyone who e-mailed Plaintiff stating that Plaintiff was no longer associated with the LLC and that Defendant Heiss should be contacted directly.  Despite this automatically generated message, Defendants and, at their direction, other LLC employees intercepted, forwarded, impersonated and responded to e-mails written to Plaintiff at the e-mail accounts associated with the RIOT ACT Domain Names owned by Plaintiff.  Similarly, Defendants also intercepted, read, forwarded and sometimes ignored e-mails that were sent to the e-mail addresses of Plaintiff's brother and mother, thereby costing the LLC revenue as a result of missed business opportunities.  Defendants also monitored and read Plaintiff's and his family's e-mails in an attempt to acquire information regarding this litigation and better prepare their legal defense.

121.    Following Plaintiff's removal, Defendants improperly used the RIOT ACT Trademark while they ineptly continued to promote comedy, a business they had no prior experience in, which further devalued the RIOT ACT Trademark.

122.    Upon information and belief, Defendants have taken and used Plaintiff's valuable intellectual property, including the RIOT ACT trademarks, the RIOT ACT website, the RIOT ACT e-mail addresses, and Plaintiff's database of 12,000 potential customers and contacts, even after Plaintiff instructed them to cease doing so.

123.    Upon information and belief, Defendants have received economic benefits and financial gains from the unauthorized use of Plaintiff's RIOT ACT trademarks, the RIOT ACT website, the RIOT ACT e-mail addresses, and Plaintiff's database of 12,000 potential customers and contacts.

38

124.    Upon information and belief, Defendants have continued to use the Riot Act trademark in their business including on all their licensing with the District of Columbia and the licenses around the LLC.

125.    Following Plaintiff's removal, Defendants Dawson and Heiss lost business and ruined Plaintiff's long-standing relationships.  For example, the "Funniest Fed" competition was lost as a result of poor management and follow-up.  The event was sponsored by Geico, covered by the Huffington Post and had a huge ad campaign that would market the LLC to every major federal agency resulting in press releases being sent to 150,000 federal employees, ads run on the metro system and Nationals stadium including the "jumbotron," and revenue generated from at least 7 sold out shows.  The official 54th Grammy Telecast Viewing party was also lost as a result of mismanagement and a lack of trust in the new management put in place after Plaintiff's removal.  This mismanagement resulted in lost revenue to the LLC.

126.    Defendants later offered to pay an employee, Dawn Henderson, back monies to which she was already entitled – if she accused Plaintiff of taking down social media sites.  This effort to implicate Plaintiff for acts that he had nothing to do with were an effort to create grounds to remove or discipline Plaintiff after the fact.

127.    Rich Mackey, a lifelong friend of Dawson, initially planned to invest in the Venture and was slated to be involved in business operations, but he ultimately distanced himself.  While at the Venue, Mr. Mackey told another individual, Jason Knutson, that Dawson has a history of bringing people into a business, getting what he needs from them, and then throwing them out.  Defendant Dawson has bragged that "I make money off other people's ideas" and he has been sued in the past for similar

actions.

128.    Since the date of his effective removal on January 26, 2012, Defendants Dawson and Heiss have systematically, and without cause, terminated the employment of all club employees associated with Plaintiff.

129.    Since the date of his effective termination on January 26, 2012, Defendants Dawson and Heiss have actively engaged in both written and oral communications with members of the entertainment industry and the general public, including RIOT ACT fan club members, agents, event planners, and others falsely representing that Plaintiff Xereas's employment was terminated due to incompetence, dishonest business practices, deceptive sales practices, and other similar false claims.

130.    Defendant Dawson and Heiss have made such claims despite full knowledge of their falsity, and with the intention of causing damage to Plaintiff's Xereas's personal and business reputation and to his ability to continue to operate in his field of expertise.

131.    After Plaintiff's illegal removal, Defendants instructed employees of the club to advise people calling for Plaintiff that he was "in a meeting."

132.    Following Plaintiff's termination, Paul Mooney, a well-known comedian and actor, attempted to contact Plaintiff Xereas through his e-mail address.  Plaintiff had a business relationship with Mr. Mooney since 1995, when Plaintiff booked financially lucrative shows at larger venues, including Constitution Hall.  Mr. Mooney cancelled a previously scheduled engagement at the venue.   Despite Mr. Mooney canceling, Defendants kept advertising him.  Mr. Mooney was upset about these actions and, as a result of Defendants' actions and Mr. Mooney's inability to contact Plaintiff through his

long-standing RIOT ACT e-mail address, he entered into a booking arrangement with the Howard Theater, thereby depriving Plaintiff the ability to book him.

133.    After Defendants unlawfully seized Plaintiff's e-mail accounts, the owner of Del Rios, a venue at which Plaintiff had booked Saturday nights from 2007-2012 for the months of September through April, sent an e-mail to Plaintiff indicating that he had been trying to reach Plaintiff by e-mail but he kept receiving an automatic reply stating that Plaintiff was no longer at the Venue.  He further stated that when he called the venue, he was told that Plaintiff was in a meeting and they asked for his contact information but no one ever got back to him.  He concluded by saying that he had to find someone else to book his venue thereby resulting in lost income to Plaintiff and/or Derivative Plaintiff.

134.    In addition to Defendants interfering with Plaintiff's business relations as they relate to Paul Mooney and the Del Rios bookings, the illegal seizure of the RIOT ACT Domain Names and associated e-mail addresses led Plaintiff to miss important e-mails from other individuals and companies with whom he does business.  Thus, Defendants improper and illegal actions interfered with Plaintiff' and Derivative Plaintiff's business relations thereby resulting in Plaintiff and/or Derivative Plaintiff losing income by missing specific engagements that he would have been able to capitalize on had he been receiving his e-mails as he should have.  Those missed engagements include the following:  (a) bookings for various comics including Rich Vos, Dante Nero, Joe Matarese, Sherrod Small and Jay Oakerson through CH Entertainment; (b) Launch party for the Blis FM radio station; (c) Opportunity to cross-promote with LiveNation for big shows at the Warner Theater including 3 Brian Regan shows, 3 Lewis

Black shows, a Gabriel Iglesias show, an Anjelah Johnson show and an Adam Carolla show; (d) an annual engagement with Potomac Place; (e) a Harrington, Delaware casino engagement; (f) an outdoor cookout event for Charlie Smith.   In addition to these financial opportunities, Plaintiff's inability to access his e-mails resulted in the loss of promotional and charity opportunities that would have resulted in income to Plaintiff and/or Derivative Plaintiff. Some of these engagements include: (a) booking comedians to perform on the WPGC 95.5 FM radio show; (b) an interview for Plaintiff with The Hill newspaper in anticipation of the White House Correspondents Dinner; and (c) Plaintiff being a judge at the State Theater.

135.    Defendants, after making repeated false statements and misleading Plaintiff into going into business with Defendants subject to agreements breached by Defendants, seized Plaintiff's e-mail marketing lists and social media accounts and continued to use the same social media accounts even after rebranding from Riot Act to Penn Social.  The social media sites include two Facebook pages, Twitter, Foursquare, Tumblr and YouTube.   Defendant Dawson also uses these social media account to promote and market his other businesses.

136.  Upon information and belief, Defendants continue to operate and receive economic benefits as a result of the unauthorized use of the "Hire a Comic" website, containing many videos, biographies and booking forms developed by Plaintiff Xereas over an extensive period of time.

137.  Upon information and belief, Defendants continue to operate and receive economic benefits as a result of the unauthorized use of the Riot Act Database (containing approximately 12,000 entertainment and customer contacts), Riot Act

videos, and the Riot Act Facebook and Twitter accounts, all of which were created and developed by Plaintiff Xereas through extensive time and effort.

138.   Despite repeated demands, Defendants Dawson and Heiss continued to deny and prevent Plaintiff's access to his e-mail account at "johnx@riotactcomedy.com," and continued, despite the termination of Plaintiff's activities in the club's operations, to use the RIOT ACT Trademarks and RIOT ACT Domain Names without Plaintiff's permission or authority.

139.   On or about February 14, 2012, counsel for Plaintiff sent a letter to counsel for Defendants Dawson, Heiss, and the LLC, reminding them of Plaintiff's ownership of the RIOT ACT Trademarks and Domain Names, and demanding that they cease and desist from any further use of the RIOT ACT Trademarks and Domain Names, and any variations thereof, thereby terminating the trademark license.

140.   Defendants Dawson and Heiss continued to make unauthorized and improper use of the RIOT ACT Trademarks in its regular business operations through August 2012.  Defendants' Counsel advised Plaintiff's Counsel on June 27, 2013, in response to an Emergency Motion filed by Plaintiff, that an e-mail was sent to Plaintiff's previous counsel on or about July 1, 2012, wherein information was provided to transfer the RIOT ACT Domain Names back to Plaintiff.    However Plaintiff's previous counsel has stated to Plaintiff's current counsel that he never received this communication, and his colleague, who had been copied on each prior communication, was not included in this alleged communication.  On or about July 2, 2014, Defendants current counsel sent Plaintiff's counsel insufficient information to transfer ownership of the RIOT ACT Domain Names and associated e-mail accounts back to Plaintiff, and correspondence

43

ensured. Finally, upon receiving the requisite information, the transfer was effectuated on September 9, 2014.

141.   Defendants retained all of Plaintiff's e-mails from 2005 until July 2012, but returned only e-mails received from January 28, 2012 through June 25, 2012.  This action has prevented Plaintiff from accessing e-mails that would serve as further evidence of Defendants' egregious, illegal actions and their liability in this case.

142.   On information and belief, Defendants Dawson and Heiss entered into the original and Amended Operating Agreements, business relationship, and implied trademark license with Plaintiff Xereas in bad faith, with the intention of taking improper advantage of Plaintiff's comedy club management expertise, talent booking skills, industry contacts, e-mail customer lists, and long-established and favorable reputation in the industry, his financial contribution, and his significant contribution of time, solely for purposes of launching a comedy club using the established RIOT ACT Trademarks and at the RIOT ACT Domain Names, with the intention of thereafter terminating Plaintiff's participation, involvement, and ownership in the Venture.

143.   Following the effective termination and exclusion from the business of Plaintiff, the reviews of and customer experience reports for Riot Act Club #2 became overwhelming negative, the club's ticket sales significantly declined, and the profitability of the club decreased significantly, all resulting in damage to Plaintiff's reputation, to the goodwill he labored to establish in the RIOT ACT Trademarks, and to his financial investment in the Venture.  Comics canceled shows and refuse to appear because of new bad management.  The club was in disarray and sales declined as did overall revenue.

144.   The Offering Memorandum that was used to secure investment funds

stated that a full subscription of $2 million in investment funds would allow for a "6 month ramp up period" to provide for operational activities after the club opened; however Defendants overspent and/or misappropriated funds such that the business lacked working capital to operate. On information and belief, Defendants Dawson and Heiss engaged in self-dealing that benefitted Dawson and Heiss individually by exceeding, mismanaging, and misappropriating almost all of the $2.3 million raised from investors. The bulk of this money was allegedly used for the buildout of the club, which went over budget by approximately $500,000 and left the company in debt before it opened its doors. As a result, Defendants Heiss, Dawson and Plaintiff received an aggregate tax write-off of approximately $1.2 million, while the Class B investors got a comparatively miniscule write-off and no return on their investment. Because of Plaintiffs lack of income (a direct result of Defendants' failure to pay him), the tax write-off was of negligible value to him; he simply did not have income to offset against the write-off. In contrast, and on information and belief, the tax write-off was valuable to Defendants Heiss and Dawson. Accordingly, the Class B investors paid 100% of the renovations, received a 20% aggregate interest in future operations, and unwittingly gave Defendant Heiss and Defendant Dawson the lion's share of the valuable tax losses.

145.    Defendants Heiss and Dawson usurped a corporate opportunity that could have inured to the benefit of the Derivative Plaintiff as the large tax write-off that benefitted Defendants Dawson, Heiss and Xereas could have been passed along to the investors whose money was used to create the write-off in the first place.

146.    Defendants wasted money unnecessarily, namely the excessive amount spent on the build-out and the incurring of unneeded costs and expenses in the form of,

*inter alia*, inflated salaries and payments to friends of Defendants Dawson and Heiss.

147.   The Offering Memorandum further misrepresented that "each Managing Member has contributed $100,000 for pre-offering expenses and to serve as a contingency reserve in the event that the offering is not fully subscribed or additional funds are required[.]"  This was never done.

148.   On June 19, 2012, a succession plan was sent to shareholders via e-mail by Defendant Dawson..  However, Plaintiff did not get actual notice of the plan as Defendants sent the e-mail to Plaintiff's RIOT ACT e-mail address, an account that was illegally seized by Defendant.  Defendants were aware that Plaintiff would not receive this notice.  Furthermore, Defendant Dawson proposed an alternative distribution model that would require Plaintiff's approval, yet Defendants made no effort to seek Plaintiff's approval.

149.   On information and belief, many of the costs, expenses and reimbursements paid by the LLC are questionable, grossly inflated, improper and/or unsubstantiated by any invoices, receipts, statements or other evidence.

150.   On information and belief, Defendants have been spending company funds on non-business assets, non-business expenses, and for the benefit of Defendant Dawson's other companies as well as Dawson's son's company.

151.   Upon information and  belief, Defendants Dawson and Heiss have misused and mismanaged the funds and assets belonging to the LLC, and have improperly spent and transferred funds from the LLC in order pay their personal expenses, and other expenses unrelated to the LLC.

152.   Upon information and belief, Defendant Dawson has improperly

commingled funds between the LLC and his other business ventures.

153.    Upon information and  belief, Defendants have also used funds from the LLC to improperly reimburse themselves for personal and non-LLC related expenses.

154.    Sometime in 2014, Defendant Dawson started receiving payments in the form of "management fees" to his company Tin Shop, LLC, notwithstanding the fact that the company already employs multiple full-time general managers and pays them quite well.

155.    Defendant Dawson and Heiss have improperly used substantial LLC monies to fund their own legal defense in this case. LLC monies were also used to fund former Defendant Squiid's legal defense.

156.    After illegally removing Plaintiff, Defendants hired legal counsel to assert their ownership of Plaintiff's trademark in furtherance of their scheme.  Having removed Plaintiff, hijacked his intellectual property, and taken control of all his contacts and databases, and were operating a business to satisfy the zoning requirements that they could not have met but for Plaintiff's involvement.  In fulfillment of the last step of their fraudulent scheme, Defendants were hoping that they could legally secure the RIOT ACT Trademark and continue running the business without Plaintiff.

157.    After Plaintiff was removed as a Managing Member and Defendants were mismanaging the LLC Defendants Dawson and Heiss and their agents falsely told important contacts in the comedy business that management was still the same and Plaintiff was still involved which further diluted and diminished the RIOT ACT Trademarks.

158.    In June 2012, after unsuccessfully challenging Plaintiff's ownership of the

RIOT ACT trademark, Defendants closed the theater to remodel and rebrand, after just 10 months of operations.  The business reopened on July 14, 2012, as Penn Social, a sports bar, restaurant, and gaming establishment.  Defendants removed most of the seating for comedy shows and added more bars, a dance floor, and game machines.  The new operation included promotions such as pub crawls, drinking game tournaments, gaming tournaments and dance parties that encouraged excessive drinking and resulted in fights, noise, disturbances, and many incidences that required police involvement and resulted in complaints from the neighbors.  There is no record that any building permits were issued for this remodel.  Indeed, Defendants would have been unable to obtain such permits due to the zoning restrictions associated with the space.

159.  Despite the fact that the LLC is no longer a comedy theater and has changed its business operations, the Articles of Organization have not been amended to reflect the change. On January 13, 2013, Defendants amended the business name in the Articles of Organization, but did not file an amendment to change the purpose of the LLC.  As such, the purpose of the LLC remains "to run a comedy theater, bar, restaurant and all activities incidental or relating to."  In addition, the Operating Agreement still refers to the old Articles of Organization and specifically states that the purpose of the business is to "own and operate a comedy theater, restaurant & bar & a school of comedy and engage in any and all activities related or incidental to."

160.  The Alcoholic Beverage Regulation Administration ("ABRA") guidelines require that all "substantial changes" be reported to the ABRA.  Despite Defendants making changes that are considered "substantial changes" to their business operations, Defendant Heiss signed off on and filed a Name Change Amendment with ABRA

stating that there was "no substantial change to business operations." Additionally, the original ABRA License issued was a CX multi-purpose license issued only to theaters and performing arts venues.  Defendants still operate under this license using the RIOT ACT name despite no longer being a theater or performing arts venue and despite claims that they no longer use Plaintiffs' trademarks.

161.   The changes to the business operations also put the LLC in violation of its Certificate of Occupancy because Penn Social, LLC, is an unrecognized legal entity by Department of Consumer and Regulatory Affairs ("DCRA") and because the approved zoning designation for the Certificate of Occupancy is "theatre/performing arts."  As such, the LLC is at risk of losing their liquor license.

162.   Defendants have not amended the Articles of Organization and Operating Agreement nor filed factually accurate paperwork with regard to the Certificate of Occupancy and Certificate of Good Standing because this could jeopardize their entire business operation.  But for Plaintiff's involvement in the business and Defendants' continued use of the RIOT ACT Trademark, Defendants would not have the legal status to conduct their business.  Plaintiff's involvement allowed Defendants to backdoor their way into carrying out their current business operations and Defendants continue to use the RIOT ACT Trademark to mislead government agencies and maintain their operations.

163.   The intentional illegal use of Plaintiff's intellectual property continues as of the date of the filing of this Second Amended Complaint. Defendants continue to hold Plaintiff's e-mails, his website content, and his RIOT ACT database, contacts, videos, Facebook and Twitter accounts. Moreover, despite assertions that they have "returned"

such intellectual property and have ceased doing business under the RIOT ACT Trademark, as of the date of this filing, Defendants continue to use that trademark in their business dealings with the District of Columbia, including on their liquor license and Certificate of Occupancy, both of which are displayed in the principal place of business of the LLC.  Such actions have the effect of reducing the value of the RIOT ACT Trademark and of preventing Plaintiff from effectively using them.

164.  Defendant Dawson has used the information and contacts he obtained through Plaintiff to benefit his other businesses.  For example, Defendant Dawson booked comedy shows at his other establishments with proprietary information he obtained  from Plaintiff.

165.  All of Defendants Dawson's and Heiss's acts described herein were taken in their capacity as managing members, principals, and/or agents of the LLC

166.  Despite all of Defendants' misconduct which was intended to undermine, sabotage, and negatively impact the revenue of the LLC so as to give Dawson and Heiss a pretextual reason to remove Plaintiff, Riot Act Club #2 started turning a sizeable profit in November 2011 and was on pace to have its biggest month in January 2012 before Plaintiff was removed as a Managing Member.  Additionally, the LLC had much higher average monthly losses after Plaintiff was removed as compared to the time period during which he was involved in the LLC's day-to-day operation.  Further, the reviews from patrons, comedians and online review websites such as Yelp were overwhelmingly positive while Plaintiff was the Managing Member of the LLC, but became negative after he was removed, thereby further devaluing and diminishing Plaintiff's RIOT ACT Trademark.

167.    After Plaintiff was improperly removed as a managing member, Defendants engaged two trademark attorneys to attempt to secure exclusive ownership of the RIOT ACT Trademark and Domain Names in furtherance of their scheme, but were ultimately unsuccessful in doing so.  Once that part of Defendants plan failed, Defendants made false statements to the media disparaging the comedy club alleging it was a failed business plan despite Defendants having every intention of continuing to promote comedy shows if they would have been successful in securing the RIOT ACT Trademarks and Domain Names and despite Defendants signing off on the Business Plan and using it to secure $2.3 Million Dollars from investors.  Defendants further falsely stated that the club was mismanaged despite healthy revenue in the last few months Plaintiff was a Managing Member and that a comedy club could not succeed in the Penn Quarter area of D.C. where the Venue was located notwithstanding the fact that Defendants expended LLC funds to obtain legal ownership to the RIOT ACT Trademark and RIOT ACT Domain Names after Plaintiff was removed to attempt to operate in that geographical area.

168.    Despite repeated verbal and written requests by Plaintiff and Plaintiff's legal counsel, Defendants have continuously denied Plaintiff access and refused to provide Plaintiff with documents, financial and otherwise, that he is entitled to, as a 26.67% Member of the LLC, under District of Columbia law and pursuant to the Operating Agreement executed by the parties hereto.  Defendants refused to provide these documents to Plaintiff while he was a Managing Member of the LLC and continue to deny him access to these documents as of the date of the filing of this Second Amended Complaint.

169.     Defendants violated Section 6.3 of the Amended Operating Agreement by failing to notify other Members of Plaintiff's termination as a Managing Member of the LLC within 10 days of the termination as is required by Section 6.3.  This is especially troubling because the RIOT ACT business plan was used to solicit investors and, as such, the Defendants relied heavily on Plaintiff's expertise, reputation and experience in the comedy business to secure investment funds.

170.     Defendants violated Section 6.3 of the LLC Amended Operating Agreement by failing to present all Members, namely Plaintiff, with a succession plan within 90 days of Plaintiff's removal as a Managing Member.

171.     Defendants violated Section 6.4 of the LLC Amended Operating Agreement, which states that each Managing Member shall be entitled to receive a reasonable market-based salary as compensation for the performance of management responsibilities.  Plaintiff was paid a total of approximately $26,000 despite working tirelessly for over two years.

172.     On information and belief, Defendants violated Section 8.2 of the Amended Operating Agreement by writing checks and otherwise using LLC funds for non-company purposes.

173.     Defendants violated Section 10.4 of the Amended Operating Agreement which states that when Managing Members call meetings, they must state the purpose of the meeting and no other business shall be conducted at the meeting without consent of the Managing Members.  Section 10.4 further states that meetings shall not be held sooner than 15 days from the date that notice of a meeting is given.

174.     Defendants violated the verbal contract that they had with Plaintiff as it

relates to Plaintiff retaining ownership of the RIOT ACT Trademark and RIOT ACT Domain Names.

175.   Plaintiff has owned the RIOT ACT trademarks, by virtue of first use and other acts alleged herein, since 2005 through the present.  Plaintiff has never transferred ownership of the RIOT ACT Trademarks or Domain Names to any other person or entity.

176.   Defendants communicated false information to Plaintiff when Heiss and Dawson falsely misrepresented to Xereas in March 2010, and Dawson did so again in May 2011, that Xereas would retain sole ownership and control of the RIOT ACT Trademarks and Domain Names and that he would be the "face" and "key man" in the company.

177.   Defendants Dawson and Heiss, by virtue of being managers of the LLC at the time most of the events that give rise to this Second Amended Complaint occurred, were in a fiduciary relationship with Plaintiff who was also a manager of the LLC at the time most of the events that give rise to this Second Amended Complaint occurred.

178.   Plaintiff, Defendant Dawson and Defendant Heiss are in a fiduciary relationship with each other as a result of them all being members of the LLC.

179.   Defendants Dawson and Heiss are in a fiduciary relationship with Defendant Penn Social, LLC as a result of Dawson and Heiss both being managers at the time most of the facts that gave rise to this Second Amended Complaint occurred and as a result of them being members of the LLC.

180.   Defendants Dawson. Heiss and Penn Social LLC are in a fiduciary relationship with all members of the LLC.

181.   A fiduciary relationship exists between Derivative Plaintiff and all

Defendants,

182.    In accordance with the law of the District of Columbia statutes (D.C. Code § 29-804.09) and District of Columbia common law, members of an LLC owe fiduciary duties to both the LLC and to the other members.

183.    Plaintiff is bringing a derivative action on behalf of Derivative Plaintiff, Penn Social, LLC, as a current member of the LLC.  Pursuant to § 29–808.02 of the D.C. Code, Plaintiff may maintain a derivative action to enforce a right of the LLC if he first makes a demand on the other members requesting that they cause the company to bring an action to enforce the right and the other members do not bring the action within a reasonable time OR if such a demand would be futile.  Plaintiff has not made a demand in this case.  As such, § 29–808.04 of the D.C. Code states that in a derivative action under § 29‑808.02, if a demand has not been made then the Plaintiff must plead the reasons a demand would be futile.

184.    A demand for the members of the LLC to bring its own action would be futile because a majority of the Members of the LLC have participated in or approved the wrongdoing cited in this Complaint and are otherwise financially interested in the challenged transactions.  Pursuant to Paragraph 6.1 of the Amended and Restated Operating Agreement of the LLC, the Managing Members have the sole and absolute discretion to file a lawsuit on behalf of the LLC; therefore, as a result of Dawson being a Managing Member and holding a 52.4% ownership interest in the LLC, Dawson and Dawson alone would have to authorize the LLC to file a lawsuit against himself and Heiss for their collaborative wrongful acts.  As such, it would be futile for Plaintiff to request or demand for the LLC to bring its own action .

185.    Derivative Plaintiff pleads all of the Counts herein pursuant to § 29‑808.02 and § 29–808.04 of the D.C. Code.

186.    Defendants Heiss and Dawson intentionally undermined and sabotaged Plaintiff's efforts to run the Venture successfully and profitably and denied him access to the LLC checkbook and financial documents and records while he was still a Managing Member of the LLC.

187.    Defendants Heiss and Dawson squandered business opportunities that would have resulted in substantial revenue and exposure for the LLC.    These engagements were lost due to poor management and a lack of follow-up.

188.    Defendants Heiss and Dawson took and authorized actions that created a hostile work environment that affected morale and affected profits.

189.    Defendants Heiss and Dawson sometimes made payments to Plaintiff and other third parties without reporting these payments to the Internal Revenue Service, paying and withholding the appropriate taxes on those funds or issuing the appropriate W-2 or 1099 IRS Forms.

190.    Defendants Heiss, with Defendant Dawson's continued authorization, approval and support, bullied staff and used her ownership and managerial role in the business to intimidate and manipulate employees, which had the effect of diminishing the performance of the LLC.

191.    Defendants Heiss, with Defendant Dawson's continued authorization, approval and support, attempted to coerce an employee to sign a resignation letter under duress by offering him $5000 and telling him he had to sign then and there, despite the person telling Defendant Heiss that he wanted to consult with legal counsel.

192.    Defendants Heiss and Dawson failed to disclose material facts regarding the business to Plaintiff and Derivative Plaintiff including, *inter alia*, the financial condition of the LLC, the ledger of the LLC, the eventual buyout of Defendant Heiss by Defendant Heiss, details regarding the buildout and expenditures related thereto and information about the hiring and engagement of employees and independent contractors. .

193.    Defendants have used the RIOT ACT Trademark and Domain Names in interstate commerce (including within the District of Columbia), and have made a false designation of origin of such trademarks and domain names in interstate commerce, by operating a website that sold merchandise and tickets throughout the country and was accessed throughout the country, by booking and paying for comedians to travel from different parts of the country, by running television commercials in multiple states, using the Riot Act Trademark on the internet and using the RIOT ACT Trademark in publications and documents distributed in multiple states.

194.    Since the inception of the LLC, Defendants Dawson and Heiss have managed the LLC's books and records, set up the LLC's bank accounts, and generally exercised control over the bank accounts, assets, finances and expenditures of the LLC.

195.    Defendants did not properly call meetings or keep regular minutes of meetings in accordance with the LLC Operating Agreements.

196.    Defendants did not properly, accurately, conventionally, reliably or completely maintain the books and records of the LLC as is required by District of Columbia law, federal law and the Section 8.1 of the LLC Operating Agreement, nor did Defendants properly or accurately file federal and state tax returns.  For example, despite Plaintiff making his full One Hundred Thousand Dollar ($100,000.00) initial capital

contribution in 2011, the books and records of the LLC indicated that Plaintiff only made a Fifty Thousand Dollar ($50,000.00) contribution.   Sometime on or about 2015, Defendant eventually corrected this and filed amended tax returns.

197.    Defendant Dawson purchased Defendant Heiss's ownership interest in the LLC at a price unconscionably lower than the fair market value of the ownership interest, thereby defrauding Plaintiff and Derivative Plaintiff and resulting in lost revenue to the Derivative Plaintiff and Plaintiff.   Plaintiff was never informed of this buyout until 2014 and was never given an opportunity to purchase Heiss's shares in the LLC.   To Plaintiff's knowledge, the other Members were also not advised of Heiss's intention to sell her ownership interest nor were they afforded the opportunity to purchase or bid on Heiss's shares of the LLC.

198.    Defendants Dawson and Heiss acted in bad faith by using their majority shares to defraud and oppress Plaintiff.

199.    Plaintiff set up social media accounts dating back to 2009 that connected Plaintiff to personal friends, comedians, booking agents, entertainment representatives, clients, customers and an extensive list of contacts that Plaintiff had developed over close to two decades.   After Defendants took control of Plaintiff's social media accounts, Defendants denied Plaintiff access to the social media accounts and the network of people attached to those accounts assumed that messages they received from these accounts or sent to these accounts were coming from and going to Plaintiff thereby misleading them.   Defendant Dawson also used these accounts to promote his other bars and restaurants despite Plaintiff never authorizing same.

200.    Pursuant to § 29–804.09 of the D.C. Code, Defendants Dawson and Heiss

owe  the LLC, Plaintiff and all Members of the LLC the duties of loyalty and care.  The statute further states, *inter alia*, that this duty of loyalty shall include the duties to account to the company and to hold as trustee for it any property, profit, or benefit derived by the member from a use by the member of the company's property or from the appropriation of a limited liability company opportunity.  This statute further provides that the duty of care owed by Dawson and Heiss in the conduct of the company's activities and affairs "requires the members to refrain from engaging in grossly negligent or reckless conduct, willful or intentional misconduct, or a knowing violation of law."

201.    Pursuant to § 29–804.09 of the D.C. Code, Defendants Dawson and Heiss are required to "discharge the duties and obligations under this chapter or under the operating agreement and exercise any rights consistently with the contractual obligation of good faith and fair dealing."

202.    Pursuant to § 29–803.04 of the D.C. Code, "With respect to members of professional limited liability companies, a member shall be personally liable and accountable only for any negligent or wrongful acts or misconduct committed by the member, or by any individual under the member's supervision and control in the rendering of professional service on behalf of a professional limited liability company organized under this chapter."  As such, Defendants Dawson and Heiss should be held individually liable for the wrongful actions pled in this Second Amended Complaint that constitute either negligence, wrongful acts or misconduct on their part.

203.    Pursuant to § 29–808.01 of the D.C. Code, "a member may maintain a direct action in the Superior Court against another member, a manager, or the limited liability company to enforce the member's rights and otherwise protect the member's

58

interests, including rights and interests under the operating agreement or this chapter or arising independently of the membership relationship."

204.    Plaintiff and the two individual Defendants entered into a legally binding and enforceable contract with each other, and with the Derivative Plaintiff, when they executed the Member Managed Operating Agreement of Riot Act DC, LLC and, again, when they executed the subsequent Amended and Restated Operating Agreement of Riot Act DC, LLC.

205.    Plaintiff conferred a benefit to Defendants when he devoted his full time and contributed his resources, industry contacts, databases, social media accounts and considerable talents to the Defendants who continue to retain the benefits unjustly, without properly compensating Plaintiff.  Dawson also engaged in self-dealing by using these benefits to promote and market his other establishments thereby personally benefitting himself financially as a result of Plaintiff's contributions.

206.    Defendants wrongfully, illegally and without Plaintiff's authorization, disabled Plaintiff's use of the social media accounts that were started, developed, owned and operated by Plaintiff such that Plaintiff was denied use of the accounts.  The RIOT ACT Trademark was improperly used by Defendants without authorization, and after Plaintiff instructed them to cease from using such Trademarks.  Thus, Defendant converting Plaintiff's property for Defendants' own use and financial benefit and, more specifically, for the financial benefit of Defendant Dawson personally.

207.   The intention of the parties was that the social media accounts would be used to solely benefit the Derivative Plaintiff, but, upon information and belief, Defendant Dawson used the social media accounts to promote and market Dawson's

other businesses resulting in revenue for Defendant Dawson and his other establishments.

208.   Defendants also disabled Plaintiff's access to databases of Plaintiff's contacts in the entertainment industry and potential customers despite his demand for same.   These databases were compiled by Plaintiff over two decades and were the property of Plaintiff.   They were shared with the LLC solely for its own benefit and the LLC's exclusive use, but Defendant Dawson also converted these databases for the financial benefit of his other businesses and, thus, for his own financial benefit.   Thus, Defendants have unlawfully exerted control and ownership over documents and databases containing valuable lists of contact information for potential entertainers and customers, in denial and repudiation of Plaintiff's ownership rights.

209.   The willful, wrongful, intentional, and reckless acts of Defendants as described herein constitute trover and conversion of Plaintiff and Derivative Plaintiff's assets, as a direct and proximate result of which Plaintiff has been irreparably injured, including damage to his business and personal reputation, damage from being denied access to his social media accounts and databases as a result of lost business opportunities that would not be lost had Plaintiff had the access to his proprietary information, damages as a result of attorney's fees incurred by Plaintiff in an attempt to recover his property, damages as a result of time expended to rebuild his contact list and social media network and harm done to this litigation as a result of the knowledge Defendants acquired and the information that Defendants withheld by continuing to retain improper control of the e-mails associated with the RIOT ACT Domain Names.

210.   Much of Defendants' conduct in this case, as asserted with specificity

herein, is willful and outrageous and constitutes gross fraud.

211.    Much of Defendants' conduct in this case, as asserted with specificity herein, is aggravated by evil motive, actual malice, and oppression.

212.    Based on information and belief, Defendants Dawson and Heiss have funded their entire defense of this lawsuit using LLC funds thereby depriving the LLC of a substantial amount of revenue and notwithstanding the fact that Dawson and Heiss are named individually in this lawsuit.  Pursuant to Section 7.1 of the LLC Operating Agreement, the Derivative Plaintiff agrees to indemnify and pay the reasonable costs and attorney's fees for Managing Members for acts and omissions taken in their capacity as Managing Members unless the acts and omissions are in violation of the Operating Agreement or constitute fraud, gross negligence or gross misconduct.  As such, Plaintiff contends that under the Operating Agreement, Dawson and Heiss are not entitled to indemnity of their attorney's fees because many of their actions constitute fraud, gross negligence or gross misconduct.

213.    Pursuant to § 29–804.08(c) of the D.C. Code, Dawson and Heiss are entitled to indemnity from Derivative Plaintiff for their attorney's fees and costs incurred in this action so long as Dawson and Heiss promise to repay the Derivative Plaintiff if Dawson and Heiss are ultimately determined not to be indemnified under § 29–804.08(a) which provides that Dawson and Heiss must complies with the duties found in § 29-804.09.  Dawson and Heiss should be required to return to Derivative Plaintiff the amounts paid in attorney's fees for breaching the following duties contained in § 29-804.09: the duty of loyalty, duty of care, duty of good faith and fair dealing,

214.    Defendant Heiss violated Rule 1.7 of the D.C. Rules of Professional

Conduct that govern conflicts of interest by (a) representing both the Derivative Plaintiff and Dawson and/or Dawson's other business ventures, by representing Derivative Plaintiff while also holding an ownership interest in Derivative Plaintiff and by undertaking said representation without obtaining signed informed consent from Plaintiff, Dawson and Derivative Plaintiff.

215.    Defendant Heiss violated Rule 1.8 of the D.C. Rules of Professional Conduct that govern conflicts of interest by entering into a business transaction with her client, Derivative Plaintiff, without fully disclosing and transmitting this information to Derivative Plaintiff in writing, by not allowing giving Derivative Plaintiff reasonable opportunity to seek the advice of independent counsel and by not receiving written informed consent from Derivative Plaintiff.

## INJURY TO PLAINTIFF XEREAS AND DERIVATIVE PLAINTIFF

216.    Defendants wrongful and unauthorized use of the RIOT ACT Trademarks and RIOT ACT Domain Names, in connection with the sale of goods and services, have caused confusion, mistake, and deception on the part of consumers, members of the entertainment industry, and members of the non-profit community as to the source of the LLC's services, the association or sponsorship of the LLC with Plaintiff Xereas, and to irreparably injure Plaintiff by diminishing and damaging Plaintiff's reputation and the reputation of his RIOT ACT Trademarks and their hard-earned goodwill.

217.    Defendants wrongful and unauthorized use of the RIOT ACT Trademarks and RIOT ACT Domain Names have caused damage to Plaintiff because they have misled, and are likely to continue to mislead, the public, the entertainment industry, and the non-profit community into believing that the LLC's business and activities are

authorized by, attributable to, sponsored by, or associated with, Plaintiff.

218.    Defendants unauthorized and unlawful transfer of ownership, and revision of registration information for the RIOT ACT Domain Names, and other related domain names previously held by Plaintiff Xereas, to the LLC, and denial of access to Plaintiff Xereas of all RIOT ACT Domain Name email accounts including his "riotactcomedy.com" email accounts, have prevented Plaintiff Xereas from exercising his ownership rights and control of his property, and precluded his ability to receive and send email for both personal and business purposes, thereby causing irreparable damage to his personal and business reputation and resulting in lost income.

219.    Defendants have caused irreparable harm to the RIOT ACT Trademark as a result of Defendants public statements about Plaintiff's business acumen and flawed business plan (a plan Defendants obviously approved when they used it to secure the investment funds used to start the business).  Prior to Defendants illegal actions, there was no negative press as it relates to the RIOT ACT Trademark, but now a simple google search of Plaintiff's trademark yields negative results which has greatly devalued the goodwill of the trade name that Plaintiff has established.  Defendants Dawson and Heiss have actively engaged in both written and oral communications with members of the entertainment industry and the general public falsely representing that Plaintiff  Xereas's employment was terminated due to incompetence, dishonest business practices, deceptive sales practices, and other like false claims.

220.    Defendants' failure to pay Plaintiff the compensation he was promised and entitled to receive as a result of the work he did as General Manager of the LLC has resulted in lost income to Plaintiff.

221.   Defendants Dawson and Heiss's nepotistic and negligent hiring practices resulted in the retention of individuals whose negligent, reckless, incompetent and intentional actions coupled with inflated salaries for those individuals resulted in lost revenue for the Derivative Plaintiff and, thereby, Plaintiff.

222.   Defendants hired and engaged multiple employees and independent contractors ("Hires") who were unqualified, incompetent and unfit for the jobs they were hired and engaged to do.

223.   Although Plaintiff was a Managing Member of the Derivative Plaintiff at the time Defendants hired and engaged the Hires, there were no managing member meetings held to vote on the Hires and Plaintiff was never otherwise informed, advised or consulted with regarding these Hires.   The employees and independent contractors complained of herein were hired by the Defendants without Plaintiff's approval, knowledge or consent.

224.   After Defendants made the negligent Hires, Defendants acted negligently in training those Hires.  Despite Plaintiff's requests that Defendants prepare an Employee Handbook, training manual and put written policies and procedures in place regarding the Hires, Defendants ignored Plaintiff's requests and failed to provide the Hires, most of whom had no experience in the comedy or entertainment business, with adequate training for them to perform the duties for which they were hired.

225.   Defendants encouraged the behavior and instructed the Hires to take inappropriate actions in order to frustrate Plaintiff into resigning in fulfillment of their scheme to push him out of the business.

226.   Notwithstanding Plaintiff voicing his concerns and disapproval regarding

the Hires to Defendants, and further expressing to Defendants that the Hires were negatively impacting the Derivative Plaintiff and Plaintiff financially and should be terminated, Defendants failed to terminate the Hires and negligently retained them.

227.    But for the Defendant illegally seizing Plaintiff's e-mail accounts, Plaintiff would have been able to secure business opportunities for Derivative Plaintiff and/or for Plaintiff directly thereby resulting in additional income to Derivative Plaintiff and income. Plaintiff and Derivative Plaintiff suffered damages in the form of lost income for the dates on which engagements were not able to be booked and Plaintiff also suffered other financial losses as a result of not being able to promote, advertise and marker his booking services and company during those lost engagements as he ordinarily would do.

228.    Defendant Heiss's legal representation of the LLC created many conflicts of interests, all of which Heiss should have disclosed to Plaintiff resulting in all of the harm as pled herein which could have been avoided had Plaintiff been apprised of the conflict of interest and retained legal counsel to protect his interests.

229.    Defendant Dawson's actions in holding back his resources and contacts, failing to cross promote the LLC with his other establishments and otherwise limiting his involvement while Plaintiff was a Managing Member in an effort to undermine and sabotage Plaintiff resulted in lost revenue for both Plaintiff and Derivative Plaintiff.

230.    Heiss's reckless, inappropriate, and negligent decisions and actions negatively impacted Derivative Plaintiff, and Plaintiff, financially.

231.    Defendants' wrongful removal of Plaintiff such that Plaintiff not being able to operate the Venue resulted in lost profits to the Derivative Plaintiff and also to Plaintiff.

232.    Defendants wasted money unnecessarily, namely the excessive amount spent on the build-out and the incurring of unneeded costs, expenses and salaries all of which resulted in lost revenue to Plaintiff and Derivative Plaintiff..

233.    Defendants mishandled and mistreated customers, comics and business associates who subsequently stopped dealing with the LLC, thereby hurting the club and affecting the profits of Plaintiff and Derivative Plaintiff.

234.    Defendants have intentionally, negligently, improperly, unconventionally, unreliably, inaccurately and fraudulently managed the business affairs of the LLC thereby resulting in lost revenue to Plaintiff and Derivative Plaintiff.

235.    Many of the costs, expenses and reimbursements paid by the LLC are questionable, grossly inflated, improper and/or unsubstantiated by any invoices, receipts, statements or other evidence and have resulted in lost revenue for Plaintiff and Derivative Plaintiff.

236.    Defendants has been illegally spending company funds on non-business assets, non-business expenses and for the benefit of Defendant Dawson's other companies, thereby reducing the profits for Derivative Plaintiff and Plaintiff.

237.    Defendants have made questionable hires, payments and "reimbursements" to benefit some members of the LLC or companies that are owned by members of the LLC in an effort to repay some investors while ignoring others, thereby resulting in lost revenue for Plaintiff and Derivative Plaintiff.

238.    Defendant Dawson and Heiss have used substantial amounts of LLC monies to fund their own legal defense in this case even though Defendants Dawson and Heiss are individual Defendants and it was their fraudulent, illegal, negligent and willful

actions that gave rise to this lawsuit in the first place, thereby affecting the income of Plaintiff and Derivative Plaintiff.

239.   The money raised from Class B members was intended to pay for the build-out as well as operating expenses, but Defendants mismanaged and misappropriated investment funds leaving Plaintiff no operating capital to run the business to its maximum potential, thereby diminishing revenue for Plaintiff and Derivative Plaintiff.

240.   As a result of Defendants' acts, Plaintiff has suffered severe emotional distress leading to harmful physical consequences and stress-related medical conditions including headaches, stomach issues, a skin condition and an stomach ulcer that required medical treatment.

241.   As a direct and proximate result of the willful, wrongful, intentional, reckless and negligence acts of Defendants as described herein, Plaintiff has been irreparably injured, including damage to his business and personal reputation, damage from being denied access to his social media accounts and databases as a result of damaged business relationships, expectancies, prospective economic advantage and lost business opportunities that would not be lost had Plaintiff had the access to his proprietary information, damages as a result of attorney's fees incurred by Plaintiff in an attempt to recover his property, damages as a result of time expended to rebuild his contact list and social media network,  decline in value of Plaintiff's membership interest, and harm done to this litigation as a result of the knowledge Defendants acquired and the information that Defendants withheld by continuing to retain improper control of the e-mails associated with the RIOT ACT Domain Names.

242.     As a direct and proximate result of these malicious and intentional acts, as described above, Plaintiff and Derivative Plaintiff's industry reputation, and relationships with current and prospective customers and industry contacts have been irreparably damaged, resulting in damage to Plaintiff and/or Derivative Plaintiff's economic interests.

243.     Defendants Dawson and Heiss's negligent management and business practices resulted in damaged relationships and the LLC losing engagements and costing Plaintiff and Derivative Plaintiff.

## COUNT I

**Federal Infringement of an Unregistered Trademark and False Designation of Origin under Section 43(a)(1)(A) of the Lanham Act 15 U.S.C. § 1125(a)(1)(A) Asserted by Plaintiff Against Defendants Dawson, Heiss and Penn Social, LLC**

244.     Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 243 above.

245.     Plaintiff's RIOT ACT Trademarks are inherently distinctive for comedy related services and have acquired recognition and secondary meaning in and among the general public and the entertainment industry as a source of high quality entertainment services.

246.     By virtue of Plaintiff's longstanding and extensive use of the RIOT ACT Trademarks in interstate commerce the RIOT ACT Trademarks have come to serve as a designation of origin for Plaintiff's various comedy services and activities, and have become valuable symbols of the goodwill Plaintiff and his businesses have labored to acquire over the years.

247.     The actions of Defendants Dawson, Heiss, and the LLC in continuing to use the RIOT ACT Trademarks and Domain Names, (following the termination of

Plaintiff's management and control over the quality of the services offered by the LLC, the termination of Plaintiff's day-to-day involvement in the operations of Riot Act Club #2, and the termination of the trademark and domain name license to the LLC), are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants, and each of them, and their commercial activities, by or with Plaintiff,  and thus constitute trademark infringement, false designation of origin and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

248.   Defendants Dawson, Heiss, and the LLC's activities, as described above, have damaged the reputation of Plaintiff, and the reputation, and goodwill of the RIOT ACT Trademarks and the value thereof.

249.   Defendants' wrongful acts have irreparably injured Plaintiff and will continue to do so unless and until such acts are enjoined by this Court under 15 U.S.C. § 1116.  Plaintiff has no adequate remedy at law.

## COUNT II

**Federal Unfair Competition under Section 43(a) of the Lanham Act 15 U.S.C. § 1125(a) Asserted by Plaintiff Against Defendants Dawson, Heiss, and Penn Social, LLC**

250.   Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 249 above.

251.   Defendants Penn Social, LLC, Dawson and Heiss have used the RIOT ACT Trademarks and RIOT ACT domain names without permission in interstate commerce in  connection with the provision of goods and/or services, including the sale of comedy tickets.

252.    Defendants Riot Act, LLC, Dawson and Heiss' use of the RIOT ACT Trademarks and RIOT ACT domain names is likely to cause confusion, in part because third parties were  likely to believe that Riot Act, LLC, Dawson and/or Heiss owned the RIOT ACT trademarks, which they did not.

253.    By continuing to utilize the RIOT ACT Trademarks and RIOT ACT Domain Names despite lawful termination of their right to use the same, and the resulting misrepresentation of an association of Defendants Dawson, Heiss, and the LLC with Plaintiff, Defendants have impaired the distinctiveness of the RIOT ACT Trademarks, and unfairly competed with Plaintiff by depriving Plaintiff of access to his domain name "riotactcomedy.com" and corresponding email accounts; interfered with Plaintiff's ability to maintain professional contacts and relationships and to continue doing business with members of the industry; and caused irreparable harm to the reputation and goodwill of the RIOT ACT Trademarks and the business reputation of Plaintiff.

## COUNT III

**Common Law Trademark Infringement and Unfair Competition under D.C. Common Law Asserted by Plaintiff Against Defendants Dawson, Heiss and Penn Social, LLC**

254.    Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 253 above.

255.    The aforesaid acts of Defendants Dawson, Heiss, and Penn Social, LLC constitute common-law trademark infringement, misappropriation of Plaintiff's goodwill, and unfair competition under DC common law.

256.    Defendants Dawson, Heiss, and Riot Act DC, LLC's activities, as described above, have damaged the reputation and goodwill held by the RIOT ACT

Trademarks and the value thereof.Defendants' wrongful acts have irreparably injured Plaintiff as set forth above, and will continue to do so unless and until such acts are enjoined by this Court.

## COUNT IV

**Action for Trover and Conversion Under D.C. Common Law Asserted by Plaintiff and Derivative Plaintiff Against All Named Defendants**

257.    Plaintiff and Derivative Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 256 above.

258.    Defendants have illegally used company funds to pay for non-business assets and  non-business expenses, including, but not limited to, for the financial benefit of Defendant Dawson, both personally and for the financial benefit of his other business endeavors.

259.    Defendants have illegally used company funds to pay for costs, expenses and reimbursements that are either grossly inflated, improper and/or unsubstantiated.

260.    The improper use of company funds by Defendants has resulted in the Derivative Plaintiff and Plaintiff being denied monies that they would otherwise be entitled to.

261.    Defendants Dawson and Heiss have converted RIOT Act website, RIOT Act videos, Facebook accounts and Twitter accounts developed and originally owned by Plaintiff and Derivative Plaintiff, and such Facebook and Twitter accounts contain lists of valuable numerous contacts that may be used for marketing purposes.

262.    Defendants Dawson and Heiss have converted the database of approximately 12,000 potential business contacts and customers which was developed and originally owned by Plaintiff.

263.     As described herein, Defendants' actions constitute an unlawful exercise of ownership, dominion, or control, over the personal property of Plaintiff and Derivative Plaintiff in denial and repudiation of Plaintiff's and Derivative Plaintiff's rights thereto.

264.     Plaintiff and Derivative Plaintiff have the right to the immediate access and return of the personal property in possession of Defendant at the time Plaintiff demanded it.

265.  Furthermore, Defendants Dawson and Heiss have also converted Plaintiff's personal property by refusing to pay Plaintiff his rightful salary, compensation, earnings and proceeds from the operation of the LLC.   Therefore, Dawson and Heiss have unlawfully exerted ownership and control over the funds owed to Plaintiff by the LCC, in denial or repudiation of the Plaintiff's rights to such funds.

266.  Defendants Dawson and Heiss have unlawfully exercised ownership and control of funds and property belonging to LLC by using the LLC's funds to pay for their personal expenses, as described herein. Dawson has also unlawfully exercised ownership and control over property belonging to the LLC by personally and improperly using the LLC's funds to pay for business expenses of Dawson's external business ventures, as described herein.

## <u>COUNT V</u>

**Breach of Contract and of the Covenant of Good Faith and Fair Dealing Under DC Common Law Asserted by Plaintiff Against Defendants Dawson and Heiss**

267.     Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 266 above.

268.     As contract parties in the District of Columbia, Defendants Dawson and

Heiss owed Plaintiff a duty of good faith and fair dealing.

269.    Defendants breached their duty of good faith and fair dealing by fraudulently inducing Plaintiff to enter into a business relationship with them, to sign the Operating Agreement, to contribute $100,000, and to contribute his time and industry expertise, contacts, and business plans, as well as the right to use Plaintiff's RIOT ACT Trademarks and Domain Names, to the Venture, and then undermining and sabotaging Plaintiff's efforts and ultimately terminating Plaintiff Xereas's participation, involvement, and ownership in the Venture shortly after the club's opening.

270.    As a proximate result of Defendants' breach of their duty of good faith and fair dealing, Plaintiff has been deprived of income throughout the time period leading up to the club's opening and for several months thereafter; has suffered damage to his business and personal reputation; has been denied access to his email accounts; has lost ownership of the RIOT ACT Domain Names and hireacomic.com domain name; has suffered irreparable damage to the reputation and goodwill of his RIOT ACT Trademarks; and has sustained other economic losses.

## <u>COUNT VI</u>

**Breach of Contract and of the Covenant of Good Faith and Fair Dealing Under DC Common Law and § 29–804.09 of the D.C. Code Asserted by Derivative Plaintiff Against Defendants Dawson and Heiss**

271.    Derivative Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 270 above.

272.    Defendants Dawson and Heiss evaded the spirit of their agreement with Plaintiff, more specifically the Operating Agreements executed between the parties.

273.    Dawson and Heiss wilfully rendered imperfect performance of their

agreements with Plaintiff and further interfered with Plaintiff's performance under their agreements.

274.     As a proximate result of Defendants wrongful and illegal actions as pled above, Derivative Plaintiff has suffered monetary damages that would have been avoidable had Dawson and Heiss not breached their duty of good faith and fair dealing.

## COUNT VII

**Breach of the Duty of Good Faith and Fair Dealing Under § 29–804.09 of the D.C. Code Asserted by Plaintiff Against All Named Defendants**

275.     Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 274 above.

276.     As a proximate result of Defendants wrongful and illegal actions as pled above, Plaintiff has suffered monetary damages that would have been avoidable had Dawson and Heiss not breached their duty of good faith and fair dealing.  Such damages include, but are not limited to, the failure of the Defendants to pay Plaintiff his rightful salary, compensation, earnings and proceeds from the operation of the LLC.

## COUNT XIII

**Breach of Contract Asserted by Plaintiff and Derivative Plaintiff Against All Named Defendants**

277.     Plaintiff and Derivative Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 276 above.

278.     A valid, written contract was created between Plaintiff and Defendants upon execution of the LLC's Operating Agreements (including both the original Operating Agreement and the Amended Operating Agreement).    The Operating

Agreements also created contracts between the LLC and Dawson and Heiss.

279.    A verbal contract was created when Plaintiff and Defendants Dawson and Heiss agreed that Plaintiff was to continuously maintain ownership of the RIOT ACT Trademarks and RIOT ACT Domain Names.

280.    The Operating Agreements created obligations and duties that Defendants must adhere to.

281.    The Defendants breached the Operating Agreements as specifically pled herein.

282.    The verbal contract between Plaintiff and Defendants created obligations and duties that Defendants must adhere to.

283.    Defendants breached the duties and obligations created by the verbal agreement as specifically pled herein.

284.    Defendants breaches resulted in Plaintiff not being able to fully participate in the day-to-day business of the LLC resulting in monetary damages.

285.    As a result of Defendants' breaches of contracts, the Plaintiff has suffered damages caused by the breaches, including but not limited to loss of salary, compensation, earnings and proceeds from the operation of the LLC.

## COUNT IX

**Fraudulent Inducement under DC Common Law Asserted by Plaintiff Against Defendants Dawson and Heiss**

286.    Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 285 above.

287.    Defendants Dawson and Heiss fraudulently induced Plaintiff to enter into a business relationship with them by making knowingly false representations that they

would not pursue sole ownership and control of the RIOT ACT Trademarks and Domain Names. Specifically, Dawson and Heiss promised Plaintiff that he would continue to retain ownership of the RIOT ACT Trademarks and Domain Names on or about March 2010 in Defendant Dawson's office, located at 4830 V Street, N.W. in Washington D.C. Such representations were material to Xereas's decision to enter into and maintain a business relationship with Dawson and Heiss, and Xereas reasonably relied on such false representations, thereby resulting in Plaintiff Xereas signing the Operating Agreement, contributing $100,000 to the LLC, and contributing his time and industry expertise, contacts, and business plans, and allowing use of the RIOT ACT Trademarks and Domain Names by the Venture.  However, Defendants Heiss and Dawson intended to terminate Plaintiff 'Xereas's participation, involvement, and ownership in the LLC without cause shortly after the club's opening.  Defendants also intended to take ownership of Plaintiff's trademarks and domain names without Plaintiff's consent.

288.    Defendants Dawson and Heiss also falsely promised Plaintiff to compensate him for his services and to make him the "face" of the LLC responsible for day-to-day operations.  These representations were first made to Plaintiff on or about the second week of March 2010 and again on or about mid-April 2010, and both promises were made in Dawson's Bedrock Management Offices on 4830 V Street, N.W. in Washington D.C.  Such false representations were made knowingly as Dawson and Heiss had hired Xereas's replacement before even opening the doors of the Venue, and the false representations were material to Xereas's decision to enter and maintain a business relationship with Dawson and Heiss.   Xereas reasonably relied on such false representations in contributing his money, time, effort and expertise to the LLC, as noted

herein.    Dawson and Heiss never paid Xereas the agreed to compensation thereby depriving Plaintiff of income and also usurped his management responsibilities from the outset in the manner pled herein.

289.    Defendant Dawson and Heiss's actions as pled in this Second Amended Complaint constitute false representations made in reference to material facts with knowledge of their falsity and with the intent to deceive.  Plaintiff took actions in reliance of these misrepresentations that resulted in harm and damages to him.

290.    As a proximate result of Defendants' fraudulent inducement, Plaintiff Xereas has been deprived of income throughout the time period leading up to the club's opening and for several months thereafter; has suffered damage to his business and personal reputation; has been denied access to his email accounts and e-mails; had the RIOT ACT Domain Names improperly seized by Defendants; has suffered irreparable damage to the goodwill of his RIOT ACT Trademarks; and has sustained other economic losses.

## COUNT X

**Conspiracy to Defraud Under DC Common Law Asserted by Plaintiff Against Defendants Dawson and Heiss**

291.    Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 290 above.

292.    Defendants Dawson and Heiss conspired to defraud Plaintiff Xereas by agreeing amongst themselves and taking actions intended to fraudulently induce Plaintiff to enter into a business relationship with them by making false representations that they would not challenge Plaintiff's  sole ownership and control of the RIOT ACT Trademarks

and Domain Names and that he would be the general manager and face of the LLC.  Such false representations were material to Xereas's decision to enter and maintain a business relationship with Dawson and Heiss, and Xereas reasonably relied on such false representations thereby resulting in Plaintiff Xereas signing the Operating Agreement, contributing $100,000, and contributing his time and industry expertise, contacts, and business plans, and allowing use of the RIOT ACT Trademarks and Domain Names by the Venture, all the while intending to terminate, without cause, Plaintiff's participation, involvement, and ownership shortly after the club's opening. This conspiracy plotted by Dawson and Heiss violates the laws of the District of Columbia, federal law and common law as otherwise pled herein.

293.    Defendants Dawson and Heiss conspired to go into business with Plaintiff since Plaintiff's involvement, knowledge and contributions would enable the LLC to become tenants in the Preferred Use Zoning building, with the plan to push Plaintiff out soon after the grand opening once the LLC was a tenant and operating in the commercial space.  This fraudulent scheme was put into action by Dawson and Heiss when they hired Plaintiff's intended replacement, Morinello, on or about May 2011 before the business was even open to the public and was further revealed to Dawn Henderson, an LLC employee, on the business's opening night, August 11, 2011, when she was told by Nathaniel Adams that Plaintiff would not "be there long" and that he would be replaced by Morinello.

294.    Initially, Plaintiff and Defendant Dawson intended to be equal partners. Defendant Dawson was introduced to Plaintiff by a realtor who indicated that Dawson was interested in the property, but did not have a business plan that would meet the Preferred

Use Zoning requirement.  Later, Dawson introduced Plaintiff to Defendant Heiss and convinced Plaintiff to agree that she would be the third partner.  As a result of Defendant Heiss's participation, Defendant Dawson and Defendant Heiss ensured that they would always be the voting majority and, as such, they conspired and made decisions to force Plaintiff out of the business once they were operating the Venue and had secured Plaintiff's contribution, industry contacts, social media accounts and learned from Plaintiff how to run a comedy club.

295.    Defendants Dawson and Heiss further conspired to defraud Plaintiff by agreeing to compensate him for his services and never paying him the agreed to salary thereby depriving Plaintiff of income.    Such false representations were material to Xereas's decision to enter and maintain a business relationship with Dawson and Heiss, and Xereas reasonably relied on such false representations in contributing his money, time, effort and expertise to the LLC, as noted herein.

296.    Defendants Dawson and Heiss further conspired to defraud Plaintiff by attempting to coerce him by threatening to fire Plaintiff if he did not sign paperwork that would usurp him of duties and responsibilities as well as a large portion of his membership interests.  Defendants Heiss and Dawson also conspired to remove Plaintiff as a Managing Member of the LLC in violation of the Operating Agreement.  These actions resulted in Plaintiff's loss of income and in his inability to participate and manage the business thereby affecting the reputation of the RIOT ACT Trademark.

297.    Defendants Dawson and Heiss actively concealed their fraud from Plaintiff intending to obtain and take improper advantage of Plaintiff's comedy club management expertise, talent booking skills, industry contacts, email customer lists, and long

established and favorable reputation in the industry, solely for the purpose of launching a comedy club using the RIOT ACT Trademarks and RIOT ACT Domain Names, with the intention of terminating Plaintiff's participation, involvement, and ownership in the Venture.

298.    Dawson and Heiss's actions as pled herein constitute an agreement between two of them to participate in an unlawful act that caused injury to Plaintiff as a result of unlawful overt acts performed by both Dawson and Heiss in furtherance of the common scheme.

299.    As a proximate result of Defendants' fraudulent inducement, Plaintiff Xereas has been deprived of income throughout the time period leading up to the club's opening and for several months thereafter; has suffered damage to his business and personal reputation; has been denied access to his email accounts; had the RIOT ACT Domain Names improperly seized by Defendants; has suffered irreparable damage to the goodwill of his RIOT ACT Trademarks; and has sustained other economic losses.

## COUNT XI

**Fraudulent Misrepresentation or, in the Alternative, Negligent Misrepresentation Under DC Common Law Asserted by Plaintiff Against Defendants Dawson, Heiss and Penn Social, LLC**

300.    Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 299 above.

301.    Defendants fraudulently, or in the alternative, negligently, communicated false information to Plaintiff when Heiss and Dawson falsely misrepresented to Xereas in March 2010, and Dawson did so again in May 2011, that Defendants would not challenge Xereas's sole ownership and control of the RIOT ACT Trademarks and Domain Names

and that Xereas would be the "face" and "key man" in the company.  However, Heiss and Dawson instead intended to, and in fact did, reduce Xereas's role even before opening the doors of the Venue, and then again within two months of the opening of the business by trying to coerce and threaten him into signing an Amended Operating Agreement, and eventually improperly removing Xereas as a managing member of the LLC.

302.    Defendants did not exercise due care in making the false representations upon which Plaintiff relied.

303.    Defendants intended or should have recognized that Plaintiff Xereas would be imperiled by actions taken in reliance of Defendant's fraudulent and/or negligent misrepresentations that they would not attempt to take or transfer the trademarks and domain names belonging to Xereas; and that they would make Xereas the "face" and "key man" of the LLC.

304.    Plaintiff reasonably relied on Defendants misrepresentations to his detriment thereby resulting in Plaintiff Xereas signing the Operating Agreement, contributing $100,000 to the LLC, and contributing his time and industry expertise, contacts, and business plans, and allowing use of the RIOT ACT Trademarks and Domain Names by the Venture, all the while Defendants Heiss and Dawson intended to terminate without cause Plaintiff's participation, involvement, and ownership shortly after the club's opening.

305.    The various misrepresentations pled in this Second Amended Complaint were intentionally or, in the alternative, negligently communicated when Dawson and Heiss intended or should have recognized that Plaintiff would likely be imperiled by action taken in reliance upon his misrepresentation and Plaintiff reasonably relied upon the

false information to his detriment.

306.    As a proximate result of Defendants' fraudulent and/or negligent misrepresentations, Plaintiff Xereas has been deprived of income throughout the time period leading up to the club's opening and for several months thereafter; has suffered damage to his business and personal reputation; has been denied access to his email accounts; had the RIOT ACT Domain Names improperly seized by Defendants; has suffered irreparable damage to the goodwill of his RIOT ACT Trademarks; and has sustained other economic losses.

## COUNT XII

**Constructive Fraud Under D.C. Common Law Asserted by Plaintiff Against Defendant Dawson**

307.    Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 306 above.

308.    After Plaintiff met Dawson, they spoke almost every day, multiple times, through phone calls, face-to-face meetings, text messages and e-mails.  Plaintiff developed a high regard and respect for Dawson.  Plaintiff admired and respected Dawson as he was a very successful entrepreneur who was well known in the DC Metropolitan area and also appeared to Plaintiff, at the time, to be an honest businessman with integrity.  Dawson quickly became someone Plaintiff looked up to and viewed as a mentor.  Dawson gained Plaintiff's trust and confidence enabling Dawson to exercise extraordinary influence over Plaintiff.  As such, a confidential relationship existed between Plaintiff and Dawson.

309.    After Plaintiff and Defendants Dawson and Heiss signed the first Operating Agreement, there was now a fiduciary relationship between the three of them that constitutes a confidential relationship by which Defendants Dawson and Heiss were

able to exercise extraordinary influence over Plaintiff as a result of their longstanding business and personal relationship and their majority voting interest in the LLC.

310.   Defendant Dawson made false representations to Plaintiff regarding material facts, the RIOT ACT Trademark and his future role in the LLC, as stated with specificity in this Second Amended Complaint and Plaintiff acted in reasonable reliance on Dawson's representations when he agreed to contribute $100,000, use of the RIOT ACT Trademarks and RIOT ACT Domain Names, and all the rest of his proprietary information including contact databases and social media accounts to enter into a business relationship with Dawson and Heiss that resulted in Plaintiff consequently incurring provable damages as asserted above.

## COUNT XIII

**Unauthorized Interception of Electronic Communications Under Subsection (1)(a) of the Electronic Communications Privacy Act 18 U.S.C. § 2511 Asserted by Plaintiff Against All Named Defendants**

311.   Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 310 above.

312.   Defendants intentionally intercepted all of the e-mails associated with the RIOT ACT Domain Names when they unlawfully transferred ownership of the RIOT ACT Domain Names, without Plaintiff's consent or authorization, such that Defendants exercised full control over all of the e-mail accounts associated with the RIOT ACT Domain Names.

313.   Defendants intentionally intercepted, viewed and downloaded e-mails belonging to Plaintiff Xereas from the server which stored the RIOT ACT e-mail accounts without Plaintiff's permission, and with the knowledge that such interception was

unlawful and unauthorized.

314.    Defendants also procured Squiid and other employees and agents of Defendant Penn Social, LLC to intercept electronic communications associated with the RIOT ACT Domain Names.

## COUNT XIV

**Unauthorized Disclosure of Electronic Communications Under Subsection (1)(c) of the Electronic Communications Privacy Act 18 U.S.C. § 2511 Asserted by Plaintiff Against All Named Defendants**

315.    Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 314 above.

316.    Defendants intentionally disclosed e-mails belonging to Plaintiff Xereas to third parties when they forwarded those e-mails and/or the information contained therein to those third parties while knowing that the information in those e-mails and the e-mails themselves were obtained through the interception of an electronic communication in violation of the statute cited herein.

317.    Upon information and belief, Defendants intentionally disclosed and shared e-mails belonging to Plaintiff Xereas to each other, to their legal counsel, and to certain employees of the LLC, including but not limited to Peter Bayne, Evan Rosenthal, and Vincent Coletti, while knowing that the information in those e-mails and the e-mails themselves were obtained through the unlawful interception of an electronic communication.

318.    Defendants also procured Squiid and other employees and agents of the LLC to forward electronic communications associated with the RIOT ACT Domain Names.

<u>**COUNT XV**</u>

**Unlawful Access to Stored Communications Under Subsection (a) of the Stored Communications Act 18 U.S.C. § 2701 Asserted by Plaintiff Against All Named Defendants**

319.    Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 318 above.

320.    Defendants engaged a third party, Linode, LLC, a virtual private service provider that offers cloud-hosting services, and possibly engaged other third party companies, to provide hosting services and storage on their servers.  Upon information and belief, the Defendants gave instructions to Linode and possibly other third party hosting companies, to host the websites connected to the RIOT ACT Domain Names, and to host and store all the e-mails sent to and sent from all e-mail accounts associated with the RIOT ACT Domain Names.  Upon information belief, Defendants engaged Linode and possibly other third party hosting services to store Plaintiff's databases of industry contacts on their server, none of which Plaintiff authorized Defendants to take ownership of or exert exclusive control over.

321.    Defendants intentionally accessed, without authorization, a facility through which an electronic communication service is provided or, in the alternative, intentionally exceeded an authorization to access that facility and thereby prevented Plaintiff's authorized access to electronic communication (his e-mails) while it is in the electronic storage in such system..

322.    Linode's cloud-hosting services, or other third party hosts engaged by Defendants, are facilities through which an electronic communication service is provided.

323.    Defendants accessed Plaintiff's e-mails for the purpose of commercial

advantage and private commercial gain as Defendants' access to the databases on the server enabled Defendants to do business directly with Plaintiff's contacts thereby resulting in revenue to them and also specifically to Dawson as a result of him using said databases for the financial benefit of other bar/restaurants he owns.  Defendants also derived a commercial advantage and private commercial gain by reading Plaintiff's e-mails to gain knowledge that would assist Defendants in defending this lawsuit and also by depriving Plaintiff of the ability to read his e-mails so as to better prosecute this legal action.

324.    Plaintiff suffered financial damages, and lost opportunities to conduct business, by being unable to communicate with potential customers, clients,  entertainers and others who attempted to contact Plaintiff through his RIOT ACT e-mail address.

325.    Defendants knowingly and intentionally transferred ownership of the RIOT ACT Domain Names and associated e-mail addresses to Defendants without Plaintiff's knowledge, consent or authorization and it was not until within a few days after January 28, 2012 that Plaintiff discovered this after he made inquiries as a result of Defendants disabling his e-mail account.  As such, Defendants knowingly and intentionally accessed and downloaded Plaintiff's stored electronic communications and e-mails from the server housing such e-mails, despite knowing that such access and downloading was unauthorized and unlawful.

326.    Upon information and belief, Defendants also accessed and downloaded Plaintiff's e-mails by opening them through a web based e-mail account, without authorization or permission, and with knowledge that such access and downloads were unauthorized.

## COUNT XVI

**Misappropriation of Trade Secrets Under D.C. Uniform Trade Secrets Act -
D.C. Code §§ 36-401 to 36-410 Asserted by Plaintiff Against All Named Defendants**

327.     Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 326 above.

328.     Plaintiff possessed trade secrets that he had spent just under two decades developing while working, running and owning various comedy and entertainment businesses in the Washington D.C. area.  These trade secrets include Plaintiff's social media accounts and large database of over 12,000 contacts that he amassed over the years, to the Defendants for the specific use and benefit of the Corporate Defendant

329.     Defendants improperly and illegally transferred ownership of these social media accounts and database of contacts by disabling Plaintiff's ability to access same, thereby depriving Plaintiff of his proprietary information.

330.     Defendant Dawson has used the social media accounts and database of contacts to inure to the benefit of other businesses he owns, namely by marketing and promoting his businesses on the social media accounts that were intended to be used solely by the Derivative Plaintiff and otherwise using the contacts Dawson amassed through Plaintiff's database of contacts to benefit his other businesses.  As a result of Defendant Dawson's self-dealing and improper use of Plaintiff's trade secrets, Dawson benefitted financially.

331.     Plaintiff's large database of contacts provides its users access to entertainment industry contacts and contact information of individuals whose contact information is not generally known and not readily ascertainable by another.  Plaintiff had

been amassing his database of contacts for close to twenty years. Plaintiff's social media accounts link the user to some of these same individuals as well as an extensive list of potential clients, customers, patrons and business associates with whom the user of the social media accounts would be able to interact. Again, these contacts are not generally known or readily ascertainable by another person and Plaintiff had been amassing the contacts linked to the social media accounts since 2009.

332.   The user of Plaintiff's database and social media accounts would obtain great economic value from its use as is evident from Defendants desire to obtain same from Plaintiff and their use of the information they have obtained from these trade secrets in order to run the business of the LLC.

333.   Plaintiff has always used reasonable efforts to maintain the secrecy of his database of contacts and social media accounts. The database of contacts was maintained on the server of a close friend of the Plaintiff who works in the technology field and is knowledgeable in encryption technology. Plaintiff had known this individual for almost twenty years and his close friendship with the person coupled with his technology expertise protected the secrecy of the database. The social media accounts were only accessed by Plaintiff and he was the only one with the user names and passwords.

334.   Plaintiff's database of contacts and social media accounts constitute trade secrets under § 36-401(4) of the D.C. Code.

335.   Defendants clearly acquired Plaintiff's trade secrets through improper means as Defendants transferred ownership by disabling Plaintiff's use of the social media accounts and database of contacts thereby depriving Plaintiff of his legal right to his trade secrets. Defendant Dawson also, personally, acquired the trade secrets through improper

means by inducing Plaintiff, in his capacity as Plaintiff's business partner, to turn over the database of contacts and social media accounts for the specific use of the LLC even though Dawson intended to, and did, use Plaintiff's trade secrets for his own financial gain.

336.    Defendant Dawson misappropriated Plaintiff's trade secret when he acquired said trade secrets for his personal use to inure to his financial benefit and the financial benefit of the other businesses he owns when he clearly knew he acquired the trade secrets through improper means as Plaintiff's trade secrets were to be used only by the LLC.

337.    Dawson also misappropriated Plaintiff's trade secrets when he used those trade secrets while having knowledge that the trade secrets were acquired from Plaintiff under circumstances giving rise to a duty to limit the use of the trade secrets such that the trade secrets would only be used by the LLC.

## COUNT XVII

**Intentional Interference with Business Relations, Opportunities, Expectancy and Prospective Economic Advantage Asserted by Plaintiff Under D.C. Common Law Against All Defendants and Asserted by Derivative Plaintiff Against Defendants Dawson and Heiss**

338.    Plaintiff and Derivative Plaintiff repeat and reallege every allegation set forth in Paragraphs 1 through 337 above.

339.    Defendants Dawson and Heiss both had knowledge of the business relationships, opportunities and expectancy that Plaintiff Xereas had and continues to have with numerous talent managers, agents, comics and other contacts in the comedy and entertainment industry as a result of almost two decades in the comedy business.

340.     Defendants acted intentionally to deprive Plaintiff of his ownership of the RIOT ACT Domain Names, his access to his longstanding email address at johnx@riotactcomedy.com, and access to his database of contacts thereby interfering with Plaintiff's ability to maintain such contacts and relationships, and continue doing business with, these individuals in fulfillment of Plaintiff and Derivative Plaintiff's expectancy which was commercially reasonable to anticipate.

341.     As a direct and proximate result of these malicious and intentional acts, as described above, Plaintiff and Derivative Plaintiff's industry reputation, and relationships with current and prospective customers and industry contacts have been irreparably damaged, resulting  in damage to Plaintiff and/or Derivative Plaintiff's economic interests.

342.     But for the Defendant illegally seizing Plaintiff's e-mail accounts, Plaintiff would have been able to secure business opportunities for Derivative Plaintiff and/or for Plaintiff directly thereby resulting in additional income to Derivative Plaintiff and income. If Plaintiff had access to these e-mails he would have first attempted to secure the engagements on behalf of Derivative Plaintiff or, in the alternative, for himself, in the event Derivative Plaintiff was not interested in the engagements or Plaintiff wanted to otherwise book the engagements on his own as he was entitled to do.

343.     As a proximate result of Defendants illegal and improper actions whereby they terminated Plaintiff and illegally seized the RIOT ACT Domain Names, associated e-mail accounts and database of contacts, Defendants thereby prevented Plaintiff from conducting business with individuals and entities with whom he had agreements, business relationships and business expectancies.  As a result of Defendants' interference, many of these business opportunities were lost and the relationships and expectancies terminated

thereby resulting in Plaintiff and Derivative Plaintiff suffering economic harm in the form of lost income.

344.    If not for Defendants' interference, Plaintiff would have been able to start a new business involving the hiring and booking of entertainers and comedians, which would have been accomplished by using the RIOT ACT Trademark and Domain Names.

345.    As a result of Defendant's actions, Plaintiff and Derivative Plaintiff suffered damages in the form of lost income for the dates on which engagements were not able to be booked and Plaintiff also suffered other financial losses as a result of not being able to promote, advertise and marker his booking services and company during those lost engagements as he ordinarily would do.

## **COUNT XVIII**

**Unjust Enrichment under DC Common Law Asserted by Plaintiff and Derivative Plaintiff Against All Named Defendants**

346.     Plaintiff and Derivative Plaintiff repeat and reallege every allegation set forth in Paragraphs 1 through 345 above.

347.    Defendants' activities, as described above, have provided an immediate market and commercial recognition for their services which they otherwise would not have, and have resulted in unjust enrichment at Plaintiff's expense.

348.    Plaintiff and Derivative Plaintiff conferred benefits on the Defendants that were retained by the Defendants and, under the circumstances, the Defendants retention of the benefits is unjust.

349.    As a direct and proximate result of the willful actions, conduct, and practices of Defendants as alleged above, Plaintiff and Derivative Plaintiff has been

damaged and will continue to be irreparably harmed.

350.   Plaintiff has provided his labor, time, expertise and extensive list of contacts to the LLC, and the LLC has benefitted from such contributions.

351.   Plaintiff has not been adequately compensated for such contributions to the LLC.

## COUNT XIX

**Cybersquatting Under Section 43(d) of the Lanham Act, 15 U.S.C. S § 1125(d) Asserted by Plaintiff Against All Defendants**

352.   Plaintiff repeats and realleges every allegation set forth in Paragraph 1 through 351 above.

353.   Defendants caused to be registered, registered, and/or used the RIOT ACT Domain Names with a bad-faith intent to profit from Plaintiff's RIOT ACT Trademarks.

354.   Plaintiff's RIOT ACT Trademarks were distinctive and had acquired secondary meaning at the time Defendants caused to be registered, registered, and/or used the RIOT ACT Domain Names.

355.   The RIOT ACT Domain Names are identical and/or confusingly similar to Plaintiff's RIOT ACT Trademarks.

356.   Plaintiff has been harmed and suffered financial damages by Defendants' acts of cyber-squatting as alleged herein.

## COUNT XX

**Intentional Infliction of Emotional Distress Asserted by Plaintiff Against Defendants Heiss and Dawson**

357.   Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 356 above.

358.     Defendants Dawson and Heiss committed acts, as pled above, which constitute extreme and outrageous conduct and did so intentionally or, in the alternative, recklessly, causing Plaintiff severe emotional distress.

359.     The actions taken by Dawson and Heiss that led to Plaintiff's emotional distress exceed all bounds of decency and can fairly be regarded as atrocious and utterly intolerable in a civilized community.

360.     As a result of Defendants' acts, Plaintiff has suffered severe emotional distress leading to harmful physical consequences and stress related medical conditions including headaches, stomach issues, a skin condition and an stomach ulcer that required medical treatment.

## COUNT XXI

**Breach of Fiduciary Duty of Loyalty and Care Under § 29–804.09 of the DC Code and DC Common Law, or in the alternative, under D.C. Code § 29-1043 (2011), Asserted by Plaintiff and Derivative Plaintiff Against Defendants Dawson and Heiss**

361.     Plaintiff and Derivative Plaintiff repeat and reallege every allegation set forth in Paragraphs 1 through 360 above.

362.     In accordance with the law of the District of Columbia statutes (D.C. Code § 29-804.09) and District of Columbia common law, members of an LLC owe fiduciary duties to both the LLC and to the other members.

363.     Defendants Heiss and Dawson owed Plaintiff Xereas, as a member of the LLC, a fiduciary duty of loyalty and care.

364.     Defendants Heiss and Dawson owed Derivative Plaintiff a fiduciary duty of loyalty and care.

365.     Defendants Heiss and Dawson failed to act with the care that a person in a

like position would reasonably exercise under similar circumstances and in a manner that Defendants Heiss and Dawson reasonably believed to be in the best interests of Plaintiff and Derivative Plaintiff.

366.   Many of Heiss and Dawson's actions as pled herein constitute willful and intentional misconduct and knowing violations of D.C. law, federal law and common law as pled herein. In the alternative, such actions constituted gross negligence and/or reckless conduct.

367.   Defendants breached their duty of loyalty to Plaintiff when they failed to disclose all material facts concerning the business as well as all facts involving membership interests in the LLC.

368.   Defendants breached their duty to provide an accounting to Plaintiff, and to give him access to corporate records.

369.   Defendants Heiss and Dawson breached their fiduciary duty of loyalty and care as a result of all of the misconduct alleged herein.

370.   Defendants Heiss and Dawson's breach of their fiduciary duty of loyalty and care proximately caused injury to the Derivative Plaintiff and Plaintiff as pled herein

371.   Defendant Heiss breached her fiduciary duty of care to Plaintiff and Derivative Plaintiff and acted negligently when she violated the D.C. Rules of Professional Conduct as specifically pled herein.

372.   Defendants breached their fiduciary duties of care and loyalty by taking actions that constitute negligence as specifically pleaded herein.

373.   Defendants Heiss and Dawson's breaches of fiduciary duties proximately caused injury and damages to both Derivative Plaintiff and Plaintiff Xereas, including but

not limited to lost profits, lost business opportunities, waste of Derivative Plaintiff's assets, and diminishment of value of Xereas's holdings (and other investors' holdings) in the Derivative Plaintiff.

374.    A demand that Riot Act, LLC would bring this derivative action would be futile, because Defendants Dawson and Heiss control the business decisions of Riot Act, LLC, and Defendants Dawson and Heiss would not initiate a lawsuit against themselves.

## COUNT XXII

**Action For Accounting Under D.C. Common Law Asserted By Plaintiff And Derivative Plaintiff Against Defendant Penn Social, LLC, Dawson and Heiss**

375.    Plaintiff and Derivative Plaintiff repeat and reallege every allegation set forth in Paragraphs 1 through 374 above.

376.    A fiduciary relationship exists between Plaintiff and the LLC, and Defendants Dawson and Heiss.

377.    A fiduciary relationship exists between Derivative Plaintiff and the LLC, and Defendants Dawson and Heiss.

378.    Defendants Penn Social, LLC, Dawson and Heiss, in their fiduciary capacity, received, deposited, managed, distributed, paid and accounted for funds on behalf of Plaintiff and Derivative Plaintiff.

379.    Defendants Penn Social, LLC, Dawson and Heiss has a legal obligation to account to Plaintiff and Derivative Plaintiff under DC Common Law, the Operating Agreements, D.C. Code § 29–804.10 (or, in the alternative, D.C. Code § 29-1022 (2011)).  As a result of all of the wrongful acts pled in this Second Amended Complaint, it is appropriate for Plaintiff and Derivative Plaintiff to receive a complete accounting as both Plaintiff and Derivative Plaintiff has suffered economic losses that cannot be

determined without an accounting.

380.    Plaintiff also has a right to review and copy all business records under DC Common Law  and the Operating Agreements, but has been denied such an opportunity.

381.    Plaintiff has requested an accounting and requested access to corporate records of the LLC, but all such requests have been denied or ignored by Defendants.

## COUNT XXIII

**Action for Quantum Meruit Under D.C. Common Law Asserted by Plaintiff Against Defendant Penn Social, LLC**

382.    Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 381 above.

383.    Plaintiff rendered valuable services to the LLC in his role as General Manager, working tirelessly and often working 20 hour days and sleeping at the Venue.

384.    The services provided by Plaintiff were accepted, used, and enjoyed by the LLC under circumstances that reasonably notified the LLC that Plaintiff expected to be paid.

385.    Plaintiff was not adequately paid for the services he rendered to the LLC.

## COUNT XXIV

**Violation of § 29–804.10 of the D.C. Code, or in the alternative, D.C. Code § 29-1022 (2011), Asserted by Plaintiff Against All Defendants**

386.    Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 385 above.

387.    Despite repeated requests and demands from Plaintiff and Plaintiff's Counsel that Defendants provide specific documents, Defendants have failed to provide the documents requested and continue to do so.

388.   Despite the provisions of § 29–804.10 of the D.C. Code, Defendants have failed to provide the documents that they are required to provide to Plaintiff as a matter of law and without his request.

## COUNT XXV

**Violation of RICO, 18 U.S.C. § 1962 Asserted by Plaintiff and Derivative Plaintiff Against All Defendants**

389.   Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 388 above.

390.   Defendants formed an enterprise-in-fact by the creation of the LLC. Defendants have extracted profits and other funds from the LLC. Defendants were managing members, members and otherwise participated in the conduct and business of the LLC and exerted control of the day-to-day operations of the LLC by virtue of their majority voting power.

391.   Defendants have engaged in racketeering activity through 1) the theft of Plaintiff's trademarks and domain names; 2) the misappropriation of Plaintiff's funds and the LLC's assets for their own personal use, for the use and benefit of other businesses owned by Defendant Dawson, and other improper uses; 3) unauthorized interception and disclosure of Plaintiff's e-mails to third parties; 4) unauthorized access of stored communications;  5) acts of fraudulent inducement in order to get Plaintiff and other investors to make capital contributions to the LLC; and 6) other activities alleged herein. Upon information and belief, Defendants have also utilized the mail and electronic communications to further their scheme to improperly use and misappropriate the assets of the LLC, as described herein.

392.   All of these activities happened in close proximity to one another and constituted a pattern of racketeering activity.  Such predicate acts were related and continuous to one another, and also committed within a ten-year period. These acts also demonstrate that Defendants pose a threat of continued criminal activity.

393.   A total of 24 investors, in addition to Plaintiff, have made investments in the LLC, and each of them made investments after having seen the Offering Memorandum and Business Plan prepared by Dawson and Heiss.

394.   All investors, including Plaintiff, have suffered diminution in value of their investment and interests in the LLC as a result of Defendants' racketeering activities.

395.   Plaintiff and Derivative Plaintiff were a target of Defendants' Conduct.

## COUNT XXVI

**Civil Conspiracy under DC Common Law, Asserted by Plaintiff and Derivative Plaintiff Against All Defendants**

396.   Plaintiff and Derivative Plaintiff repeat and reallege every allegation set forth in Paragraphs 1 through 395 above.

397.   Defendants Dawson and Heiss have agreed to participate in conspiracies to engage in the following unlawful acts, or lawful acts in an unlawful manner, against Defendants as it relates to the following Counts as pled herein:

1) Federal Infringement of an Unregistered Trademark

2) Federal Unfair Competition

3) Common Law Trademark Infringement

4) Conversion

5) Breach of Contract

6) Fraudulent Misrepresentation

7) Constructive Fraud

8) Unauthorized Interception of Electronic Communications under 18 U.S.C. §2511(1)(a).

9) Unauthorized Disclosure of Electronic Communications under 18 U.S.C. §2511(1)(b).

10) Unlawful access to Stored Communications under 18 U.S.C. §2701.

11) Misappropriation of Trade Secrets

12) International Interference with Business Relations, Opportunities, Expectancy and Prospective Economic Advantage

13) Unjust Enrichment

14) Cybersquatting under 15 U.S.C. 1125(d)

15) Breach of Fiduciary Duty of Loyalty and Care

16) Breach of Duty of Good Faith and Fair Dealing

17) Violation of § 29–804.10 of the D.C. Code

18) Violation of RICO, 18 U.S.C. § 1962

398.   Defendants Dawson and Heiss have committed unlawful overt acts in furtherance of the above acts, as alleged herein.

399.   The unlawful overt acts committed by Defendants Dawson and Heiss as alleged herein have resulted in injuries to both Plaintiff and Derivative Plaintiff, in furtherance of the common scheme as alleged herein.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on any issue triable of right by a jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Xereas and Derivative Plaintiff Penn Social, LLC prays that this Court enter judgment in his favor on each and every count set forth above, and award it relief including, but not limited, the following:

A.      An Order declaring that Defendants' use of the RIOT ACT Trademarks and RIOT ACT Domain Names infringed on Plaintiff's RIOT ACT Trademarks and constitutes unfair competition under federal and/or common law, as detailed above;

B.      A preliminary and permanent injunction enjoining Defendants Dawson, Heiss,  Penn Social, LLC, and their respective employees, agents, officers, directors, members, shareholders, subsidiaries, related companies, affiliates, and all persons in active concert or participation with any of them from:

(1)      Using any of the e-mails associated with the RIOT ACT Domain Names.

(2)      From representing by any means whatsoever, directly or indirectly, that Defendants, any products or services offered by Defendants, or any activities undertaken by Defendants, are associated or connected in any way, or sponsored by, affiliated or connected with Plaintiff or his various RIOT ACT businesses.

(3)      From engaging in libelous or defamatory communications with any third party regarding Plaintiff Xereas, members of his family, his business activities, or otherwise.

(4)      Requiring Defendants to change any trade name, and designations and materials reflecting any corporate name, trade name, or business name,

including telephone listings, certificates of occupancies, business licenses, corporate documents, DCRA filings and liquor licenses so as to eliminate any and all use of the RIOT ACT trademark and name, or any name or mark confusingly similar thereto.

       (5)     Directing Defendants to cease using all social media accounts that were previously used, run and controlled by Plaintiff;

C.     An Order directing Defendants to provide Plaintiff with data files of all e-mails received and sent from the e-mail accounts associated with the RIOT ACT Domain Names, including e-mails stored on a third party's cloud based server,  from the time that Defendants seized said e-mail accounts through September 9, 2014 which is the day Plaintiff resumed custody, control and access to the e-mail accounts.

D.     An Order directing Defendants to provide Plaintiff with electronic files containing the approximately 12,000 e-mail addresses that he provided to Defendants.

E.     An Order for Defendants to provide Plaintiff with a full and complete accounting of Defendant Penn Social, LLC that includes all documents Plaintiff has previously requested and is entitled to pursuant to the parties' Operating Agreement, DC Common Law, and D.C. Code § 29–804.10 (or, in the alternative, D.C. Code § 29-1022 (2011)).

F.     An Order directing Defendants to file with this Court and serve on Plaintiff's attorneys, thirty (30) days after the entry of any permanent injunction, a report in writing and under oath setting forth in detail the manner and form in which they have complied with the injunction.

G.     An Order requiring Defendants to pay Plaintiff and Derivative Plaintiff

compensatory damages and punitive damages in an amount as yet undetermined for each of the above stated Counts;

H.      An Order requiring Defendants to pay Plaintiff whichever is greater of (i) actual damages suffered by Plaintiff plus profits made by Defendants as a result of Defendants unauthorized interception of electronic communications or (ii) statutory damages to be calculated at the rate of $100 per day for each day of violation or $10,000, whichever is greater as well as punitive damages, reasonable attorney's fees and litigation costs, pursuant to 18 U.S.C. § 2520;

I.       An Order requiring Defendants to pay Plaintiff actual damages, profits made by the Defendants, punitive damages, reasonable attorney's fees and costs of this action, pursuant to 18 U.S.C. § 2707;

J.       An Order requiring Defendants to pay Plaintiff restitution and compensatory damages in quantum meirut;

K.      An Order requiring Defendants to pay damages and compensation for pain and suffering as a result of Plaintiff's emotional distress;

L.      An Order requiring Defendants to pay Plaintiff compensatory damages and lost profits in an amount as yet undetermined caused by the foregoing unlawful acts, and trebling such damages in accordance with 15 U.S.C. § 1117 and other applicable laws;

M.      An Order requiring Defendants to pay statutory damages under 15 U.S.C. § 1117(d), on election by Plaintiff, in an amount of One Hundred Thousand dollars ($100,000) for each RIOT ACT Domain Name and other domain names previously owned by Plaintiff that Defendants registered, assumed possession and control over and/or used without Plaintiff's permission.

N.     An Order requiring Defendants to pay Plaintiff punitive damages in an amount as yet undetermined cause by the foregoing unlawful acts of Defendants.

O.     An Order requiring Defendants to pay Plaintiff's costs and attorneys' fees in this action pursuant to 15 U.S.C. § 1117 and other applicable laws.

P.     An Order requiring Defendants to pay Plaintiff _(i) actual damages caused by the misappropriation of Plaintiff's trade secrets and for unjust enrichment caused by the misappropriation that is not taken into account in computing actual loss or a reasonable royalty for the unauthorized use of Plaintiff's  trade secret, exemplary damages in an amount not to exceed twice the award made under § 36-403 of the D.C. Code., and reasonable attorney's fees pursuant to § 36-403 of the D.C. Code;

Q.     An Order requiring Defendants to give Plaintiff all usernames, passwords and information related to social media accounts previously controlled, used and operated by Plaintiff, such that Plaintiff can resume use, custody and control of the social media accounts.

R.     An Order requiring Defendant Dawson and Defendant Heiss to pay compensatory and punitive damages, and restitution, directly to Penn Social, LLC as a result of their violation of the above stated Counts, including Intentional Interference with Business Relations, Breach of the Fiduciary Duty of Loyalty and Care, Conversion, Breach of Contract, Breach of the Covenant of Good and Fair Dealing, and Unjust Enrichment, as it relates to Derivative Plaintiff's claims;

S.     An Order piercing the corporate veil and holding Defendants Dawson and Heiss personally liable for the acts of Penn Social, LCC as a result of their fraudulent, dishonest, reckless and wrongful actions;

T.     An Order requiring Defendant Dawson and Defendant Heiss to pay reasonable expenses, including reasonable attorney's fees and costs, for the derivative claims made herein pursuant to D.C. Code § 29-808.06, or in the alternative, pursuant to D.C. Code § 29-1046; and

U.     An Order directing Defendants Heiss and Dawson to refund Derivative Plaintiff all monies paid by Derivative Plaintiff to indemnify them in this cause of action pursuant to  Section 7.1 of the LLC Operating Agreement and D.C. Code §§ 29–804.08(c), 29–804.08(a) and § 29-804.09; and

V.     Such other and further relief as the Court may deem appropriate.

Dated: October 1, 2015              Respectfully submitted,

/s/ W. Todd Miller
W. Todd Miller (D.C. Bar No. 414930)
tmiller@bakerandmiller.com
BAKER & MILLER PLLC
2401 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20037
Telephone:  202.663.7820
Fax:  202.663.7849

Tony C. Richa
richa@richalawgroup.com
Richa Law Group, LLC
One Bethesda Center
4800 Hampden Lane, Suite 200
Bethesda, MD 20814
Telephone: 301-424-0222
Facsimile: 301-576-8600

*Attorneys for Plaintiff John N. Xereas*