UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN N. XEREAS, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 12-456 |
| MARJORIE A. HEISS, *et al.*, | ) |
| Defendants | ) |

**DEFENDANTS' MOTION TO EXCLUDE THE EXPERT REPORTS
AND TESTIMONY OF PLAINTIFF'S EXPERTS
CINDY VU AND JIM MORRISSEY**

Defendants Penn Social, LLC, Marjorie Heiss and Geoffrey Dawson move to exclude the expert reports and expert testimony of Plaintiff's experts Cindy Vu and Jim Morrissey as violative of Fed.R.Evid. 702 and the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Ms. Vu's expert opinions center on how Penn Social's vendor billing records potentially violate IRS standards and certain 1099 forms were either incorrect or not issued. These opinions do not support nor are the relevant to any of the causes of action pled by Plaintiff and further, as admitted by Ms. Vu, play no part in the "damages" calculated by her expert report. For these reasons, Ms. Vu's expert opinions do not meet the legal standard for admission and should not be provided to the trier of fact.

Mr. Morrissey's expert opinions address three topics: (1) employee reimbursements, ATM withdrawals and third party vendor payments that he says were not backed up by supporting documentation in Penn Social's files, (2) a valuation of Mr. Xereas 26.67% interest in

1

the LLC, and (3) a valuation of a hypothetical trademark license Mr. Xereas claims based upon his trademark in the term "Riot Act." Each of Mr. Morrissey's opinions in these areas should be excluded from admissible evidence. The employee, ATM withdrawals and vendor reimbursements are recorded in the LLC's accounting records. From his inability to find the back up paper invoices in Penn Social records, Mr. Morrissey then makes the speculative and unsupported jump that 26.67% of those funds represent damages suffered by Mr. Xereas. Mr. Morrissey acknowledges that he has no evidence that the amounts in question were not spent as described in the accounting records or that Defendants mis-appropriated these funds. In fact, the undisputed facts contradict Mr. Morrissey's assumptions. In any event, if the expenses did not have associated invoices located by Mr. Morrissey in the files, that is no basis to conclude that the money was in fact not spent reimbursing vendors or others. Mr. Morrissey's opinions attributing 26.67% of such costs as damages to Plaintiff are speculative and unsupported by any accepted theory of corporate finance. Mr. Morrissey's second opinion regarding his valuation of the company is irrelevant and Mr. Morrissey admits they are not presented as a basis for damages. As such the valuation is irrelevant to any issue before the Court. Finally, the trademark damages "license fee" has never been accepted in the District of Columbia as a proper measure of damages for trademark infringement and is too hypothetical. The expert report and opinions of Vu and Morrissey fail to meet the standards required of Rule 702 and fail to meet the requirements set forth in Daubert and for those reasons the reports and testimony should be excluded from the record.

## BACKGROUND

Plaintiff, originally one of three managing members of an LLC that operated a comedy club in Washington, D.C., had a falling out with the other two members, Geoffrey Dawson and

Marjorie Heiss, in January 2012, approximately six months after the club, then knows as Riot Act Comedy Theater, opened. Declaration of Geoffrey Dawson (Motion to Exclude Experts) ("Dawson Ex. Dec.") at ¶ 4. In its first six months of operations the club lost money and broke even for only one month when a substantial number of tickets to future shows were sold at a discount. Id. at ¶ 2, Exhibit 1. In January 2012, the two individual Defendants, as a majority of the managing members, agreed to terminate the employment of both Plaintiff's brother and a personal friend.[1] Id. at ¶ 3. In response, Plaintiff objected strongly to these actions and walked out of the club. Id. at ¶ 4. Shortly thereafter, the club's marketing efforts through social media were taken down and passwords changed, inflicting damage on the business. Id. at ¶ 5. Plaintiff later admitted that his friend Dawn Henderson had interfered with the YouTube and Facebook accounts. Id. at ¶ 6. Thereafter, the Defendants agreed to limit Plaintiff's independent control over the day to day operations at the club, requiring approval for his actions and tightening up the operations. Id. at ¶ 7. In response, Plaintiff dramatically cut back his work at the club, causing chaos with the comedy show operations. Id. at ¶ 8. By March 2012, Defendants concluded that Plaintiff had abandoned his duties at the club and removed him as a managing member in accordance with the Amended Operating Agreement. Id. at ¶ 9. On July 1, 2012, Defendants executed a quit claim deed transferring all of their rights to the trademarks and websites to Plaintiff. Declaration of William O'Neil (Motion to Exclude Experts) ("O'Neil Ex. Dec.") at ¶ 8, Ex. 8. Plaintiff admits he has done nothing with this intellectual property since the July 2012 transfer. O'Neil Ex. Dec. at ¶ 7, Ex. 7.

After the July 2012 quit claim deed, Defendants reorganized the operations at the club, stopping the comedy portion of its operations and transforming to a bar and nightclub named

---

[1] Plaintiff had previously terminated his own brother's employment at the D.C. Improv when his brother broke the club's glass front door. See O'Neil Ex. Dec. at Ex. 6 (Xereas Dep. at 24-25).

3

"Penn Social." Dawson Dec. at ¶ 11. The revised club became profitable and has continued to prosper over the last six years of operations. Id. at ¶ 11. Plaintiff played no role in the transformation of the club or its profitability. Id. Plaintiff continues to own 26.67% of the business based on his original investment of $100,000, which Plaintiff's experts opined is now worth between $380,000 and $700,000. O'Neil Ex. Dec. at ¶ 1. Ex 1 at 7.

In order to support his claim for damages, Plaintiff retained Ms. Cindy Vu and Mr. James Morrissey who together issued one expert report. In deposition, it became clear that Ms. Vu was providing opinions on the LLC's compliance with IRS recordkeeping rules and form 1099 rules. O'Neil Dec. Ex. 4 at 16-17. Mr. Morrissey provided opinions on three areas (1) employee reimbursements, ATM withdrawals and third party vendor payments that he says were not backed up by supporting documentation in Penn Social's files, (2) a valuation of Mr. Xereas 26.67% interest in the LLC, and (3) a valuation of a hypothetical trademark license Mr. Xereas claims based upon his trademark in the term "Riot Act."

## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence permits the testimony of a witness as an expert if (1) the witness "is qualified as an expert by knowledge skill, experience, training, or education," (2) the testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," (3) the testimony is "based on sufficient facts or data," (4) the testimony "is the product of reliable principles and methods," and (5) the expert has "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

If a witness is deemed to be qualified to testify as an expert, the Court then applies the two-part test laid out in *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993), to determine if the remaining requirements for admissibility under Rule 702 are met. Under

*Daubert*, the Court must determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Id. at 592. In other words, the proffered expert testimony "must be both reliable and relevant." *United States v. Nwoye*, 824 F.3d 1129, 1136 (D.C. Cir. 2016).

In determining reliability, the Court's purpose is to conduct a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue," an analysis focused "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 592–93, 595. The Supreme Court in *Daubert* identified four factors to consider in this analysis: "(1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the method's known or potential rate of error; and (4) whether the theory or technique finds general acceptance in the relevant scientific community." *Ambrosini v. Labarraque*, 101 F.3d 129, 134 (D.C. Cir. 1996) (citing Daubert, 509 U.S. at 593–94). Ultimately, this inquiry is a "flexible one" and "none of the factors discussed is necessarily applicable in every case or dispositive; nor are the four factors exhaustive." Id. (quoting *Daubert*, 509 U.S. at 594).

In addition to reliability, the proposed testimony must also meet the second prong of *Daubert*: relevance. This requires the Court to determine "whether the proffered expert testimony 'is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" Id. (quoting *Daubert*, 509 U.S. at 591). The proponent of the expert testimony bears the burden of showing, by a preponderance of the evidence, that these requirements for admittance are met. See *Daubert*, 509 U.S. at 592 n.10.

**ARGUMENT**

Plaintiff proffers two experts whose opinions offer nothing of relevance to the trier of fact, are based on incomplete data and whose methodologies are on their face incomplete, misleading and logically suspect. Neither expert's opinion meets the requirements of Rule 702 or Daubert and for this reason should be excluded from consideration by the trier of fact.

 **1. Cindy Vu's Expert Opinions Fail To Meet the Requirements of Fed.R. Evid. 702**

Cindy Vu's expert report and testimony about the failure of Penn Social LLC to keep back-up invoice records in accordance with IRS requirements and its alleged errors in issuing 1099s, even if credited as true, does not "help the trier of fact to understand the evidence or to determine a fact in issue" as required by Fed.R.Evid. 702. Ms. Vu's opinions are not relevant to any of Plaintiff's claims. None of Mr. Xereas's claims assert any failure to meet IRS record-keeping guidelines and there is no private cause of action for failing to meet IRS record keeping requirements. The same is true regarding issuance of form 1099s – there is no cause of action for failing to issue such forms and Plaintiff's claims have nothing to do with any alleged failure to issue 1099s. In addition, Ms. Vu admits that her opinions play no role in the damages calculation presented in her own expert report. See O'Neil Ex. Dec. at Ex. 4 (Vu Dep. at 17-19). For these reasons, her opinions fail to help the trier of fact to understand the evidence or to determine a fact in issue and should be excluded.

The majority of Ms. Vu's expert report and the principle topic on which she intends to testify argues that Penn Social failed to "keep proper records" and failed to "maintain a proper accounting system," but Plaintiff pleads no counts based on such facts. Such opinions are irrelevant to breach of contract, intellectual property, fraud or the myriad other claims asserted by Plaintiff. There is no cause of action for violating IRS recordkeeping requirements. Her

6

testimony does not shed light on any evidence or help determine a fact at issue. Her testimony is based on the company general ledger, taken from the comprehensive accounting records maintained by the company in their Quickbooks accounting files, but did not take into account any questioning of the location's general managers who had direct day to day responsibility for the company's books and records. These opinions are based on the inability of Ms. Vu to find paper back-up copies of invoices and expense reimbursement slips in Penn Social's files after a two and a half day review of the LLC's on-site files, some often several years old at the time of her review.[2] But her testimony is not of any specific charge not finding support or any specific missing record. Exhibit 1 to the report – the only exhibit partially sponsored by Ms. Vu – simply restates IRS recordkeeping guidelines and 1099 rules.[3]

Plaintiff has not plead any causes of action regarding the failure to maintain back-up records of entries in the company's Quickbooks accounting system, nor has he pled any causes of action regarding the failure to issue 1099 forms. The closest any of the causes of action pled come to such a claim are the conversion and trover allegations in Count IV, but those allegations are regarding the spending of Penn Social funds on other businesses owned by Geoffrey Dawson. But Ms. Vu offers no opinions on any such payments, and does no identify any missing records or persons who failed to receive a 1099 as related to any other Dawson business. Thus, her testimony does not support the allegations of conversion or trover. Further, her testimony does not bolster or support conclusions regarding operative allegations for any other

---

[2] Penn Social produced to Plaintiff a complete copy of its entire Quickbook electronic file, but Ms. Vu did not even open those records until shortly before filing her expert report. O'Neil Ex. Dec. at Ex. 4 (Vu Dep. at 60).

[3] Exhibit 1 also restates portions of the DC Limited Liability Company Act and recitations from the Riot Act Amended Operating Agreement, but Ms. Vu is not offering any opinions regarding the DC Limited Liability Company Act or the Riot Act Amended Operating Agreement. O'Neil Ex. Dec. at Ex. 4 (Vu Dep. at 68).

cause of action. Her testimony is not about any fact at issue in this litigation, and does not "help the trier of fact to understand the evidence or to determine a fact in issue" as required by Fed.R.Evid. 702.

In addition to the lack of any link to Mr. Xereas's causes of action, Ms. Vu's testimony is not considered in any part of any actual damage calculation and therefore is irrelevant. Plaintiff's damage claims are presented in Table 5 of the expert report. O'Neil Ex. Dec. at Ex. 1 (Table 5). It includes totals for undocumented expenses, in the form of expense reimbursements, ATM withdrawals and vendor payments. But Ms. Vu's opinions regarding IRS guidelines and 1099 errors are not used in any such calculation, as she admits in her deposition testimony. O'Neil Ex. Dec. at Ex. 4. Vu Dep. at 17-19) Table 5 also includes a damage calculation for hypothetical licensing fees, but again Ms. Vu's testimony is not used in any part of that calculation. Id. A damages expert who has no opinions on damages serves no function and does not "help the trier of fact to understand the evidence or to determine a fact in issue" as required by Fed.R.Evid. 702.

    **2.**    **Jim Morrissey's Opinion Are Irrelevant, Not Generally Accepted and Are Not the Product of Reliable Principles or Methods.**

Expert James Morrissey presented three general areas of testimony, but none of his expert opinions meet the requirements of Rule 702 and Daubert. First, he identifies a list of reimbursements, ATM withdrawals and payments to third party vendors as "damages" when supporting material for such payments was not found in the company files or if the supporting material located did not on its face indicate how it related to the Riot Act business. Mr. Morrissey's opinions on these unsubstantiated expenses are based on insufficient facts and is not the result of reliable principles. Mr. Morrissey also presents a valuation of Mr. Xereas's shares in the company, but he admits that such valuation is not a measure of damages and was done for

settlement purposes. As such it is irrelevant. Finally, Mr. Morrissey concocted a hypothetical "license" value for Mr. Xereas trademark in the term "Riot Act," but this measure of damages has never been accepted as evidence of trademark infringement or unfair competition damages under the Lanham Act in the District of Columbia. His opinions and report are irrelevant and unsupported and fail the requirements of Daubert.

> **A. Mr. Morrissey's Opinions and Report Regarding Unsubstantiated Expense Reports, ATM Withdrawals and Payments to Third Party Vendors Lack Critical Data and Are Based on Unreliable Inferences**

This first set of opinions proffered by Mr. Morrissey are perhaps the most divorced from reality and lacking in reliable principles. First, Mr. Morrissey spent two and a half days reviewing LLC files in October 2015, which included access to all of the LLC records stored on site. He then compared his review to the Company general ledger which contains nearly 7000 entries just for payments made over a two year period. For any entry on the general ledger that he did not find a corresponding invoice, or any expense reimbursement that did not on its face reveal the connection to Penn Social, he assumed the charge was improper and it became an element of Mr. Xereas's damages. O'Neil Ex. Dec. at Ex.1; Ex. 5 (Morrissey Dep. at 33-35). Not surprisingly, his numbers of unsubstantiated charges was large. For improper documentation of third party disbursements, Mr. Morrissey conclude that $3.1 million in payments were unsubstantiated, and therefore represented $834,371 in damages to Mr. Xereas. This conclusion rests on a pile of unsubstantiated facts and incomplete information. For example, cryptic notes in the general ledger can be understood if testimony of the Company general manager was taken and considered, but Plaintiff made no effort to undertake such a review. Neither Peter Bayne nor Sara Norman, both prior General Managers of the club, were deposed for facts regarding these expenses. Similarly, the third party vendors were not deposed

9

or subpoenaed.  For example, just one of the vendors with unsubstantiated expenses, Adams – Burch, was said by Mr. Morrissey to have over $153,000 in unsubstantiated expenses.  See O'Neil Ex. Dec. at Ex. 3.  When asked, Adams-Burch says that all $153,000 in expenses were for materials ordered by Penn Social and paid by the LLC.  They did not find one payment by the LLC that did not correspond to orders from Penn Social.  See Declaration of Alisa Isaacs, arttached.

Mr. Morrissey also identified certain travel expenses of Mr. Dawson for travel to and from Maine that were expenses to the LLC.  He did not understand a business reason for such travel.  But when Mr. Dawson testified twice in this matter, no questions regarding his travel from Maine were asked.  In fact, as Mr. Dawson would have testified, the travel was for his return to DC from his home in Maine when required by the course of this litigation or other business purpose related to Penn Social.  See Dawson Ex. Dec. at ¶ 14.  Plaintiff chose not to depose any of the other recipients of unsubstantiated expenses listed in Table 1-A of the report, but, for example, Mr. Bayne would have testified that all of the expenses reimbursed to him by Penn Social were expenses of the Company paid by him and properly reimbursed.  See Bayne Ex. Dec. at ¶ 2.  That Mr. Morrissey leaps from a deficient record to the conclusion that all such payments were improper and not properly understood as expenses of the company reveals his data as incomplete and his methods unsound.

The final category of expenses flagged as damages by Mr. Morrissey related to "ATM withdrawals" from both operating accounts and ATM accounts.  These withdrawals again could have been explained if Plaintiff sought to take discovery from persons with knowledge.  Again. Mr. Bayne explains that ATM withdrawals from the operating accounts were generally for dispersing tips to waiters at the end of the night and for other minor expenses of the LLC.  The

withdrawals from the ATM accounts were for cash to be placed in two different ATM's located on site. As explained, money would be withdrawn from the ATM account and placed in the on-site ATM. As patrons withdrew it, it earned a fee and was then repaid through the bank clearing process. All withdrawals from the ATM account were for a business purpose, whether that fact was shown in the LLC accounting records. See Bayne Ex. Dec. at ¶¶ 3-5. Mr. Morrissey's assumptions regarding these accounts and withdrawals once again reveal how limited his factual base was (he was not aware that there were ATMs at the location) and how suspect his methodology. O'Neil Ex. Dec. at Ex. 5 (Morrissey Dep. at 61.)

  **B. Mr. Morrissey's Valuation of Plaintiff's 26.67% Share of the LLC is Not an Element of His Damages and Should be Excluded from the Record**

The second portion of Mr. Morrissey' expert report and testimony presents a business valuation of the LLC and then computes Plaintiff's 26.67% share. The result as presented by Mr. Morrissey argues that Plaintiff's share in the LLC is worth between $380,000 and $800,000, compared to his original investment of $100,000. Other than proving that Plaintiff has been a beneficiary of Defendants' hard work in turning a failing company into a profitable enterprise and providing Mr. Xereas with a substantial profit, these figures are not part of Mr. Xereeas's damages and should not be admissible. As Mr. Morrissey himself notes, the numbers were created for settlement purposes and are not part of Mr. Xereas's damage calculation, since Mr. Xereas' still owns the shares. O'Neil Ex. Dec. at Ex. 5 (Morrissey Dep. at 26). The presentation of the LLC's net worth does not relate to any fact in controversy and should not be admitted.

  **C. Mr. Morrissey's License Fee Model Is Not An Accepted Method for Computing Damages for Trademark Infringement and Is Too Hypothetical To Be Credited**

A plaintiff establishing a claim of trademark infringement may be entitled, under the Lanham Act, either the infringer's profits if the infringement was willful or in bad faith, or

Plaintiff's actual damages. *Foxtrap, Inc. v. Foxtrap, Inc.,* 671 F.2d 636 (D.C. Cir. 1982). Mr. Morrissey's calculation of a lost licensing fee is not a calculation of "actual loss" suffered by Mr. Xereas, who during the time of the alleged infringing actions was not making any sales involving the trademark that he claims to own. Mr. Morrissey's calculated damages do not seek to present the Defendants' profits during the alleged period of infringement, and Mr. Morrissey makes no claims that Defendants acted willfully or in bad faith. O'Neil Ex. Dec. at Ex. 5 (Morrissey Dep. at 113). In addition, Mr. Morrissey's calculation of future licensing fees is neither reliable nor relevant. The hypothetical fees that Mr. Morrissey projects Plaintiff would have made are directly contradicted by the facts that since 2012, Plaintiff has done nothing with his intellectual property.

The recognized damages for trademark infringement, other than injunctive relief, are defendant's profits and the trademark owner's own damages. The trial court may award up to treble the actual damages, and adjust the award of profits as he deems just, depending upon the circumstances of the case. However, the Act specifically forbids the award of a penalty. *Foxtrap, Inc.,* 671 F.2d at 641. As the Foxtrap court noted:

> Before making an award on the basis of defendant's profits, courts customarily require a plaintiff to show bad faith or willful infringement by the defendant. See, e.g., *Carl Zeiss Stiftung*, 433 F.2d at 707 (deliberate intent to cause confusion necessary to recover defendant's profits); *Borg-Warner Corp. v. York-Shipley, Inc.*, 293 F.2d 88, 95 (7th Cir.), cert. denied, 368 U.S. 939, 82 S.Ct. 381, 7 L.Ed.2d 338 (1961) (A finding of infringement does not, as a matter of right, entitle owner to recover profits under s 1117.). In fact, courts have insisted on a relatively egregious display of bad faith, e.g., an " 'aura of indifference to plaintiff's rights and a smug willingness that the good will plaintiff sought to foster could safely be treated as a nullity.' " *W. E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 662 (2d Cir. 1970); see also *Stuart v. Collins*, 489 F.Supp. 827, 831 (S.D.N.Y.1980) ("infringing done knowingly and with callous disregard" of mark holder's rights).

*Foxtrap*, 671 F.2d at 641.

Mr. Morrissey made no finding or presumption that Defendants acted in bad faith and made no effort to calculate Defendant's profits, even if such bad faith was alleged.  By his own admission, Mr. Morrissey's opinions do not supply the trier of fact with a calculation of Defendant's profits as a result of the trademark infringement.[4]

Mr. Morrissey similarly made no effort to calculate Plaintiff's actual loss.  "Projections" of potential or possible losses were specifically rejected in *Foxtrap*.  Mr. Morrissey's model of future projected license fees has no valid basis for his projections, as they are built on hypothetical negotiations that never occurred and business plans that were never discussed or even contemplated.  Lacking proof of Plaintiff's actual damages, Mr. Morrissey's projections cannot be the basis for an award of damages and fail for inadequate evidentiary support.  There is nothing "actual" about any of Mr. Morrissey's calculated damages and his expert report and opinions are irrelevant to any of the questions before the Court.

Mr. Morrissey's construct of future projected licensing fees is also far too hypothetical to be based on sufficient facts or data to be reliable.  From a negotiated 5% licensing fee based on gross income, to the projected profits of a company that had only experienced losses, to the expansion of that model to numerous locations, all contrasted with Plaintiff's actual conduct in doing nothing with his intellectual property for the past five years, all reveal Mr. Morrissey's license fee projections to be based on no real facts.  As such, the projections fails to meet the requirements of Rule 702 and should be excluded from consideration by the trier of fact.

## CONCLUSION

For the reasons stated above, the Plaintiff's expert report and expert opinions  are violative of Fed.R.Evid. 702 and the requirements of *Daubert v. Merrell Dow Pharmaceuticals,*

---

[4] It is undisputed that from January 2012 to July 2012, the LLC had no profits.  See Dawson Ex. Dec. at ¶11. Ex. 2.

*Inc*., 509 U.S. 579 (1993) and as such should be excluded from the record and not considered by the trier of fact.

                               Respectfully submitted,

                               _/s/_____
                               William T. O'Neil
                               Bar No. 426107
                               THE O'NEIL GROUP LLC
                               1629 K Street, N.W.
                               Washington, DC 20006
                               Telephone (202) 684-7140
                               Facsimile ((202) 517-9179
                               woneil@oneilgroupllc.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 4nd day of May 2018, I have caused the foregoing Defendants' Motion to Exclude Plaintiff's Expert Report and Expert Opinions be served by operation of the Court's CM/ECF system upon the following:

    W. Todd Miller, Esq.
    Baker & Miller PLLC
    2401 Pennsylvania Ave, NW
    Suite 300
    Washington, D.C. 20037
    Attorney for John Xereas

    Tony C. Richa, Esq.
    Richa Law Group, P.C.
    4800 Hampden Lane
    Suite 200
    Bethesda, MD 20814
    Attorney for John Xereas

                                         /s/_____
                                          William T. O'Neil